## IN THE UNITED STATES DISTRICT COURT FOR
## THE EASTERN DISTRICT OF OKLAHOMA

(1) CHILD DOE 1, a minor, by and through
    parent and next friend, PARENT DOE 1;

(2) CHILD DOE 2, a minor, by and through
    parent and next friend, PARENT DOE 2;

(3) CHILD DOE 3, a minor, by and through
    parent and next friend, PARENT DOE 3;

(4) JANE DOE 1;

(5) CHILD DOES 4-20;

    Plaintiffs,

v.

(1) TULSA COUNTY, ex. rel. JUVENILE
    BUREAU OF THE TULSA COUNTY
    DISTRICT COURT;

(2) ANTHONY TAYLOR; as former Director
    of the Juvenile Bureau;

(3) ALONDO EDWARDS, as Acting
    Director of the Juvenile Bureau;

(4) DOUGLAS CURRINGTON, as
    Superintendent of the Juvenile Bureau;

(5) CORTEZ TUNLEY, as former
    Superintendent of the Juvenile Bureau;

(6) JONATHAN HINES, former detention
    officer of the Juvenile Bureau;

(7) AUSTIN ZENZEN, former detention
    officer of the Juvenile Bureau;

(8) DQUAN DOYLE, former detention
    officer of the Juvenile Bureau, aka "DQ;"

FILED

MAY 2 3 2024

BONNIE HACKLER
Clerk, U.S. District Court
By_____
Deputy Clerk

Case No: CIV - 24- 182- JHR

ATTORNEY LIEN CLAIMED

JURY TRIAL DEMANDED

1

(9) MANDI LEE RAYMOND, former employee of the Juvenile Bureau;

(10)    CINDY TREADWAY, former employee of the Juvenile Bureau;

(11)    JANE DOE 1, aka "DO Shalonda," current or former detention officer of the Juvenile Bureau;

(12)    JANE DOE 2, aka "DO Kelly," current or former detention officer of the Juvenile Bureau;

(13)    JANE DOE 3, aka "Miss Carrie," current or former detention officer of the Juvenile Bureau;

(14)    JANE DOE 4, aka "Miss Torrie," current or former detention officer of the Juvenile Bureau;

(15)    JOHN DOES 1-10, current and former detention officers of the Juvenile Bureau;

(16)    JANE DOES 5-14, current and former detention officers of the Juvenile Bureau;

(17)    STATE OF OKLAHOMA, ex rel. OFFICE OF JUVENILE AFFAIRS;

(18)    JEFFREY CARTMELL, as Director for the Office of Juvenile Affairs;

(19)    RACHEL HOLT, as former Director for the Office of Juvenile Affairs;

(20)    BEN BROWN, as General Counsel for the Office of Juvenile Affairs; and,

(21)    BOARD OF COUNTY COMMISSIONERS OF TULSA COUNTY;

Defendants.

## COMPLAINT

**COMES NOW** the Plaintiffs, CHILD DOE 1, a minor, by and through parent and next friend, PARENT DOE 1; CHILD DOE 2, a minor, by and through parent and next friend, PARENT DOE 2; CHILD DOE 3, a minor, by and through parent and next friend, PARENT DOE 3; JANE DOE 1; and, CHILD DOES 4-20 (collectively "Plaintiffs"), by and through their attorneys of record, and for their causes of action against the Defendants, alleges and states as follows:

## INTRODUCTORY STATEMENT

1.      Plaintiff CHILD DOE 1, a minor, was incarcerated at the Detention Home of the Juvenile Bureau of the Tulsa County District Court (hereinafter "Juvenile Detention Center") for the period including April 2024.

2.      Plaintiff CHILD DOE 2, a minor, was incarcerated at the Juvenile Detention Center for the period of November 2023 to May 2024.

3.      Plaintiff CHILD DOE 3, a minor, was incarcerated at the Juvenile Detention Center for the period of February 2024 to May 2024.

4.      Plaintiff JANE DOE 1, an adult, was incarcerated at the Juvenile Detention Center for the period of June 2023 to August 2023.

5.      For the length of Plaintiffs' detentions, Defendants failed to provide Plaintiffs with adequate and safe housing, supervision, and security in order to protect them from the known risk of serious physical harm, including but not limited to rape and/or sexual abuse.

6.      Over the course of Plaintiffs' detentions at the Juvenile Detention Center, each was sexually assaulted, harassed, and/or raped by detention officers or other staff at the Juvenile

3

Detention Center, to-wit, including but not limited to, Defendant Jonathan Hines; Defendant Austin Zenzen; Defenant Dquan Doyle; Defendant Cindy Treadway; Defendant Raymond; Defendants John Does; and Defendant Jane Does.  As detention officers and other employees, it was Defendants duty to protect Plaintiffs from harm.  However, rather than protect them, these Defendants preyed on Plaintiffs.  Knowing the deficiencies in safety and security within the Juvenile Detention Center where their actions would be unmonitored and knowing of the persistent inadequate staffing, these Defendants had total control over juvenile detainees like Plaintiffs. In an utter betrayal of public trust and duty, these Defendants exploited their positions of power to rape and sexually assault defenseless minor children.

7.      The rapes and sexual assaults and harassments upon Plaintiffs were eminently preventable.  These heinous crimes were the foreseeable result of Defendants' policies, practices and/or customs of inadequate housing, supervision, and security. In sum, Defendants' deliberate indifference toward Plaintiffs' health and safety was a direct and proximate cause of their injuries and damages.

## JURISDICTION AND VENUE

8.      The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1343 to secure protection of and to redress deprivations of rights secured by the Eighth Amendment and Fourteenth Amendment to the United States Constitution as enforced by 42 U.S.C. § 1983, which provides for the protection of all persons in their civil rights and the redress of deprivation of rights under color of law.

9.      The jurisdiction of this Court is also invoked under 28 U.S.C. § 1331 to resolve a controversy arising under the Constitution and laws of the United States, particularly the Eighth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

4

10.     Venue is proper under 28 U.S.C. § 1391(b)(1) because one or more Defendant(s) are subject to this court's personal jurisdiction with respect to the civil action in question. Defendant Dquan Doyle is a resident of Wagoner County, which is in the Eastern District of Oklahoma.

11.     Venue is also proper under 28 U.S.C. § 1391(e)(1)(C) because one or more Defendant(s) are subject to this court's personal jurisdiction with respect to the civil action in question. Defendant State of Oklahoma ex. rel. Office of Juvenile Affairs ("OJA") is subject to this Court's personal jurisdiction.

12.     Venue is proper under 28 U.S.C. § 1391(c)(2) because this action does not involve real property and at least one or more of the Plaintiffs, CHILD DOES 8-30 is believed to be a resident of Muskogee County.

## PARTIES

13.     Plaintiffs are residents of Tulsa County, Oklahoma.

14.     Defendant Tulsa County ex. rel. Juvenile Bureau of the Tulsa County District Court ("Juvenile Bureau") is an agency within Tulsa County, which is incorporated as a county under the law of the State of Oklahoma and is located in Tulsa County, State of Oklahoma. Defendant Juvenile Bureau contracts, through Defendant Board of County Commissioners of Tulsa County ("Tulsa County Commissioners"), with Defendant OJA, "for secure detention services." The Juvenile Bureau's mission is "to provide the necessary programming to address the criminal justice needs of Tulsa County youth and families."

15.     Defendant Anthony Taylor is the former Director of the Juvenile Bureau, who was, in part, responsible, during the relevant timeframes for this lawsuit, for overseeing Plaintiffs' health and well-being, and assuring that housing and security needs of Plaintiffs and other

juveniles were met, during the time they were in the custody of the Juvenile Detention Center.

16.     Defendant Alondo Edwards is the Acting Director of the Juvenile Bureau, who was, in part, responsible, during the relevant timeframes for this lawsuit, for overseeing Plaintiffs' health and well-being, and assuring that housing and security needs of Plaintiffs and other juveniles were met, during the time they were in the custody of the Juvenile Detention Center.

17.     Defendant Douglas Currington is the Superintendent of the Juvenile Bureau, who was, in part, responsible, during the relevant timeframes for this lawsuit, for overseeing Plaintiffs' health and well-being, and assuring that housing and security needs of Plaintiffs and other juveniles were met, during the time they were in the custody of the Juvenile Detention Center.

18.     Defendant Cortez Tunley is the former Superintendent of the Juvenile Bureau, who was, in part, responsible, during the relevant timeframes for this lawsuit, for overseeing Plaintiffs' health and well-being, and assuring that housing and security needs of Plaintiffs and other juveniles were met, during the time they were in the custody of the Juvenile Detention Center.

19.     Defendant Jonthan Hines is a former detention officer of the Juvenile Bureau, who raped and sexually assaulted and harassed multiple Plaintiffs and other juveniles, during the time they were in the custody of the Juvenile Detention Center.

20.     Defendant Austin Zenzen is a former detention officer of the Juvenile Bureau, who sexually assaulted and abused at least one juvenile, possibly others, during the time they were in the custody of the Juvenile Detention Center.

21.     Defendant Dquan Doyle is a former detention officer of the Juvenile Bureau, who sexually assaulted and abused multiple Plaintiffs and other juveniles, during the time they were in the custody of the Juvenile Detention Center.

22.     Defendant Mandi Lee Raymond is a former nurse of the Juvenile Bureau, who raped and sexually assaulted and harassed at least one Plaintiff and other juveniles, during the time they were in the custody of the Juvenile Detention Center.

23.     Defendant Cindy Treadway is a detention officer, either current or former, of the Juvenile Bureau, who knowingly and intentionally allowed the sexual assault and harassment of multiple Plaintiffs and other juveniles to occur, both at the hands of Juvenile Bureau detention officers and staff as well as other detainees, during the time they were in the custody of the Juvenile Detention Center.

24.     Defendant JANE DOE 1, aka "DO Shalonda" is a detention officer, either current or former, of the Juvenile Bureau, who knowingly and intentionally allowed the sexual assault and harassment of multiple Plaintiffs and other juveniles to occur, both at the hands of Juvenile Bureau detention officers and staff as well as other detainees, during the time they were in the custody of the Juvenile Detention Center.

25.     Defendant JANE DOE 2, aka "DO Kelly" is a detention officer, either current or former, of the Juvenile Bureau, who knowingly and intentionally allowed the sexual assault and harassment of multiple Plaintiffs and other juveniles to occur, both at the hands of Juvenile Bureau detention officers and staff as well as other detainees, during the time they were in the custody of the Juvenile Detention Center.

26.     Defendant JANE DOE 3, aka "Miss Carrie" is an employee, either current or former, of the Juvenile Bureau, who knowingly and intentionally allowed the sexual assault and harassment of multiple Plaintiffs and other juveniles to occur, both at the hands of Juvenile Bureau detention officers and staff as well as other detainees, during the time they were in the custody of the Juvenile Detention Center.

27.     Defendant JANE DOE 4, aka "Miss Torrie" is an employee, either current or former, of the Juvenile Bureau, who knowingly and intentionally allowed the sexual assault and harassment of multiple Plaintiffs and other juveniles to occur, both at the hands of Juvenile Bureau detention officers and staff as well as other detainees, during the time they were in the custody of the Juvenile Detention Center.

28.     Defendants JOHN DOES 1-10 and JANE DOES 5-14 are employees, either current or former, of the Juvenile Bureau, who either sexually abused and assaulted, or knowingly and intentionally allowed the sexual assault and harassment of, multiple Plaintiffs and other juveniles to occur, both at the hands of Juvenile Bureau detention officers and staff as well as other detainees, during the time they were in the custody of the Juvenile Detention Center.

29.     Defendant State of Oklahoma ex. rel. Office of Juvenile Affairs is an agency within the State of Oklahoma, which is subject to this court's personal jurisdiction with respect to the civil action in question and is located across the State of Oklahoma.  Defendant OJA contracted with the Defendant Tulsa County Commissioners and the Defendant Juvenile Bureau regarding the Juvenile Detention Center.   Additionally, Defendant OJA was given the management of the State of Oklahoma's juvenile affairs, including providing justice for serious and habitual juvenile offenders.

30.     Defendant Jeffrey Cartmell is the Director for Defendant OJA, who "shall be responsible for the care and custody of a youthful offender who has been placed in the custody of the Office of Juvenile Affairs and shall have the duty and the authority to provide food, clothing, shelter, ordinary medical care, education, discipline and in an emergency to authorize surgery or other extraordinary care."  OKLA. STAT. tit. 10A, § 2-5-212(D).  This includes responsibility for the Plaintiffs and other juveniles in the Juvenile Detention Center.

31.     Defendant Rachel Holt is the former Director for Defendant OJA, until October 2023, who was "responsible for the care and custody of a youthful offender who has been placed in the custody of the Office of Juvenile Affairs and shall have the duty and the authority to provide food, clothing, shelter, ordinary medical care, education, discipline and in an emergency to authorize surgery or other extraordinary care." OKLA. STAT. tit. 10A, § 2-5-212(D).  This includes responsibility for the Plaintiffs and other juveniles in the Juvenile Detention Center.

32.     Defendant Ben Brown is the General Counsel for Defendant OJA, who "shall be responsible for the care and custody of a youthful offender who has been placed in the custody of the Office of Juvenile Affairs and shall have the duty and the authority to provide food, clothing, shelter, ordinary medical care, education, discipline and in an emergency to authorize surgery or other extraordinary care." OKLA. STAT. tit. 10A, § 2-5-212(D).  This includes responsibility for the Plaintiffs and other juveniles in the Juvenile Detention Center.

33.     Defendant Board of County Commissioners of Tulsa County is an administrative and business management entity, within Tulsa County, which is incorporated as a county under the law of the State of Oklahoma and is located in Tulsa County, State of Oklahoma.  Defendant Tulsa County Commissioners are responsible for the execution of a wide range of legal and fiscal responsibilities, including oversight of the Juvenile Bureau.   Defendant Tulsa County Commissioners contracted with Defendant OJA regarding the Juvenile Detention Center. Defendant Tulsa County Commissioners approved a $13,070,125.00 budget for "juvenile detention" expenses, out of a $17.5 million budget total for "court related" items for the 2023-2024 fiscal year.

## FACTUAL ALLEGATIONS

34.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 33, as

though fully set forth herein.

35.     Plaintiffs were in the custody of the Juvenile Detention Center at various period

of time from June 2023 to the present.  During these periods of custody, Plaintiffs were all minors.

36.     On May 9, 2022, representatives of Defendant OJA met with Tulsa County

representatives and stakeholders to discuss concerns that were raised as a result of the 2022 [OJA]

Office of Public Integrity (OPI) licensing and certification assessment for [the Juvenile Detention

Center].

37.     Between May 9, 2022 and May 5, 2023, Defendant OJA continued to monitor

developments at the Juvenile Detention Center, making unannounced visits regularly to address

these concerns.

38.     On May 3, 2023, Defendant Brown met with the Tulsa County Public Defender's

Office to address comprehensive concerns about the Juvenile Detention Center.  At that meeting,

Defendant Brown acknowledged the public defender's following concerns:

      a.      The juvenile resident did not go to school regularly;

      b.      The juvenile residents spent significant amounts of time on lockdown, during all hours of the day and on weekends;

      c.      The juvenile residents stayed on restriction/lockdown for days at a time, as opposed to hours;

      d.      Discipline was utilized for groups of juvenile residents, as opposed to individuals;

      e.      Juvenile residents were not allowed to take regular showers;

      f.      Juvenile Detention Center staff was intoxicated on illegal substances while at work;

      g.      Juvenile residents were getting "vape pens" in the Juvenile Detention Center; and,

      h.      Medications were not being properly dispensed, administered or monitored

for compliance.

39.     On May 5, 2023, Defendant OJA placed the Juvenile Detention Center on probation.  In a letter to Defendant Tulsa County Commissioners, Defendant Brown noted that issues that "have remained out of compliance for the past 11 months," included "youth being kept in their rooms/isolated, education concerns, and problems handling grievances and their resolutions."

40.     On May 17, 2023, a meeting was held to address a corrective plan, due to the Juvenile Detention Center's probationary status.  In attendance at this meeting, among others, were Defendant Holt, Defendant Brown, Defendant Taylor, Defendant Edwards, Defendant Tunley, as well as various representative from the Tulsa County District Attorney's office, the Tulsa County Public Defender's office, and a Tulsa County Commissioner.

41.     Despite the purpose of the meeting being the formation of a corrective plan, Defendant Juvenile Bureau denied issues at the Juvenile Detention Center.  At least one member of the Tulsa County Public Defender's office advised the Defendant Tulsa County Commissioners, at that time, that it was subjecting itself to a federal civil rights lawsuit if it did not correct the conditions within the Juvenile Detention Center.

42.     The Juvenile Detention Center policies and procedures state that "[s]exual abuse of an inmate, detainee, or resident by another inmate, detainee, or resident includes any of the following acts, with or without consent of the detainee or resident, is coerced into such act by overt or implied threats of violence, or is unable to consent or refuse. **No juvenile in custody can legally consent to sexual behavior**."  Policy 00-01, PREA Compliance Requirement at IV(C). Tulsa County Juvenile Detention Home, Policy and Procedure Manual ("Manual"), Policy 00-01, PREA Compliance Requirement at IV(C) (emphasis in original).

11

43.     The Manual further provides that the "Tulsa County Juvenile Detention Home (TCJDH) in accordance with State Statute 10A O.S., § 1-2-101 and the Oklahoma Office of Juvenile Affairs Policy, has a ZERO TOLERANCE stance towards all forms of sexual abuse and sexual harassment. TCJDH will take appropriate action to prevent, detect, and respond to all forms of sexual abuse and sexual harassment in compliance with the Prison Rape Elimination Act (PREA) of 2003." Manual at Policy 00-02, Prison Rape Elimination Act (PREA) of 2003, PREA Compliance, Coordinated Facility Response at I.

44.     From June 2023 to March 2024, JUVENILE VICTIM 1 was in custody at the Juvenile Detention Center. During this period of detention, JUVENILE VICTIM 1 was raped and sexually assaulted, multiple times, by Defendant Raymond, who was a nurse at the Juvenile Detention Center during that time.

45.     Defendant Raymond would proscribe "heat treatments" for JUVENILE VICTIM 1 and provide said treatments in a one-on-one setting, in order to engage in sexual relations with JUVENILE VICTIM 1.

46.     The Juvenile Detention Center policies and procedures states that "Employees will not provide any juvenile/client with any item(s) of contraband, i.e., any item(s) prohibited for all juveniles/clients by Juvenile Bureau or department/facility policy or prohibited for a specific juvenile/client or group of juveniles/clients by administrative or supervisory directive." Tulsa County, Juvenile Bureau of the District Court/Administration & Management/Personnel Policies, Policy File Number JBDC 0005, Policy Code of Conduct ("Code of Conduct") at ¶ 11.

47.     Defendant Raymond would provide JUVENILE VICTIM 1 with "vape pens" or e-cigarettes in exchange for JUVENILE VICTIM 1 having sex with Defendant Raymond.

48.     The Juvenile Detention Center policies state that "[a]ny staff member with a

substantiated allegation of the sexual abuse or harassment of a resident shall be terminated and reported to local authorities for legal prosecution." Manual at Policy 00-01, PREA Compliance Requirement at IV(D).

49.     By the end of 2023, JUVENILE VICTIM 1'S parent reported that her child had received "vape pens" to Defendant Currington.

50.     Defendant Raymond was never terminated but was merely transferred from Juvenile Detention Center to David L. Moss Correctional Center; however, upon information and belief, to date, none of the Defendants, including Defendant Juvenile Bureau or Defendant OJA, nor any of their personnel or representatives, ever made a child abuse referral pursuant to OKLA. STAT. tit. 10A, § 1-2-201.

51.     Plaintiff JANE DOE 1 and Plaintiff ADULT VICTIM 1 were both in custody at the Juvenile Detention Center from June 2023 to August 2023. During this period of time both JANE DOE 1 and ADULT VICTIM 1 were repeatedly sexually assaulted and harassed by Defendant Doyle.

52.     The Code of Conduct states that "Employees will not bring or cooperate with others in bringing illegal drugs, unauthorized weapons or ammunition, beverages containing alcohol, or other dangerous items into or upon any Juvenile Bureau or other Tulsa County facility, building or vehicle, or onto any surrounding grounds, parking area or property." Code of Conduct at ¶ 12.

53.     At least from June 2023 to August 2023, Defendant Doyle provided marijuana gummies and other marijuana-based products to multiple juveniles in the Juvenile Detention Center, including JANE DOE 1 and ADULT VICTIM 1.

54.     Under the Code of Conduct, "Employees will avoid contact with current and

former clients outside the context of professional interaction. NOTE: Contact with current and former clients is unacceptable if such contact is nonprofessional, social, and/or otherwise inappropriate, unless approval of the interaction has been obtained in advance from the department supervisor or facility director. (Department supervisors and facility directors may have differing levels of tolerance in this regard. Employees are thus encouraged not to violate the contact prohibition without first obtaining guidance concerning the department/facility's specific contact policies.)" Code of Conduct at ¶ 47(a).

55.    At some point between June 2023 and August 2023, ADULT VICTIM 1 was released for a period of time from custody.  During her period of release, Defendant Doyle sent ADULT VICTIM 1 unprovoked messages requesting sex and sending a picture of Defendant Doyle's penis.

56.    Between June 2023 and August 2023, among other things, Defendant Doyle:

    a.    entered JANE DOE 1's cell, to "snake" her toilet and licked her;

    b.    choked JANE DOE 1 in a sexual manner;

    c.    grabbed his penis in front of JANE DOE 1;

    d.    repeatedly attempted to get JANE DOE 1 to grab and touch him in a sexual manner;

    e.    showed JANE DOE 1 a picture of his penis; and,

    f.    told JANE DOE 1 to "lift" her shirt and expose her breasts to him, to which she complied.

57.    Between June 2023 and August 2023, Defendant Doyle stated to ADULT VICTIM 1 that he "found" ADULT VICTIM 1's friend on Facebook, while ADULT VICTIM 1 was using the women's restroom.

58.    Between June 2023 and August 2023, Defendant Doyle repeatedly made sexually-explicit remarks and verbal advances to both JANE DOE 1 and ADULT VICTIM 1.

59.    Between June 2023 and August 2023, Defendant Doyle regularly gave JANE DOE 1 and ADULT VICTIM 1 unauthorized privileges, such as use of his cellphone, use of the

computer facilities in the Juvenile Detention Center, and unauthorized freedoms within the physical spaces of the Juvenile Detention Center.

60.     From June 2023 to the present, the cameras in Unit B, JANE DOE 1's and ADULT VICTIM 1's unit, of the Juvenile Detention Center have been inoperable.  Upon information and belief, Unit B was originally a male unit but the female residents were transferred there, due to the camera issues.  The inoperable camera situation was made known to the residents in the Juvenile Detention Center and provided the ability for multiple policy violations and resident abuses.

61.     Between June 2023 and August 2023, Defendant Treadway recruited JANE DOE 1 to write and pass romantic notes to a male juvenile resident, with whom Defendant Treadway was engaged in an ongoing relationship.

62.     The Manual States that "It is the responsibility of every staff member to report possible sexual abuse or sexual harassment or residents or any person in our environment. Manual at Policy 00-02, Prison Rape Elimination Act (PREA) of 2003, PREA Compliance, Coordinated Facility Response at at IV(C).

63.     From June 2023 to August 2023, Defendant Treadway, Defendant JANE DOE 1, aka "DO Shalonda," Defendant JANE DOE 2, aka "DO Kelly," Defendant JANE DOE 3, aka "Miss Carrie," and Defendant JANE DOE 4, aka "Miss Torrie," all witnessed and personally observed Defendant Doyle's sexually inappropriate behavior and other inappropriate conduct, regarding JANE DOE 1 and ADULT VICTIM 1, as well as other juvenile residents of the Juvenile Detention Center, and not only failed to intervene, but actually encouraged Defendant Doyle's behaviors.

64.     Prior to their release from the Juvenile Detention Center, both JANE DOE 1 and

ADULT VICTIM 1 where interviewed, in the presence of their lawyers, after multiple juvenile residents tested positive for marijuana, because Defendant Doyle had provided several residents gummies.

65.     During her interview, JANE DOE 1 disclosed Defendant Doyle's sexual assaults and harassments, as well as the various improprieties from multiple Defendants, directly to Defendant Juvenile Bureau personnel, including Defendant Taylor and Defendant Currington, among others.  JANE DOE 1 also provided a written statement as a part of this interview.

66.     During her interview, ADULT VICTIM 1 also disclosed multiple improprieties regarding Juvenile Detention Center personnel, including Defendant Doyle and specifically disclosed the inoperable cameras in "Unit B."  ADULT VICTIM 1's interview was recorded.

67.     From November 2023 to May 2024, CHILD DOE 2 was in custody at the Juvenile Detention Center. During this period of detention, CHILD DOE 2 was sexually assaulted and harassed by Defendant Hines, who was a detention officer at the Juvenile Detention Center during that time.

68.     From November 2023 to May 2024, Defendant Hines told CHILD DOE 2 to tell CHILD DOE 1 to put "Vaseline" on CHILD DOE 1's butt to make sure it did not hurt when Defendant Hines had sex with CHILD DOE 1.

69.     CHILD DOE 2 witnessed Defendant Hines rape of CHILD DOE 1.

70.     From November 2023 to May 2024, Defendant Hines showed CHILD DOE 2 pornography, including videos of Defendant Hines having sex with other Juvenile Detention Center personnel and videos of Defendant Hines raping other juvenile detainees at the Juvenile Detention Center.

71.     Between November 2023 and May 2024, Defendant Hines told CHILD DOE 2

that "your dick is big today."

72.     Between November 2024 and May 2024, Defendant Hines propositioned CHILD

DOE 2 on multiple occasions and CHILD DOE 2 touched Defendant Hines' leg at least once.

73.     From January 2024 to March 2024, JUVENILE VICTIM 3 was in custody at the

Juvenile Detention Center.  During this period of detention, JUVENILE VICTIM 3 was sexually

assaulted and harassed by Defendant Hines.

74.     From January 2024 to March 2024, Defendant Hines would show pornographic

images and videos to JUVENILE VICTIM 3 on his Apple Watch.  These videos would include

Defendant Hines having sex with other individuals.

75.     From January 2024 to March 2024, Defendant Hines would supply JUVENILE

VICTIM 3 with marijuana-based products.

76.     Between January 2024 to March 2024, Defendant Hines made sexually

inappropriate comments to JUVENILE VICTIM 3, such as "Goodnight, Honey Buns" as

JUVENILE VICTIM 3 was going to bed.

77.     From February 2024 to the present, JUVENILE VICTIM 2 was in custody at the

Juvenile Detention Center.  During this period of detention, JUVENILE VICTIM 2 was sexually

assaulted and harassed by Defendant Hines.

78.     From February 2024 to the present, Defendant Hines would require JUVENILE

VICTIM 2 to take his pants off to go to bed, inferring to JUVENILE VICTIM 2 that this was

Juvenile Detention Center policy.

79.     From February 2024 to the present, Defendant Hines provided "vape pens" and

sodas to JUVENILE VICTIM 2, multiple times.

80.     From February 2024 to the present, Defendant Hines would allow JUVENILE

VICTIM 2 to use his personal cellphone to have videoconference calls with his girlfriend. JUVENILE VICTIM 2 was shirtless for one or more of these calls.

81.     Between February 2024 to the present, Defendant Hines called JUVENILE VICTIM 2 "cute" while JUVENILE VICTIM 2 was on a FaceTime call with his girlfriend, who observed the interaction.

82.     Between February 2024 to the present, Defendant Hines touched JUVENILE VICTIM 2's butt on at least one occasion.

83.     From February 2024 to the present, Defendant Hines disclosed to JUVENILE VICTIM 2 that he was paying other juvenile residents money in exchange for performing sex acts with those resident.

84.     From February 2024 to April 2024, JUVENILE VICTIM 4 was in custody at the Juvenile Detention Center. During this period of detention, JUVENILE VICTIM 4 was sexually assaulted and harassed by Defendant Hines.

85.     Between February 2024 and April 2024, Defendant Hines attempted to sexually touch JUVENILE VICTIM 4 while he was alone in his cell, including attempting to touch JUVENILE VICTIM 4's genitals.

86.     Upon information and belief, inappropriate photographs of JUVENILE VICTIM 4 were found on Defendant Hines' phone.

87.     Between February 2024 and April 2024, Defendant Hines propositioned JUVENILE VICTIM 4 on multiple occasions.

88.     Between February 2024 and April 2024, Defendant Hines provided JUVENILE VICTIM 4 with marijuana-based products.

89.     Upon information and belief, Defendant Hines attempted to contact JUVENILE

VICTIM 4 after being released from custody in the Juvenile Detention Center.

90.     From February 2024 to May 2024, CHILD DOE 3 was in custody at the Juvenile Detention Center. During this period of detention, CHILD DOE 3 was sexually assaulted and harassed by other juvenile residents in the presence of Juvenile Detention Center personnel, who failed to intervene or prevent said abuses.

91.     Between February 2024 and May 2024, CHILD DOE 3 was sexually threatened by a group of juvenile residents and disclosed the harassment/threats to Juvenile Detention Center staff.

92.     At no point did Defendant Juvenile Bureau address or rectify CHILD DOE 3's disclosures or follow up on the allegations of harassment.

93.     From February 2024 to May 2024, the Juvenile Detention Center was personally aware of CHILD DOE 3's diagnoses of Attention Deficit/Hyperactivity Disorder, Oppositional Defiant Disorder and Intellectual Development and Disability; however, Defendant Juvenile Bureau never gave CHILD DOE 3 correct prescription dosages for various medications.

94.     The Manual does not contain any provision that allows the Juvenile Detention Center to mandate a haircut for a juvenile resident. Further, the Manual specifically states that "[h]air style will be limited only to a shorter cut of the 'existing style cut' that the resident has. No 'buzz cut' or drastic departure from that style cut may be made. Such as long hair to a 'Bald Cut.' Only conservative modification of the hair is acceptable, whether male or female resident." Manual at Policy 04-07, Hair Care Services at IV(B)(3).

95.     Between February 2024 to May 2024, the Juvenile Detention Center forced CHILD DOE 3 to cut off all their hair, from long to short, in direct violation of the Manual.

96.     On March 9, 2024, Defendant Hines molested his stepsister's child, while

babysitting for her.  Defendant Hines previously took pictures of the child's genitalia.  A contemporaneous police report of the March 9, 2024 incident was prepared and, presumably, disclosed and disseminated to the Defendant Juvenile Bureau and Defendant OJA, respectively. Defendant Hines remained employed well into April 2024.

97.   From March 2024 to April 2024, CHILD DOE 1 was in custody at the Juvenile Detention Center. During this period of detention, CHILD DOE 1 was raped by Defendant Hines.

98.   On April 6, 2024, Defendant Hines physically raped CHILD DOE 1.  This rape was witness by multiple juvenile resident at the Juvenile Detention Center, including one or more of the Plaintiffs.

99.   Upon information and belief, the April 6, 2024 incident is not the only instance of sexual abuse perpetrated by Defendant Hines upon CHILD DOE 1 during CHILD DOE 1's detention at the Juvenile Detention Center.

100.   The discovery of CHILD DOE 1's rape resulted in the Tulsa County criminal felony case, styled *State of Oklahoma v. Jonathan Michael Hines*, CF-2024-1559.  Defendant Hines remains in custody on charges of human trafficking, possession of a cellphone in jail, and destroying evidence.

101.   As of April 16, 2024, the Defendant Juvenile Bureau was aware of CHILD DOE 1's rape and had not disclosed the incident to CHILD DOE 1's legal counsel.

102.   On April 17, 2024, Defendant Currington disclosed the April 6, 2024 rape and noted that an "internal investigation" was initiated.  Defendant Currington's email was sent to multiple parties, including various personnel with Defendant OJA; however, Defendant Currington excluded CHILD DOE 1's legal counsel from said disclosures.

103.   On April 19, 2024, at approximately 6:30 p.m., a Juvenile Detention Center female

detention officer threatened CHILD DOE 1, through counsel, into silence regarding the April 6, 2024 rape. Specifically,

a.   The female detention officer approached a Tulsa County public defender in the parking lot of the Juvenile Detention Center;

b.   The detention officer stated to counsel that "you need to tell your client to keep his mouth shut."

c.   The detention officer also disclosed that the Juvenile Detention Center employees were instructing the juvenile residents that if any of them discuss the April 6, 2024 incident, "detention will get shut down and all of the kids will be sent to [David L. Moss], and you know what happens to kids at DLM."

d.   The detention officer stated that "what happened" between CHILD DOE 1 and Defendant Hines was agreed upon and between them, so everyone should just let it go.

e.   The detention officer stated that CHILD DOE 1 got what he bargained for.

104.   On April 24, 2024, at 11:03 a.m., Tulsa County Public Defender Juvenile Division Supervisor notified various personnel with Defendant OJA and Defendant Juvenile Bureau, specifically including Defendant Taylor, Defendant Currington, and Defendant Cartmell, about the April 19, 2024 incident regarding a female detention officer and noting a "culture" within the Juvenile Detention Center that promotes harm to the juvenile detainees.

105.   On April 24, 2024 at 11:27 a.m., Judge Kevin Gray issued correspondence to Defendant Taylor, copying Defendant Currington and Defendant Brown, noting his receipt of the correspondence sent earlier that morning by the Tulsa County Public Defender's office and further noting his concerns. Judge Gray stated:

AT,

I'm sure you read the email from Ms. Feldhake that she sent a short while ago. They brought the detention officer's conversation to my attention yesterday, and it is quite disturbing. I do agree that it worries me that this exemplifies a culture that might not understand the magnitude of the responsibility that detention officers carry with them as they care for some of our most vulnerable young citizens. I would ask that there be a mandatory meeting and training done as soon as possible to discuss issues surrounding inappropriate contact with detainees, specifically sexual contact. I know that you know this, but it appears that some of the staff either does not know or simply disagrees with the reality that it is a crime to engage in ANY sexual

contact with a detainee, even if that contact is initiated or done willingly by a detainee. Not only is it a crime, but a conviction of such a crime will place an offender on the Sex Offenders Registry. Additionally, I would like for a part of that training to make clear to the detention officers that it is absolutely inappropriate for them to encourage the detainees not to talk about incidents, not to report incidents, or to otherwise share information they have about incidents. It is astonishing to me that someone would make such comments to our detainees. The detainees should ABSOLUTELY be reporting such contact to supervisors and/or their attorneys, and detention leadership should address the issues appropriately. The staff also needs to be informed (because clearly this particular detention officer does not know) that federal and state law would not allow our detainees to be simply transferred to DLM if our detention facility were to either close or lose its license. If they don't know, they need to be educated about the law. It appears to me that any mention of DLM to the detainees would be designed to frighten or otherwise intimidate the detainees into silence. That is also unacceptable and inappropriate.

Additionally, I would like to review our detention center's policies regarding the reporting of critical incidents such as the one that occurred the other day, to take into account the related but particular needs of both a personnel investigation and a criminal investigation. I understand the need to make sure that detention ascertains quickly what, if any, incident occurred so as to take proactive action regarding suspending or otherwise reassigning personnel until a thorough investigation is completed. That said, we must ensure that a personnel investigation neither hampers nor harms any subsequent criminal investigation. We also need to ensure that all detention leadership is clear on who needs to be informed about such an incident, when they need to be informed, and what law enforcement agency should take the lead on any criminal investigation. It is my position that as soon as any safety or security issues are quickly resolved, that law enforcement needs to be IMMEDIATELY called to initiate a criminal investigation. The delay in engaging law enforcement should not be measured in days, but likely in minutes or an hour. Coupled with that should be immediate notification to a detainee's parents and attorney, not as an afterthought but as a quick response to the incident. I would like to ensure that our policies and procedures reflect these positions. If not, they need to be updated and/or changed.

106. At 3:55 p.m. that same day, Defendant Taylor responded to Judge Gray's email noting that he had identified the female detention officer from the April 19th interaction with the public defender and that she denied making those comments. In that same email, Defendant Taylor noted that "[o]ur continued improvement is reflected in *the increased confidence of employees* when working with complex and hostile residents." To be clear Defendant Taylor was undisputedly aware that Defendant Hines, his employee, raped CHILD DOE 1 approximately

two weeks earlier.

107.    In that same communication, Defendant Taylor also touted that the Juvenile

Detention Center "continue to receive accolades from our state licensing agency, which monitors

our facility monthly." Defendant OJA is that "licensing agency."

108.    On April 25, 2024, correspondence was sent from the Tulsa County Public

Defender's Office to Defendant Brown, copying Defendant Cartmell and Tulsa County District

Judges Kevin Gray and Dawn Moody, requesting "immediate action regarding Tulsa County

Juvenile Detention." The correspondence outlined:

   a.    the April 6, 2024 rape incident;

   b.    past incidents of sexual assault that had occurred within the confines of the
         Juvenile Detention Center in the past eighteen (18) months; and

   c.    The April 19, 2024 physical threats made by a female detention officer to
         the Tulsa County public defender in an attempt to bully CHILD DOE 1 into
         silence.

The correspondence concluded noting "[i]f immediate action is not taken to ensure the safety of

these children, [the Tulsa County Public Defender's Office] will not hesitate to get the ball

rolling so that a federal lawsuit may be brought."

109.    On May 6, 2024 Defendant Taylor was fired as Director of Defendant Juvenile

Bureau. Defendant Edwards, who was the First Deputy Director at the time, replaced Defendant

Taylor as Acting Director.

110.    To date, no publicly-available corrective action, by either Defendant Juvenile

Bureau or Defendant OJA, has occurred to protect the children held within the confines of the

Juvenile Detention Center.

111.    Relative to juvenile rights, the Manual states as follows:

The Oklahoma Juvenile Code (10 O.S. 7302-6.3) defines the rights of a juvenile in

custody. This policy is not intended to infringe on the stated rights of any juvenile, but put in place an organized predictable system of discipline that is consistent with the goals and mission of the Detention Home. This system is designed to utilize positive approaches that encourage the juvenile to be personally responsible for his or her actions. The degree of disciplinary actions, sanctions, or related restrictions initiated on a resident shall be directly related to the severity of the rule broken as detailed in the resident orientation form and disciplinary guidelines. The objective of disciplinary sanctions shall be to hold residents accountable and encourage responsible behavior within the program.

Manual at Policy 03-28, Disciplinary Guidelines at I.  Even juvenile residents under "room confinement" per the Juvenile Detention Center policy "shall be afforded living conditions, essential services and privileges approximating those available in the program. No resident will be denied access to mail, daily exercise, regular phone calls, *visitation*, access to attorney or worker due to disciplinary sanction." *Id.* at 5(c) (emphasis added).

112.    Furthermore, "A denial of visitation privileges shall be based on the safety, security, and order of the facility and the safety of the individuals involved. The resident shall be notified in writing the Supervisor of a denial of visitation that includes the name of the restricted or prohibited visitor, the name of the person making the decision, and the resident's right to appeal the decision." Manual at Policy 05-10, Resident Visitor Program at B(1).

113.    At the latest, by May 2023, Defendant Juvenile Bureau and Defendant OJA were put on notice that swaths of juvenile residents were being placed on "lockdown" during all hours of the day, in clear violation of policy.

114.    It is the visitation policy within the Juvenile Detention Center that juvenile residents can only have visitation, even with family members, during the weekends.

115.    During their periods of detainment, multiple juvenile Plaintiffs reported having their rights to visitation with their family members revoked, even for infractions as minor as having "two books" in their cell.  These infractions and restrictions often came in tandem with those same

juveniles declining to perform specific sexual acts with various detention officers and/or personnel within the Juvenile Detention Center, including but not limited to multiple Defendants.

116.    Defendant Juvenile Bureau and Defendant OJA have exhibited a clear culture of weaponizing a disciplinary system into not only retaliating against juvenile residents who refuse to comply with the sexual advances of the detention officers and other personnel within the Juvenile Detention Center, but also to cut off those juvenile residents from any means of contemporaneously reporting sexual abuse, even rape, to their family members, instead becoming wholly reliant on the reporting system within the very administration that allowed the abuses in the first place.

117.    There is extraordinary vulnerability of any persons who are detainees of an incarceration facility to be preyed upon by the detention personnel; however, these vulnerabilities are compounded for juvenile detainees.  For this reason, the law of the State of Oklahoma specifically protects such persons. Under Oklahoma criminal statutes, any state, federal, county, municipal or political subdivision employee who has sexual intercourse with a person under the supervision of a sheriff is guilty of the crime of rape. OKLA STAT. tit. 21, § 1111(A)(7).  These same laws protect minors even further.  *Id.* at § 1111(A)(1) and (8).

118.    Various Defendants' acts of depravity and crimes were facilitated by a total breakdown in supervision, security and housing within the Juvenile Detention Center.

119.    Despite the Juvenile Detention Center being placed on probation in May 2023 for documented May 2022 violations, Defendant Juvenile Bureau, Defendant OJA and Defendant Tulsa County Commissioners, as well as individual Defendants, Taylor, Edwards, Currington, Tunley, Cartmell, Holt, and Brown did nothing to change the policies, procedures, or culture of the Juvenile Detention Center.

120.    Upon learning of the May 2023 legitimate concerns from the Tulsa County Public Defenders' Office, Defendant Juvenile Bureau, Defendant OJA and Defendant Tulsa County Commissioners, as well as individual Defendants, Taylor, Edwards, Currington, Tunley, Cartmell, Holt, and Brown did nothing to change the policies, procedures, or culture of the Juvenile Detention Center.

121.    Upon learning that JUVENILE VICTIM 2 was raped by Defendant Raymond in mid- to late-2023, Defendant Juvenile Bureau, Defendant OJA and Defendant Tulsa County Commissioners, as well as individual Defendants, Taylor, Edwards, Currington, Tunley, Cartmell, Holt, and Brown did nothing to change the policies, procedures, or culture of the Juvenile Detention Center.

122.    Upon learning of the that JANE DOE 1 and ADULT VICTIM 1 were sexually assaulted and harassed by Defendant Doyle by August 2023, Defendant Juvenile Bureau, Defendant OJA and Defendant Tulsa County Commissioners, as well as individual Defendants, Taylor, Edwards, Currington, Tunley, Cartmell, Holt, and Brown did nothing to change the policies, procedures or culture of the Juvenile Detention Center.

123.    Despite receiving definitive proof that CHILD DOE 1 was raped by Defendant Hines in April 2024, Defendant Juvenile Bureau, Defendant OJA and Defendant Tulsa County Commissioners, as well as individual Defendants, Taylor, Edwards, Currington, Tunley, Cartmell, Holt, and Brown did nothing to change the policies, procedures, or culture of the Juvenile Detention Center.

124.    The Juvenile Detention Center promotes rape culture within its walls and each and every one of the Defendants is culpable, in some fashion, for committing said act, promoting said culture or for turning a blind eye, despite overwhelming information, evidence, and

documented proof that said depravities were occurring to children, for years.

125. Defendants failed to provide adequate housing, supervision, and security for Plaintiffs as juvenile detainees.

126. Defendants' deliberate indifference to the clear and present risks to Plaintiffs' safety, as well as the deliberate indifference to the incontrovertible proof of rape incidents, was a direct and proximate cause of each of Plaintiffs' serious injuries and damages.

127. Defendants' deliberate indifference to the safety and welfare of Plaintiffs is evinced by their persistent violation of numerous provisions of the Manual, listed above, as well as the Prison Rape Elimination Act ("PREA"), adopted by Defendant OJA in December 2019. In fact the PREA states at the very beginning:

> The Office of Juvenile Affairs (OJA) has a <u>ZERO-TOLERANCE</u> toward all forms of sexual abuse and sexual harassment. OJA will take appropriate action to prevent, detect, and respond to all forms of sexual abuse and sexual harassment in compliance with the Prison Rape Elimination Act (PREA) of 2003. (115.311 (a))

128. Among other provisions, the PREA further states:

> ➢ Retaliation - An act of vengeance, covert or overt action, or threat of action, taken against a juvenile in response to the juvenile's complaint of sexual misconduct, in the reporting or investigation of sexual misconduct, regardless of the merits or the disposition of the complaint is prohibited. Examples of acts of retaliation are unnecessary discipline, intimidation, unnecessary changes in work or program assignments, unjustified transfers or placements and unjustified denials of privileges or services.

> ➢ Institutional Superintendents shall ensure that facility staff discourage and prevent sexual misconduct by providing clear definitions of prohibited conduct, establishing uniform methods for the prompt reporting and investigation of allegations of misconduct, and prescribing sanctions for both substantiated misconduct and false allegations. Sexual misconduct between staff and juveniles, volunteers or contract personnel and juveniles, regardless of consensual status, is prohibited and subject to administrative and criminal disciplinary sanctions.

> ➢ Institutional Superintendents shall develop, implement, and document a staffing plan that provides for adequate levels of staffing, and, where

applicable, video monitoring, to protect juveniles against sexual abuse. (115.313 (a))

➢ When designing or acquiring new facilities and in planning any substantial expansion or modification of existing facilities, OJA shall consider the effect of the design, acquisition, expansion, or modification upon OJA's ability to protect juveniles from sexual abuse. (115.318 (a)) D.

➢ When installing or updating a video monitoring system, electronic surveillance system, or other monitoring technology, OJA shall consider how such technology may enhance OJA's ability to protect juveniles from sexual abuse. (115.318 (b))

➢ OAC 377:3-1-25. Abuse, neglect, and caretaker misconduct of a child in OJA custody and placed in a secure facility or other facility operated by or through contract with OJA

    (a)    Requirements for reporting incidents of abuse and neglect. Title 10A O.S. § 1-2-101 requires every person who, in good faith and exercising due care, has reason to believe that a child under the age of eighteen (18) is a victim of abuse or neglect to report the condition or incident to the appropriate office for investigation through the DHS statewide centralized hotline. For the purposes of the reporting requirements for this subchapter, abuse shall include sexual abuse and sexual harassment. An employee who, in good faith and exercising due care, has reason to believe that a child is a victim of abuse or neglect shall make an immediate, verbal or email report, as required by 10A O.S. § 1-2-101 and to the supervisor who shall ensure a report is made to the OJA Office of Advocate General, or as required by 10A O.S. § 1-2-102 to the DHS hotline, when: (1) the employee has reason to believe such child has been the victim of abuse or neglect; (2) a child, parent, guardian, or other person makes an allegation of abuse or neglect of such child. …

➢ All OJA staff shall report immediately any knowledge, suspicion, or information they receive regarding an incident of sexual abuse or sexual harassment that occurred in a facility, whether or not it is part of the agency; retaliation against juveniles or staff who reported such an incident; and any staff neglect or violations of responsibilities that may have contributed to an incident or retaliation. (115.361 (a))

➢ All allegations of sexual abuse or sexual harassment are referred for administrative or criminal investigation. (115.322 (a)(b))

Each of these provisions states widely accepted minimum standards for the operation of

Oklahoma juvenile detention facilities.  The failure to uniformly and consistently observe such standards evidences deliberate indifference to the safety and security of juvenile detainees, generally, and Plaintiffs specifically. These standards were clearly and flagrantly violated.  The sexual rapes, abuses, harassment, etc., of Plaintiffs resulted from a total and complete breakdown in the minimum supervision, security, and housing practices that Defendants, across the board, are required to provide and/or ensure are followed.

129.    Defendants' deliberate indifference to Plaintiffs' health and safety was in furtherance of and consistent with: (a) policies which Defendant Juvenile Bureau and Defendant OJA, as well as the individual Defendants Taylor, Taylor, Edwards, Currington, Tunley, Cartmell Holt, and Brown, promulgated, created, implemented, or possessed responsibility for the Juvenile Detention Center's operation; and (b) established procedures, customs, and/or patterns and practices.

130.    Defendant Juvenile Bureau failed to promulgate and implement adequate housing and supervision policies responsive to the specific needs of juvenile detainees at the Juvenile Detention Center.  Defendant Juvenile Bureau has long been aware of instances of inappropriate and improper sexual contact at the Juvenile Detention Center, including rape and sexual abuses between staff members/detention officers and juvenile detainees, which can qualify as felony rape under Oklahoma law. Consistent with past practices, in the present case, when Defendant Juvenile Bureau was on notice of sexual contact between staff and juveniles, nobody notified the District Attorney's office, the Public Defender's office, or the Oklahoma Department of Human Safety.  Defendant Juvenile Bureau failed to take adequate corrective action to prevent additional instances and harm.

131.    Despite knowledge of inappropriate sexual contact, Defendants Taylor, Edwards,

Currington, and Tunley failed to provide adequate facilities or promulgate and implement adequate policies, training, procedures, and guidelines to ensure the safety of juvenile detainees. The lack of adequate and appropriate supervision for juvenile detainees and the utter lack of guidance for employees to follow at the Juvenile Detention Center as to the standard of supervision, security and care for juvenile detainees demonstrates a failure to train, failure to supervise, and deliberate indifference toward known risks to the health and safety of detainees like Plaintiffs.

132.   Defendant Juvenile Bureau, as well as individual Defendants Taylor, Edwards, Currington and Tunley, have promulgated, and in fact profited, off perpetuating rape culture. Through their deliberate indifference and conscious choices, these Defendants have knowingly allowed juvenile detainees, including Plaintiffs, to be raped, sexually abused, exploited, and harassed by multiple staff and personnel within the Juvenile Detention Center.   Indeed, Defendants have been aware of these facts and circumstances since mid-2023, likely before, and have elected to do nothing to change the policies, practices, procedures, or supervision within the Juvenile Detention Center.   Such action, and intentional inaction, amounts to deliberate indifference toward known risks to the health and safety of detainees like Plaintiffs.

133.   "The Office of Juvenile Affairs shall be responsible for the care and custody of a youthful offender who has been placed in the Office of Juvenile Affairs and shall have the duty and the authority to provide food, clothing, shelter, ordinary medical care, education, discipline and in an emergency to authorized surgery or other extraordinary care." OKLA. STAT. tit. 10A, § 2-5-212(D).

134.   Despite their statutory responsibility, Defendant OJA, as well as individual Defendants Cartmell, Holt, and Brown, failed to promulgate and implement adequate safety

measures to address the needs of the juvenile detainees at the Juvenile Detention Center.  Despite Defendant OJA's "ZERO-TOLERANCE policy" for sexual abuse, these Defendants' not only deferred their statutory responsibilities to Plaintiffs to Defendant Juvenile Bureau but also undisputed evidence that juvenile detainees were being raped, sexually abused and harassed and physically abused by the personnel, detention officers and staff at the Juvenile Detention Center for a considerable amount of time.  Indeed, Defendants have been aware of these facts and circumstances since mid-2023, likely before, and have chosen to do nothing to intervene in the pervasive culture within the Juvenile Detention Center.  Such action, and intentional inaction, amounts to deliberate indifference toward known risks to the health and safety of juvenile detainees like Plaintiffs.

135.    Among other things, Defendant Tulsa County Commissioners is responsible for approving an annual budget for Defendant Juvenile Bureau, which includes the day-to-day operation of the Juvenile Detention Center.   In this regard, Defendant Tulsa County Commissioners were aware of Defendant Juvenile Bureau's non-compliance in the operation of the Juvenile Detention Center in May 2022 and received formal, written, documentation of the continued non-compliance in May 2023.  Defendant Tulsa County Commissioners were further made personally aware of the continued deficiencies at the Juvenile Detention Center at a multi-agency meeting on May 17, 2023. Defendant Tulsa County Commissioners were well aware that these deficiencies, over the span of at least two (2) years, perpetuated an undue and preventable risk to juvenile detainees at the Juvenile Detention Center, for rape, sexual abuse and harassment. Despite this knowledge, Defendant Tulsa County Commissioners approved a more than $13 million budget for "juvenile detention" for the 2023-2024 fiscal year, thereby intentionally allowing a deficient Juvenile Detention Center to continue its ongoing operation and, by proxy,

perpetuate the ongoing rape culture within its confines.  Such action, and intentional inaction, amounts to deliberate indifference toward known risks to the health and safety of juvenile detainees like Plaintiffs.

136.    Defendants Hines, Zenzen, Doyle, Treadway, and Raymond each, individually and separately, committed one or more sexual abuses on juvenile detainees, including but not limited to Plaintiffs, during their periods of employment at the Juvenile Detention Center.  Such action clearly amounts to deliberate indifference toward known risks to the health and safety of juvenile detainees like Plaintiffs.

137.    Defendants Treadway, JANE DOE 1, aka "DO Shalonda," JANE DOE 2, aka "DO Kelly," JANE DOE 3, aka "Miss Carrie," and JANE DOE 4, aka "Miss Torrie," each witnessed, and maintained personal knowledge of, one or more sexual abuses on juvenile detainees, including but not limited to Plaintiffs, during their periods of employment at the Juvenile Detention Center.  Despite this personal knowledge, each of these Defendants not only elected not to report these abuses but conspired to further allow these abuses to continue within the Juvenile Detention Center.  Such action clearly amounts to deliberate indifference toward known risks to the health and safety of juvenile detainees like Plaintiffs.

138.    Upon information and belief, Defendants JOHN DOES 1-10 and JANE DOES 5-14 each either committed one or more sexual abuses on juvenile detainees, or witnessed or had personal knowledge of such abuses, including but not limited to Plaintiffs, during their periods of employment at the Juvenile Detention Center.  Such action clearly amounts to deliberate indifference toward known risks to the health and safety of juvenile detainees like Plaintiffs.

<b>CLAIMS FOR RELIEF</b>

**I.     CRUEL AND UNUSUAL PUNISHMENT IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION OF THE UNITED**

STATES (42 U.S.C. § 1983)

A.      Allegations Applicable to:
        i.      Defendant Juvenile Bureau;
        ii.     Defendant OJA;
        iii.    Defendant Tulsa County Commissioners;
        iv.     Defendant Taylor;
        v.      Defendant Edwards;
        vi.     Defendant Currington;
        vii.    Defendant Tunley;
        viii.   Defendant Cartmell;
        ix.     Defendant Holt; and,
        x.      Defendant Brown

139.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 138, as though fully set forth herein.

140.    Each of these Defendants knew of the potential for harm to Plaintiffs as juvenile detainees within the Juvenile Detention Center because of the lack of adequate and appropriate facilities, supervision and/or security for such juvenile detainees.

141.    By May 2023, each of these Defendants possessed actual knowledge, in writing, of the inadequate facilities, supervision and security within the Juvenile Detention Center, which gave rise to the heightened risks of sexual abuses and harassment, including rape, to the juvenile detainees, including Plaintiffs.

142.    By May 17, 2023, each of these Defendants was placed on actual notice, at a mutli-agency meeting involving each of these Defendants, of the abuses suffered by multiple juvenile detainees within the Juvenile Detention Center.

143.    Each of these Defendants failed to provide adequate facilities, supervision and/or security to Plaintiffs while each was detained at the Juvenile Detention Center.

144.    Each of these Defendants' acts and/or omissions as alleged herein, including, but not limited to, their failure to provide Plaintiffs with adequate and appropriate housing, adequate

supervision, adequate security and/or to take other measures to protect them from sexual abuses, constitute deliberate indifference to Plaintiffs' needs, health and safety.

145.    As a direct and proximate result of each of these Defendants' conduct, Plaintiffs experienced and continue to experience pain and suffering, severe emotional distress, mental anguish, and the damages alleged herein.

**B.    Allegations Applicable to:**
  **i.     Defendant Taylor;**
  **ii.    Defendant Edwards;**
  **iii.   Defendant Currington;**
  **iv.    Defendant Tunley;**
  **v.     Defendant Cartmell;**
  **vi.    Defendant Holt; and,**
  **vii.   Defendant Brown**

146.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 145, as though fully set forth herein.

147.    Each of these Defendants knew of the actual harms being sustained by the Plaintiffs as juvenile detainees within the Juvenile Detention Center because of the lack of adequate and appropriate facilities, supervision and/or security for such juvenile detainees.

148.    By at least May 17, 2023, Defendants Holt, Brown, Taylor, Edwards and Tunley were individually placed on actual notice, at a multi-agency meeting involving attended by each of these Defendants, of the abuses suffered by multiple juvenile detainees within the Juvenile Detention Center.

149.    By at least the end of August 2023, JANE DOE 1 and ADULT VICTIM 1 each disclosed Defendant Doyle's sexual abuse and other abuses, upon both themselves and other juvenile detainees within the Juvenile Detention Center, directly to Defendants Taylor and Currington.

150.    By the end of 2023, JUVENILE VICTIM 1's parent reported that Defendant

Raymond provided JUVENILE VICTIM 1 with "vape pens," directly to Defendant Currington.

151.     By at least April 17, 2024, Defendant Currington admitted actual knowledge of the April 6, 2024 rape incident between CHILD DOE 1 and Defendant Hines, which occurred at the Juvenile Detention Center.

152.     By at least April 18, 2024, Defendant Brown was placed on written notice of the April 6, 2024 rape incident.

153.     By April 24, 2024, Defendants Taylor, Currington and Brown were all placed on written notice of the incident on April 19, 2024, wherein a female detention officer with the Juvenile Detention Center threatened CHILD DOE 1 to keep silent on the rape incident involving Defendant Hines and confessed to similarly threatening all the juvenile detainees to keep silent, all in the presence of a juvenile Tulsa County Public Defender.  In response, Defendant Taylor summarily denied the interaction to Judge Kevin Gray and touted the Juvenile Detention Center's recent accolades, provided by Defendant OJA, as proof of the "safe environment for the youth in our care."

154.     By April 25, 2024, the Tulsa County Public Defender specifically pleaded with Defendant Brown, including Defendant Currington in the correspondence, to shut down the Juvenile Detention Center, to prevent children from being raped and sexually abused.  The correspondence noted that federal litigation was likely imminent if Defendant OJA and/or Defendant Juvenile Bureau refused to act.

155.     Each of these Defendants failed to provide adequate facilities, supervision, and/or security to Plaintiffs while each was detained at the Juvenile Detention Center, specifically after being made aware of the specific abuses sustained by the Plaintiffs, as well as other juvenile detainees.

156.     Each of these Defendants' acts and/or omissions alleged herein including, but not limited to, their failure to provide Plaintiffs with adequate and appropriate housing, adequate supervision, adequate security and/or to take other measures to protect them from sexual and other abuses, constitute deliberate indifference to Plaintiffs' needs, health, and safety.

157.     As a direct and proximate result of each of these Defendants' conduct, Plaintiffs experienced and continue to experience pain and suffering, severe emotional distress, mental anguish, and the damages alleged herein.

**C.     Allegations Applicable to:**
**i.      Defendant Hines;**
**ii.     Defendant Zenzen;**
**iii.    Defendant Doyle;**
**iv.     Defendant Treadway; and,**
**v.      Defendant Raymond**

158.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 157, as though fully set forth herein.

159.     Each of these Defendants sexually abused one or more of the juvenile detainees within the Juvenile Detention Center, between June 2023 and the present.

160.     On April 30, 2024, Defendant Currington disclosed that Defendant Zenzen sexually abused a male juvenile detainee, by grabbing his genitals, while said detainee was using the restroom.

161.     Between June 2023 and May 2024, Defendant Raymond raped JUVENILE VICTIM 1. Defendant Raymond would exchange "vape pens" for sex with JUVENILE VICTIM 1. Defendant Juvenile Bureau and Defendant OJA were made aware of this relationship, sometime in 2023, and transferred Defendant Raymond to David L. Moss as a corrective measure.

162.     Between June 2023 and August 2023, Defendant Doyle repeatedly sexually abused JANE DOE 1 and ADULT VICTIM 1 and further abused an unknown number of juvenile

detainees within the Juvenile Detention Center, resulting in the widespread dissemination of marijuana-based products through the Juvenile Detention Center.

163.    By August 2023, Defendant Treadway was involved in a romantic relationship with at least one male juvenile detainee at the Juvenile Detention Center and used JANE DOE 1 and ADULT VICTIM 1 to exploit this vulnerable male juvenile detainee by sending correspondence to the detainee through JANE DOE 1 and ADULT VICTIM 1.

164.    In April 2024, Defendant Hines raped CHILD DOE 1.  Due to pornographic videos and photographs Defendant Hines showed other juvenile detainees at the Juvenile Detention Center, including JUVENILE VICTIM 3 and CHILD DOE 2, the disclosure of money-for-sex to JUVENILE VICTIM 2, as well as the fact that an inappropriate photograph of JUVENILE VICTIM 4 is believed to have been found on Defendant Hines' phone, it is believed that Defendant Hines also raped more juvenile detainees while employed at the Juvenile Detention Center.

165.    Each of these Defendants' acts alleged herein constitute deliberate indifference to Plaintiffs' needs, health and safety.

166.    As a direct and proximate result of each of these Defendants' conduct, Plaintiffs experienced and continue to experience pain and suffering, severe emotional distress, mental anguish, and the damages alleged herein.

**D.    Allegations Applicable to:**
    **i.      Defendant Treadway;**
    **ii.     Defendant JANE DOE 1, aka "DO Shalonda;"**
    **iii.    JANE DOE 2, aka "DO Kelly;"**
    **iv.     JANE DOE 3, aka "Miss Carrie;" and**
    **v.      JANE DOE 4, aka "Miss Torrie,"**

167.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 166, as though fully set forth herein.

168.     Between June 2023 and August 2023, each of these Defendants witnessed, and maintained personal knowledge of, one or more sexual abuses on juvenile detainees, including JANE DOE 1 and ADULT VICTIM 1, by Defendant Doyle.

169.     Between June 2023 and August 2023, each of these Defendants witnessed or otherwise had personal knowledge that Defendant Doyle was supplying marijuana-based products to multiple juvenile detainees within the Juvenile Detention Center, including JANE DOE 1 and ADULT VICTIM 1, which resulted in widespread overdoses on marijuana by multiple juvenile detainees.

170.     Despite this personal knowledge, each of these Defendants conspired to further these abuses within the Juvenile Detention Center.

171.     Each of these Defendants' acts and/or omissions alleged herein constitute deliberate indifference to Plaintiffs' needs, health, and safety.

172.     As a direct and proximate result of each of these Defendants' conduct, Plaintiffs experienced and continues to experience physical pain, severe emotional distress, mental anguish, and the damages alleged herein.

## II.     PUNITIVE DAMAGES

173.     Plaintiffs re-alleges and incorporates by reference paragraphs 1 through 172, as though fully set forth herein.

174.     Plaintiffs are entitled to punitive damages on their claims brought pursuant to 42 U.S.C. § 1983 as each Defendants' conduct, acts, and omissions alleged herein constitute malicious and/or reckless or callous indifference to Plaintiffs' federally protected rights.

WHEREFORE, based on the foregoing, Plaintiffs prays that this Court grant the relief sought, including, but not limited to, actual damages in excess of Seventy-Five Thousand Dollars

($75,000.00), with interest accruing from the date of filing of suit, punitive damages in excess of Seventy-Five Thousand Dollars ($75,000.00), reasonable attorney fees, and all other relief deemed appropriate by this Court.

Respectfully submitted,

SMOLEN | LAW, PLLC

Donald E. Smolen, II, OBA #19944
Michael F. Smith, OBA #14815
Chris U. Brecht, OBA #22500
611 S. Detroit Ave.
Tulsa, OK 74120
P: (918) 777-4LAW (4529)
F: (918) 890-4529
don@smolen.law
michael@smolen.law
chrisbrecht@smolen.law
*Attorneys for Plaintiff*

Dustin J. Vanderhoof
#21388

dustin@smolen.law