**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **CHILD DOE 1, a minor, by and through parent and next friend, PARENT DOE 1, et al.,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**TULSA COUNTY, ex. rel. JUVENILE BUREAU OF THE TULSA COUNTY DISTRICT COURT, et al.,**<br><br>**Defendants.** | **Case No. 24-cv-380-SEH-CDL** |

## OPINION AND ORDER

Thirty-seven plaintiffs, primarily minors, allege through a third amended complaint that detention officers and staff at the Tulsa County Juvenile Detention Center ("JDC") physically and sexually assaulted, harassed, and/or raped them during their detention at the facility. [ECF No. 176]. They further allege inadequate medical care, prolonged isolation, failure to meet basic needs, and an absence of oversight. [*Id.*]. They sue various county officials and detention staff under 42 U.S.C. § 1983, claiming cruel and unusual punishment, in violation of the Eighth Amendment, and violations of their due process rights under the Fourteenth Amendment. They advance theories of individual, supervisory, and municipal liability, and further bring

a failure to intervene claim. [*Id.* at ¶¶ 313–366]. Plaintiffs also assert a breach of third-party contract claim against Defendants Juvenile Bureau of the Tulsa County District Court ("Juvenile Bureau"), Board of County Commissioners of Tulsa County ("BOCC"), and the Office of Juvenile Affairs ("OJA"), and negligence claims against Defendant Turn Key Health Clinics, LLC ("Turn Key"). [*Id.* at ¶¶ 367–384]. Plaintiffs seek punitive damages, a permanent injunction, and declaratory relief that would compel Defendants to implement constitutional policies, training, and supervision, and repair "institutional guardrails." [*Id.* at ¶¶ 385–394]. They also request that the Court order independent audits and monitoring of the JDC to ensure compliance and safety. [*Id.* at ¶¶ 389–90].

Multiple Defendants move to dismiss these claims. [ECF Nos. 98, 207, 218–21, 227–28, 230–32, 268–69, 294, 296]. Defendants Turn Key and Mandi Lee Raymond move to sever, arguing that the claims against them do not arise from the same transaction or occurrence. [ECF No. 209].

For the reasons explained below, the Court GRANTS Turn Key's [ECF No. 207], Juvenile Bureau's [ECF No. 219], Parker's [ECF No. 227], Cartmell's [ECF No. 230], Holt's [ECF No. 231], and Brown's [ECF No. 232] motions to dismiss; DENIES Judge Gray's [ECF No. 218], Currington, Edwards, Tunley, and Williams's [ECF No. 221], BOCC's [ECF No. 228], and Taylor's [ECF No. 268] motions to dismiss; and GRANTS, in part, and DENIES, in part T. Gray,

Harris, Lavine, Powell, and Wilson's [ECF No. 220], Treadway, Johnson, Loyd, and Slife's [ECF No. 269], Doyle's [ECF No. 296], and McCoy's [ECF No. 294] motions to dismiss. Also for the reasons set out below, Turn Key and Raymond's motion to dismiss the second amended complaint [ECF No. 98] is MOOT, and Turn Key and Raymond's motion to sever [ECF No. 209] is DENIED as to Raymond and MOOT as to Turn Key.

## I. Party Introductions[1]

Plaintiffs were each detained at the JDC during various periods between 2021 and 2024. [ECF No. 176 at ¶¶ 1–28]. Some were detained multiple times. [*Id.*]. Because the JDC is a juvenile detention center, Plaintiffs were all minors during these custodial periods. [*Id.* at ¶ 70]. Plaintiffs allege that Defendants violated their constitutional rights by providing inadequate housing and supervision, and that some detention officers and staff physically and sexually assaulted, harassed, and raped them. [*See, e.g., id.* at ¶¶ 29–30, 135, 185, 236–37, 239, 290, 298, 301, 303–05, 341, 343, 346, 351, 353, 360, 363, 365–66].

[1] Because certain defendants challenge the sufficiency of the third amended complaint ("complaint"), the Court accepts as true all material allegations of the complaint and construes them in favor of the plaintiffs, as it must at this stage in the litigation. *COPE v. Kansas State Bd. of Educ.*, 821 F.3d 1215, 1220 (10th Cir. 2016). To this end, the Court presents facts throughout this opinion and order from the perspective of the plaintiffs, as alleged in the complaint. But material factual allegations are taken as true only for purposes of determining the motions presented.

*A. Organizational Defendants*

BOCC is a statutorily created governmental entity that is responsible for the operation and maintenance of the JDC through its oversight of the Juvenile Bureau. [ECF No. 176 at ¶ 37]. BOCC contracted with the OJA regarding the JDC. [*Id.*]. The Juvenile Bureau is a county agency that contracts with OJA, through BOCC, "for secure detention services." [*Id.* at ¶ 38].

*B. OJA Leadership*

As Director of the OJA, Defendant Jeffrey Cartmell is "responsible for the care and custody of a youthful offender who has been placed in the custody of the [OJA], and shall have the duty and the authority to provide food, clothing, shelter, ordinary medical care, education, discipline and in an emergency to authorize surgery or other extraordinary care." [ECF No. 176 at ¶ 65 (quoting 10A O.S. § 2-5-212(D))]. Defendant Rachel Holt was Director of the OJA until October 2023. [*Id.* at ¶ 66]. Defendant Ben Brown is OJA's General Counsel. [*Id.* at ¶ 67].

*C. JDC Supervisors*

As chief judge of the Juvenile Division of the Tulsa County District Court, Defendant Kevin Gray ("Judge Gray") has "general administrative authority" over the Director of the Juvenile Bureau. [ECF No. 176 at ¶ 38].

Each of the following defendants, as Juvenile Bureau administrators, were "in part, responsible … for overseeing Plaintiffs' health and well-being, and assuring housing and security needs of Plaintiffs and other juveniles were met," at the JDC:

- Anthony Taylor (Former Director)
- Alondo Edwards (Acting Director)
- Curtice Williams (Interim Superintendent)
- Douglas Currington (Interim Superintendent)
- Cortez Tunley (Former Superintendent)

[ECF No. 176 at ¶¶ 40–44].

Defendant David Parker is the Manager of the JDC. [ECF No. 176 at ¶ 39]. He was also, in part, responsible for overseeing Plaintiffs' health, well-being, housing, and security at the JDC. [*Id.*].

*D. JDC Detention Officers and Staff*

Various employees are alleged to have committed specific acts against Plaintiffs while "employed by Defendant BOCC," and while "acting within the scope of [their] employment and under the color of state law." [ECF No. 176 at ¶¶ 45–63].

The following defendants are alleged to have "abused, harassed, mistreated, raped, and/or sexually assaulted at least one Plaintiff and other juveniles" at the JDC:

- Cindy Treadway[2] (Detention Officer)
- Jonathan Hines (Detention Officer)
- Austin Zenzen (Detention Officer)
- Dquan Doyle (Detention Officer)
- Derek Harris (Detention Officer)
- Dustin Slife (Detention Officer)
- Cierra Manning (Nurse)
- Mandi Lee Raymond (Nurse)

[ECF No. 176 at ¶¶ 30, 45–49, 315]. Hines, Zenzen, Doyle, Treadway, and Raymond are alleged to have each sexually abused juvenile detainees with "deliberate indifference toward known risks to the health and safety of juvenile detainees like Plaintiffs." [*Id.* at ¶ 309].

The following defendants are alleged to have "knowingly allowed the abuse, harassment, mistreatment, rape, and/or sexual assault of multiple Plaintiffs and other juveniles to occur, both at the hands of Juvenile Bureau detention officers and staff as well as other detainees" at the JDC:

- Cindy Treadway (Detention Officer)

[2] Defendant Treadway asserts that Plaintiffs have been made aware that the Juvenile Bureau never employed an individual by the name of "Cindy" Treadway but did employ Sydney Treadway. [ECF No. 269 at 5 n.1]. Plaintiffs respond that "Cindy Treadway" identified in the complaint is "Sydney Treadway." [ECF No. 272 at 7 n. 2]. However, to avoid confusion, the Court refers to this defendant as named in the complaint.

- Sparkle Johnson (Detention Officer)
- Shaylonda Powell (Detention Officer)
- Kelly Lavine (Detention Officer)
- Carrie Loyd (Detention Officer)
- T. Gray (Detention Officer)
- Jane Doe 1 (Nurse)

[ECF No. 176 at ¶¶ 50–51, 53–57].

The following defendants allegedly "assaulted and harassed one or more Plaintiffs and other juveniles" at the JDC:

- John Doe 1, a/k/a "Jeff" (Detention Officer)
- John Doe 2, a/k/a "Deandre" (Detention Officer)
- Derek Harris (Detention Officer)
- Steven McCoy (Detention Officer)
- Dustin Slife (Detention Officer)

[ECF No. 176 at ¶¶ 58–62].

Defendants Jane Does 2–10 are current and former detention officers who are alleged to have "either sexually abused and assaulted, or knowingly and intentionally allowed the abuse, harassment, mistreatment, rape, and/or sexual assault of, multiple Plaintiffs and other juveniles to occur, both at the hands of Juvenile Bureau detention officers and staff as well as other detainees." [ECF No. 176 at ¶ 63].

Defendant Sharon Wilson is the JDC's kitchen manager. [ECF No. 176 at ¶ 52]. She allegedly fed Plaintiffs food "for the specific purpose of triggering these juveniles' diagnosed medical food allergies and causing personal injury(ies)." [*Id.*].

Finally, Turn Key oversees the JDC's day-to-day healthcare operations, including the appointment of various healthcare professionals and nurses. [ECF No. 176 at ¶¶ 68, 72].

## II. Relevant Factual Allegations

The Juvenile Bureau opened the JDC in December 2019. [ECF No. 176 at ¶ 71]. The JDC was subject to routine inspections between 2020 and 2024 by the OJA. [*Id.* at ¶¶ 73–78]. Within the first two years, the OJA noted that the JDC was improperly using room confinement and locking residents down for too long during the day. [*Id.* at ¶¶ 74–75].

### *A. 2022 Allegations*

In May 2022, Brown wrote to all members of the BOCC, noting continued deficiencies, which included extended room confinement. [ECF No. 176 at ¶ 76]. A few days later, OJA representatives met with Tulsa County representatives and stakeholders to discuss concerns raised by the licensing and certification assessment. [*Id.* at ¶ 77]. To address these concerns, the OJA continued to monitor developments over the following year and made unannounced visits to the facility. [*Id.* at ¶ 78].

*B. 2023 Allegations*

In May 2023, Brown met with the Tulsa County Public Defender's Office. [ECF No. 176 at ¶ 79]. At the meeting, Brown noted the Public Defender's concerns about juvenile residents not going to school regularly and spending significant time on lockdown. [*Id.*]. He further noted concerns that members of the JDC staff were intoxicated at work, that the residents had access to "vape pens," and that medications were not being properly dispensed, administered, or monitored. [*Id.*]. Two days later, the OJA placed the JDC on probation. [*Id.* at ¶ 80].

Approximately two weeks later, Brown, Holt, Taylor, Edwards, Tunley, and representatives from the Tulsa County District Attorney's Office, Tulsa County Public Defender's Office, and at least one member of the BOCC, met to address a corrective plan. [ECF No. 176 at ¶ 81]. The Juvenile Bureau denied issues at the JDC, and a member from the Tulsa County Public Defender's office advised BOCC that it was subjecting itself to a federal civil rights lawsuit if it did not correct the identified conditions. [*Id.*].

In August 2023, an OJA licensing specialist emailed the BOCC, detailing multiple areas the Juvenile Bureau needed to remedy at the JDC and extended probation for 90 days. [ECF No. 176 at ¶ 82]. In November, the same licensing specialist recommended to Brown that the JDC receive a permanent two-year license. [*Id.* at ¶ 83]. However, against the OJA licensing

specialist's recommendation, Brown extended probation for another 90 days. [*Id*. at ¶ 84].

*C. 2024 Allegations*

In February 2024, despite continued documented reports of non-compliance, the Juvenile Bureau received a two-year license for the operation of the JDC. Two months after the license issued, Hines raped Plaintiff Child Doe 1. [ECF No. 176 at ¶ 236].

In April 2024, Currington, Williams, Lavine and other personnel within the JDC held a meeting with multiple juvenile male residents of "Unit A" who witnessed, or were otherwise aware of, Hines's rape of Child Doe 1. [ECF No. 176 at ¶ 252]. During the meeting, Currington told the residents that they could not talk about the Hines incident to their therapists, workers, other residents, or staff. [*Id*.]. Lawyers and families were not notified of this meeting. [*Id*.].

On April 19, 2024, Johnson threatened Child Doe 1 into silence about his April 6, 2024 rape, by approaching Child Doe 1's public defender and making multiple statements, including, "you need to tell your client to keep his mouth shut." [ECF No. 176 at ¶ 253].

Five days later, Judge Gray emailed Taylor about correspondence he received earlier that morning from the Tulsa County Public Defender's Office. [ECF No. 176 at ¶ 255]. He copied Currington and Brown. [*Id*.]. In his email,

Judge Gray noted his concerns about Johnson's comments and called for a mandatory meeting and immediate training to discuss issues related to inappropriate sexual contact with detainees. [*Id.*]. He further stated that he would like to review the JDC's policies about the reporting of critical incidents to ensure the policies and procedures reflect an appropriate response and reporting to law enforcement. [*Id.*].

Taylor responded to Judge Gray's email the same day. [ECF No. 176 at ¶ 256]. He noted that Johnson had denied making the comments and stated, "continued improvement is reflected in *the increased confidence of employees* when working with complex and hostile residents." [*Id.* (emphasis in original)]. Taylor wrote this, despite his awareness of Child Doe 1's rape. [*Id.*]. Taylor also touted that the JDC "continues to receive accolades from our state licensing agency, [OJA], which monitors our facility monthly." [*Id.* at ¶ 257].

On April 25, 2024, the Tulsa County Public Defender's Office sent correspondence to Brown, copying Cartmell, Judge Gray, and Tulsa County District Judge Dawn Moody, requesting "immediate action." [ECF No. 176 at ¶ 258]. The correspondence outlined the April 6, 2024 rape, past incidents of sexual assaults that occurred within the JDC during the previous 18 months, and physical threats made on April 19, 2024 to a public defender to bully Child Doe 1 into silence. [*Id.*].

On May 6, 2024, Taylor was fired as Director of the Juvenile Bureau. [ECF No. 176 at ¶ 268]. Edwards, who was the First Deputy Director at the time, replaced Taylor as the Acting Director. [*Id.*]. Approximately two months later, the OJA placed the JDC back on probation. [*Id.* at ¶ 275].

On July 19, 2024, BOCC assumed management of the JDC and hired Parker as the manager. [ECF No. 176 at ¶ 278]. Five days later, Defendant John Doe 3 sexually assaulted Child Doe 20 by purposefully groping Child Doe 20's genitalia during his intake. [*Id.* at ¶ 279]. After the incident, Defendant John Doe 3 repeatedly came to Child Doe 20's cell asking if he "wanted anything," inferring that John Doe 3 wanted to engage in further sexual activities. [*Id.* at ¶ 280].

Upon discovery of the intake incident, Tulsa County Public Defender Lora Howard issued a statement to Cartmell, all three members of BOCC, Parker, and others. [ECF No. 176 at ¶ 281]. In her statement, Ms. Howard requested immediate closure of the JDC, for a brief interim period, to allow Parker to build a new team from the ground up. [*Id.*]. To date, no publicly available corrective action by Juvenile Bureau or the OJA has taken place. [*Id.* at ¶ 282].

**III. Procedural History**

On May 23, 2024, Plaintiffs brought civil rights claims, under 42 U.S.C. § 1983, in the Eastern District of Oklahoma. [ECF No. 2]. Plaintiffs amended

the complaint five days later, adding additional plaintiffs, defendants, factual allegations, and claims for relief. [ECF No. 6]. About a month later, Plaintiffs moved for an emergency preliminary injunction. [ECF No. 24]. The motion was held in abeyance until all the defendants were served or the district court determined venue. [ECF No. 34]. Plaintiffs' counsel was directed to advise the district court when all the defendants had been served, and the case was ready for a hearing. [ECF No. 61].

On July 2, 2024, Plaintiffs filed a second amended complaint, adding additional plaintiffs, defendants, factual allegations, and claims for relief.[3] [ECF No. 31]. The case transferred to this district on August 15, 2024. [ECF Nos. 87, 111, 112]. Before the case transferred, Defendants Raymond and Turn Key moved to dismiss the second amended complaint and alternatively moved to transfer the case to this district. [ECF No. 98].

Plaintiffs sought leave to amend a third time, to include additional plaintiffs, defendants, and operative facts. [ECF No. 109]. After considering the parties' briefing, the Court granted Plaintiffs leave to file a third amended complaint. [ECF No. 175]. It was filed on October 10, 2024. [ECF

[3] The first amended complaint listed 32 plaintiffs, 21 defendants, and was 46 pages long. [ECF No. 6]. The second amended complaint listed 30 plaintiffs, 30 defendants, and spanned 70 pages. [ECF No. 31].

No. 176].[4] About two weeks later, Raymond filed an answer and moved to sever her claims from the other defendants. [ECF Nos. 208, 209]. Turn Key, Judge Gray, Juvenile Bureau, T. Gray, Harris, Lavine, Powell, Wilson, Currington, Edwards, Tunley, Williams, Parker, BOCC, OJA, Cartmell, Holt, Brown, Taylor, Treadway, Johnson, Loyd, Slife, McCoy, and Doyle all move to dismiss the complaint. [ECF Nos. 207, 218–21, 227–32, 268–69, 294, 296]. On December 20, 2024, Plaintiffs voluntarily dismissed their claims against OJA, without prejudice. [ECF No. 267]. Plaintiffs' claims against all other defendants remain pending.

[4] The third amended complaint is the operative complaint. It lists 37 plaintiffs, 34 defendants, and spans 80 pages. [ECF No. 176].

## IV. Discussion

The complaint raises seven claims for relief, categorized by type below:

| **Claim** | **Theory** | **Defendants** |
|---|---|---|
| ***(I) Eighth and Fourteenth Amendment Claims (42 U.S.C. § 1983)*** | | |
| First Claim:<br>Cruel and Unusual Punishment: | Individual Liability | Hines, Zenzen, Doyle, Raymond, Treadway, Wilson, Harris, McCoy, Slife, Jane Doe 1, John Does 1-3 |
| | Municipal / *Monell*[5] Liability | BOCC and Juvenile Bureau |
| | Supervisory Liability | Judge Gray, Parker, Taylor, Edwards, Williams, Currington, Tunley, Cartmell, Holt |
| Second Claim:<br>Failure to Intervene | Individual Liability | Treadway, Powell, Lavine, Loyd, T. Gray |
| ***(II) State-Law Claims*** | | |
| Third Claim:<br>Breach of Third-Party Beneficiary Contract | | BOCC, Juvenile Bureau |
| Fourth Claim:<br>Negligence | | Turn Key |
| Fifth Claim:<br>Negligent Hiring Training, Supervision, Retention, and Maintenance | | Turn Key |
| ***(II) Claims for Relief*** | | |
| Sixth Claim:<br>Injunctive Relief | | BOCC, Juvenile Bureau |
| Seventh Claim:<br>Punitive Damages | | All Defendants |

[5] *Monell v. Dept. of Soc. Svcs.*, 436 U.S. 658 (1978).

As an initial matter, the Court must address claims that Plaintiffs assert on behalf of others. These include references to “other juveniles” in the allegations set out above. Plaintiffs lack standing to bring claims on behalf of others. *See Swoboda v. Dubach*, 992 F.2d 286, 290 (10th Cir. 1993) (plaintiff lacked standing to bring claims on behalf of other prisoners); *see also Archuleta v. McShan*, 897 F.2d 495, 497 (10th Cir. 1990) (referencing the “well-settled principle that a section 1983 claim must be based upon the violation of plaintiff’s personal rights, and not the rights of someone else”). Therefore, to the extent Plaintiffs assert claims on behalf of those not a party to this action, those claims are dismissed.

Relatedly, the Court will dismiss some of the parties sua sponte. The complaint shows multiple plaintiffs failing to make factual allegations against any *particular* defendant. For example, Plaintiff John Doe 4 alleges that he was “repeatedly abused and mistreated by staff and other representatives, including some of the Defendants, at the [JDC].” [ECF No. 176 at ¶ 87]. Similarly, some allegations identifying a defendant fail to identify a *particular* plaintiff. For instance, all Plaintiffs generally allege that Defendant Manning “abused, harassed, mistreated, raped, and/or sexually assaulted at least one Plaintiff” and “was terminated … for having an ‘Inappropriate Relationship’ with a juvenile resident.” [*Id.* at ¶¶ 49, 206]. Plaintiffs also allege that Defendants John and Jane Does 2–10 “each either

committed one or more sexual abuses on juvenile detainees, or witnessed or had personal knowledge of such abuses, including but not limited to Plaintiffs, during their period of employment at the [JDC]." [*Id.* at ¶ 311]. Except for John Doe 2 and John Doe 3, none of these defendants are mentioned anywhere else in the complaint.

In § 1983 cases, Fed. R. Civ. P. 8 requires a party to "make clear exactly *who* is alleged to have done *what* to *whom*, to provide each individual with fair notice as to the basis of the claims against him or her, as distinguished from collective allegations against the state." *Robbins v. Oklahoma, ex rel., Dept. of Human Servs.*, 519 F.3d 1242, 1250 (10th Cir. 2008) (emphasis in original). The examples the Court lists above do not give sufficient notice to any defendant.

Sua sponte dismissal of meritless claims are permissible under Fed. R. Civ. P. 12(b)(6). *Curley v. Perry*, 246 F.3d 1278, 1283–84 (10th Cir. 2001), cert. denied, 534 U.S. 922 (2001). And the Federal Rules permit the Court to dismiss parties in addition to claims. Fed. R. Civ. P. 20(b) vests in the district court the discretion to order separate trials or make such other orders as will prevent delay, expense, or other prejudice. Fed. R. Civ. P. 21 allows a court to sua sponte add or drop a party "at any time, on just terms." Requiring defendants to proceed in this action who are not given adequate notice of the claims against them will undermine the principle of fundamental fairness

implicit in Fed. R. Civ. P. 20(b) and Fed. R. Civ. P. 21. For this reason, the following defendants are dismissed as parties to this action: Manning, Jane Does 2–10, and John Does 4–10.

Because some plaintiffs fail to make allegations identifying any defendant, the following plaintiffs are dismissed as parties: John Doe 4 and Child Does 22–30. Each dismissed Plaintiff may proceed in his or her own individual action.

As to the remaining parties, Plaintiffs' allegations involve serious official misconduct. For the defendants who have not moved to dismiss the claims against them, the Court need not address the sufficiency of those claims. Therefore, the remainder of this opinion and order is limited to the determination of whether claims challenged by the moving defendants should be dismissed from the complaint.

**A. *Claims arising under 42 U.S.C. § 1983***

"Title 42 U.S.C. § 1983 allows an injured person to seek damages against an individual who has violated his or her federal rights while acting under color of state law." *Davis v. Clifford*, 825 F.3d 1131, 1134 (10th Cir. 2016) (quotation omitted).

*1. Rule 12(b)(6)*

A defendant may move to dismiss under Fed. R. Civ. P. 12(b)(6) based on a plaintiff's failure to state a claim upon which relief can be granted. To survive

such a motion, "a plaintiff must plead sufficient factual allegations 'to state a claim to relief that is plausible on its face.'" *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1104 (10th Cir. 2017) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

When determining whether to dismiss a complaint, the court "must accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff." *Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007). The analysis requires a two-pronged approach. First, the court identifies "the allegations in the complaint that are not entitled to the assumption of truth," i.e., those allegations which are merely conclusory. *Iqbal*, 56 U.S. at 680–81. Although "legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679. "[C]onclusory allegations without supporting factual averments are insufficient to state a claim upon which relief can be based." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). Second, the court

assumes the veracity of "well-pleaded factual allegations" and determines "whether they plausibly give rise to an entitlement to relief." *Id.* at 679. If the allegations state a plausible claim for relief, the claim survives the motion to dismiss. *Id.*

Here, the Court is tasked with deciding whether claims should be dismissed under Rule 12(b)(6). However, because Plaintiffs and some defendants assert certain facts in their briefing not alleged in the complaint and attach exhibits to their pleadings, the Court must first address what it can properly consider when deciding Defendants' motions under the Rule. In some responses, Plaintiffs assert facts not asserted in the complaint. [ECF No. 259 at 8–10, 12, 19, 27, 29–31; ECF No. 260 at 8–10; ECF No. 260-1; ECF No. 266 at 6–10; ECF No. 272 at 2–6]. They also attach exhibits to responses that were not attached to the complaint. [ECF Nos. 259-1, 259-2, 259-3, 259-4, 259-5, 259-6, 260-1]. Defendant BOCC does the same in its motion to dismiss, [ECF Nos. 228, 228-1; ECF No. 277-1], as do Cartmell and Holt [ECF Nos. 230, 230-1, 230-2, 230-3, 231, 231-1].

It is well-established that, when deciding a motion to dismiss, the Court must consider whether the facts alleged in the complaint state a claim upon which relief can be granted. *Miller v. Glanz*, 948 F.2d 1562, 1565 (10th Cir. 1991) ("The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess

whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted."). If the Court considers matters outside the complaint, it may transform Defendants' motions into one for summary judgment. *See* Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) … matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."). Generally, "a motion to dismiss should be converted to a summary judgment motion if a party submits, and the district court considers, materials outside the pleadings." *Alvarado*, 493 F.3d at 1215 (quotation omitted).

But "the district court may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity." *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002). It may also take judicial notice of "facts which are a matter of public record" without converting a Rule 12(b)(6) motion into a motion for summary judgment. *Tal v. Hogan*, 453 F.3d 1244, 1264 n. 24 (10th Cir. 2006) (citations omitted).

Under these standards, BOCC submits as exhibits: the JDC's policy manual [ECF No. 228-1], its contract with the OJA [ECF No. 228-3], pages from the JDC resident orientation manual [ECF No. 277-1], and a copy of 1968 session laws authorizing the temporary detention of children [ECF No. 228-2]. [ECF No. 228 at 10–12]. Because the complaint references the policy

manual throughout and Plaintiffs allege a breach of the attached contract, the Court finds these documents are central to the asserted claims. Plaintiffs also do not dispute the documents' authenticity in their response. [ECF No. 261]. Therefore, the Court will consider the policy manual and contract and take judicial notice of the session laws when determining BOCC's motion to dismiss. However, the Court will not consider pages from the resident orientation manual. BOCC attaches these to their reply, which does not afford Plaintiffs an opportunity to object to this exhibit's authenticity. [ECF No. 277].

Cartmell and Holt each attach press releases to their motions to dismiss, apparently to show when they became OJA Executive Director. [ECF No. 230 at 12; ECF Nos. 230-1, 230-2, 230-3; ECF No. 231 at 7; ECF No. 231-1]. They explain that their attachments relate to the Court's determination of subject matter jurisdiction for any official-capacity claims Plaintiffs bring against them. [ECF No. 230 at 14–15; ECF No. 231 at 15]. However, Plaintiffs concede that official-capacity claims against Cartmell and Holt are barred by the Eleventh Amendment. [ECF No. 262 at 6 n.2]. Therefore, the Court will not consider these exhibits, or any fact pertaining to them that is extraneous to the complaint, when deciding Cartmell and Holt's motions to dismiss.

As to additional facts raised in Plaintiffs' briefing, "it is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to

dismiss." *Kearney v. Dimanna*, 195 F. App'x 717, 721 n.2 (10th Cir. 2006) (quotation and brackets omitted). It is also well-established "that in determining whether to grant a motion to dismiss, the district court … [is] limited to assessing the legal sufficiency of the allegations contained within the four corners of the complaint." *Jojola v. Chavez*, 55 F.3d 488, 494 (10th Cir. 1995). Accordingly, the only factual allegations the Court considers are those in Plaintiffs' third amended complaint.

Plaintiffs attach to some of their responses: (1) an email between Judge Gray and Taylor, dated April 24, 2024 [ECF No. 260-1]; (2) a letter Judge Gray wrote to the BOCC, dated July 10, 2024 [ECF No. 259-1]; (3) various publications on solitary confinement and mental health [ECF Nos. 259-2–259-5]; and (4) an online news article about Parker becoming manager of the JDC [ECF No. 259-6]. Because the email between Judge Gray and Taylor is referenced and quoted in the complaint, the Court finds it central to Plaintiffs' claims. Judge Gray nor Taylor raise any objection to the email's authenticity. So, the Court will consider this exhibit in determining Judge Gray and Taylor's motions to dismiss. However, the Court will not consider the remaining exhibits Plaintiffs attach to their responses. The letter Judge Gray wrote to the BOCC is not referenced in the complaint. Nor are any of the publications. The news article is also not mentioned in the complaint.

Because these materials are not central to Plaintiffs' claims, the Court will not consider them in determining the pending motions.

*2. Eighth and Fourteenth Amendment claims*

"[T]he factors necessary to establish a § 1983 violation depend upon the constitutional provision at issue, including the state of mind required to establish a violation of that provision." *Dodds v. Richardson*, 614 F.3d 1185, 1204 (10th Cir. 2010) (citing *Iqbal*, 556 U.S.at677). Plaintiffs assert that the complaint alleges four categories of constitutional violations: sexual abuse, conditions of confinement, medical neglect, and excessive force. [ECF No. 261 at 18; ECF No. 259 at 15]. However, the face of the complaint does not cabin its allegations into these categories. And the Tenth Circuit classifies such claims generally, as either "conditions of confinement" or "excessive force" claims. *See Strain v. Regalado*, 977 F.3d 984, 991 (10th Cir. 2020) (treating medical neglect as a claim of "deliberate indifference" which differed from an "excessive force claim"); *Redmond v. Crowther*, 882 F.3d 927, 936 (10th Cir. 2018) (recognizing both the "conditions-of-confinement framework" and "excessive-force framework"). Here, Plaintiffs' claims of extended room confinement and medical neglect will be analyzed under a "conditions-of-confinement" framework, and their claims of excessive force and sexual abuse analyzed under an "excessive-force" framework. *Thompson v. Lengerich*, No. 22-1128, 2023 WL 2028961, at *3–4 (Feb. 16, 2023) (conditions of

confinement); *Strain*, 977 F.3d at 991 (medical neglect); *Redmond*, 882 F.3d at 936 (excessive force); *Works v. Byers*, 128 F.4th 1156, 1163 (10th Cir. 2025) (sexual abuse).

Although Plaintiffs bring their claims under both the Eighth and Fourteenth Amendments, they do not indicate whether they were pretrial detainees or adjudicated delinquents at the time of the alleged conduct. The Eighth Amendment "applies to those who have been convicted of crime, so they usually cannot complain of confinement itself." *Colbruno v. Kessler*, 928 F.3d 1155, 1162 (10th Cir. 2019) (citation omitted). But the Eighth Amendment protects against "unjustifiable conditions of confinement, such as the unnecessary and wanton infliction of pain, or deliberate indifference to an excessive risk to a prisoner's health." *Id.* (cleaned up). For pretrial detainees, claims of mistreatment are evaluated under the Due Process clause of the Fourteenth Amendment and its protection against arbitrary governmental action by state authorities. *Id.* (citations omitted).

(a) <u>Excessive Force</u>

*Adjudicated Detainees (Eighth Amendment)*

The standards for evaluating excessive force claims differ based on a detainee's adjudication status. "In its prohibition of 'cruel and unusual punishments,' the Eighth Amendment places restraints on prison officials, who may not, for example, use excessive physical force against prisoners."

*Farmer v. Brennan*, 511 U.S. 825, 832 (1970). It also requires officials to provide humane conditions of confinement, such as ensuring that "inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates." *Id.* (internal quotation marks and citations omitted). An Eighth Amendment excessive force claim "involves two prongs: (1) an objective prong that asks if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation, and (2) a subjective prong under which the plaintiff must show that the officials acted with a sufficiently culpable state of mind." *Redmond*, 882 F.3d at 936.

"Not every push or shove, even if it may later seem unnecessary … violates a prisoner's constitutional rights." *Marshall v. Milyard*, 415 F. App'x 850, 852–53 (10th Cir. 2011) (citing *Hudson v. McMillian*, 503 U.S. 1, 9 (1992)). But the "Supreme Court has suggested that even a de minimis use of physical force may violate the Eighth Amendment if it is 'of a sort repugnant to the conscience of mankind.'" *Ali v. Duboise*, 763 F. App'x 645, 650 (10th Cir. 2019) (quoting *Hudson*, 503 U.S. at 10). Thus, the "Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Ullery v.*

*Bradley*, 949 F.3d 1282, 1290 (10th Cir. 2020) (quoting *Hudson*, 503 U.S. at 9–10) (emphasis in original) (internal quotation marks omitted).

"Conduct is repugnant to the conscience of mankind when it is 'incompatible with evolving standards of decency' or involves 'the unnecessary and wanton infliction of pain.'" *Ullery*, 949 F.3d at 1290 (quoting *Hudson*, 503 U.S. at 10). "[E]ven if a use of force is deemed unnecessary after the fact, if it was both de minimus and 'not of a sort repugnant to the conscience of mankind,' it will not sustain an excessive-force claim." *Marshall*, 415 F. A'ppx at 853 (quoting *Hudson*, 503 U.S. at 10); *Wilkins v. Gaddy*, 559 U.S. 34, 38 (2010) ("An inmate who complains of a 'push or shove' that causes no discernable injury almost certainly fails to state a valid excessive force claim.").

"[P]sychological harm, as well as physical injury, can implicate the Eighth Amendment." *Colbruno*, 928 F.3d at 1162 (citing *Hudson*, 503 U.S. at 16 (Blackmun, J., concurring in the judgment) ("It is not hard to imagine inflictions of psychological harm—without corresponding physical harm—that might prove to be cruel and unusual punishment.")

"An official has a culpable state of mind if he uses force 'maliciously and sadistically for the very purpose of causing harm,' rather than 'in a good faith effort to maintain or restore discipline.'" *Redmond*, 882 F.3d at 936 (quoting *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986)).

*Pretrial Detainees (Fourteenth Amendment)*

"[T]he appropriate standard for a pretrial detainee's excessive force claim is solely an objective one" and therefore, "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." *Kingsley v. Hendrickson*, 576 U.S. 389, 396–97 (2015); *see also Colbruno*, 928 F.3d at 1163 ("[T]here is no subjective element of an excessive-force claim brought by a pretrial detainee."). Because due process forbids punishment before adjudication of guilt, "a court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." *Colbruno*, 928 F.3d at 1162 (quoting *Bell v. Wolfish*, 441 U.S. 520, 538 (1979)). If "not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is [unconstitutional] punishment." *Id.* (quoting *Bell*, 441 U.S. at 539). Therefore, "a pretrial detainee can establish a due-process violation by 'providing only objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose.'" *Id.* (quoting *Kingsley*, 576 U.S. at 396–97).

Because the sexual abuse of prisoners is treated "as a species of excessive-force claim," a pretrial detainee bringing such a claim is also not required to meet the "subjective element" required of Eighth Amendment excessive-force

claims. *Brown v. Flowers*, 974 F.3d 1178, 1182–83 (10th Cir. 2020) (internal citations omitted).

(b) Conditions of Confinement

The standards for evaluating Plaintiffs conditions-of-confinement claims are similar under both the Eighth and Fourteenth Amendments. *See Strain*, 977 F.3d at 989 (holding that deliberate indifference to a pretrial detainee's serious medical needs includes both an objective and subjective component); *see also Craig v. Eberly*, 164 F.3d 490, 495 (10th Cir. 1998) ("Although the Due Process Clause governs a pretrial detainee's claim of unconstitutional conditions of confinement, the Eighth Amendment standard provides the benchmarks for such claims." (citation omitted)). To show a conditions-of-confinement violation, Plaintiffs must meet two requirements.[6] First, Plaintiffs must demonstrate that the alleged deprivation "is 'sufficiently serious' to implicate constitutional protection." *DeSpain v. Uphoff*, 264 F.3d 965, 973 (10th Cir. 2001) (quoting *Farmer*, 511 U.S. at 834) (internal quotation marks omitted). And second, they must show that the prison

---

[6] An exception exists for pretrial detainees held in a condition of confinement that amounts to punishment. A pretrial detainee "may not be punished prior to an adjudication of guilt in accordance with due process of law." *Bell*, 441 U.S. at 535. But pretrial detainees may be held in detention "so long as those conditions and restrictions do not amount to punishment or otherwise violate the Constitution." *Id.* at 536–37.

official had "a 'sufficiently culpable state of mind.'" *Farmer*, 511 U.S. at 834 (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)).

Being "incarcerated under conditions posing a substantial risk of serious harm" is enough to satisfy the first requirement. *DeSpain*, 264 F.3d at 973. "A medical need is [objectively] serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Strain*, 977 F.3d at 990 (alteration in original and quotation omitted).

The required state of mind in prison-conditions cases is one of 'deliberate indifference' to inmate health or safety."[7] *Farmer*, 511 U.S. at 834. (citations omitted). "Deliberate indifference" is defined as knowing and disregarding a substantial risk to an inmate's health or safety. *Id*. at 842. Thus, when "a prison official has knowledge of a substantial risk of serious harm to inmates, he is not deliberately indifferent to that risk unless he is aware of and fails to take reasonable steps to alleviate that risk." *Tafoya v. Salazar*, 516 F.3d 912, 916 (10th Cir. 2008). "An official's failure to alleviate a significant risk of which he was unaware, no matter how obvious the risk or how gross his

---

[7] "Section 1983 claims made under the Fourteenth Amendment for deliberate indifference are evaluated under the same standard as section 1983 claims made under the Eighth Amendment for deliberate indifference." *Smith v. Allbaugh*, 987 F.3d 905, 910 n.1 (10th Cir. 2021) (citing *Quintana v. Santa Fe Cty. Bd. of Commrs*, 973 F.3d 1022, 1028 (10th Cir. 2020)).

negligence in failing to perceive it, is not an infliction of punishment and therefore not a constitutional violation." *Id.* (citing *Farmer*, 511 U.S. at 837). But "[t]he official's knowledge of the risk need not be knowledge of a substantial risk to a *particular* inmate, or knowledge of the particular manner in which injury might occur." *Id.* (emphasis in original). Although deliberate indifference may be inferred "based solely on the obviousness of the threat posed to inmates … the mere showing of negligence by an employee over whom the official exercised supervisory responsibility is insufficient for liability to attach." *Id.* at 922 (citing *Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001). Therefore, to establish deliberate-indifference, a plaintiff must show: (1) that the defendant "was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed; (2) that he actually drew that inference; and (3) that he was aware of and failed to take reasonable steps to alleviate that risk." *Perry v. Durborow*, 892 F.3d 1116, 1122 (10th Cir. 2018) (cleaned up).

(c) <u>Generally</u>

For § 1983 actions, "[i]t is well settled that a plaintiff must prove each defendant personally participated in a constitutional violation." *Griffith v. El Paso County, Colorado*, 129 F.4th 790, 822 (10th Cir. 2025) (citing *Pahls v. Thomas*, 718 F.3d 1210, 1231 (10th Cir. 2013) ("Liability under § 1983 … requires personal involvement.")). "Section 1983 also requires proof of an

affirmative causal connection between the actions taken by a particular person 'under color of state law' and the constitutional deprivation." *Tafoya*, 516 F.3d at 922 (citation and internal quotation marks omitted). This requires the plaintiff to show that "an official's acts or omissions were the cause—not merely a contributing factor—of the constitutionally infirm condition." *Id.* (citation and internal quotation marks omitted).

Here, Plaintiffs allege a myriad of claims against various individual defendants. Although some of the allegations rise to the level of a constitutional violation, many do not. This does not make the alleged conduct morally acceptable or any less egregious. But the Court does not sit to reprimand conduct that is uncivilized or morally unacceptable. The Court's job in this context is to consider whether Plaintiffs have stated viable claims against each moving defendant.

Furthermore, the Court recognizes that much of the applicable law is derived from cases involving incarcerated adults. Although it seems reasonable that a different standard should apply to a vulnerable class like detained children, the parties submit no law, and the Court is aware of none, that applies a different standard for analyzing alleged constitutional violations occurring within a juvenile detention center. Therefore, the Court will apply the law as set out above to the allegations brought in the complaint.

**<u>Individual Liability Claims</u>**

**Doyle**

*Jane Doe 1 and Jane Doe 2*

Jane Doe 1 and Jane Doe 2 allege:

From June to August 2023, Doyle repeatedly sexually assaulted and harassed Jane Doe 1 and Jane Doe 2. [ECF No. 176 at ¶ 142]. He routinely made sexually explicit remarks and verbal advances to both girls and gave them unauthorized privileges, such as the use of his cell phone and computer facilities, and unauthorized freedom to physical spaces within the JDC. [*Id.* at ¶¶ 148–49]. During a time Jane Doe 2 used the women's restroom, Doyle stated that he had found her friend on Facebook. [*Id.* at ¶ 147]. Doyle licked and choked Jane Doe 1, grabbed his penis in front of her, showed her a picture of his penis, repeatedly attempted to have her touch him sexually, and told her to lift her shirt and expose her breasts to him. [*Id.* at ¶ 146]. Jane Doe 1 complied with Doyle's instruction to lift her shirt. [*Id.*].

Jane Doe 2 was released at some point between June and August 2023. [*Id.* at ¶ 145]. While she was released, Doyle sent her two unprovoked messages requesting sex and sent her a picture of his penis. [*Id.*].

Before Jane Doe 1 and Jane Doe 2 were both released, they were interviewed about allegations that Doyle was providing residents gummies amid multiple residents testing positive for marijuana. [ECF No. 176 at

¶ 154]. During her interview, Jane Doe 1 made a written statement and disclosed Doyle's sexual assaults and harassment, as well as improprieties of other defendants. [*Id*. at ¶ 155]. Jane Doe 2 also disclosed various improprieties of JDC personnel, including Doyle's, and specifically disclosed that cameras in "Unit B" were inoperable. [*Id*. at ¶ 156]. Her interview was recorded. [*Id*.]. The discovery of Doyle's actions led to state charges of felony sexual battery, indecent exposure, abetting a minor in a drug crime, and possession of contraband in jail. [ECF No. 176 at ¶ 157].

Doyle moves to dismiss the § 1983 claims asserted against him, pursuant to Rule 12(b)(6). [ECF No. 296]. He argues that several of the allegations fail to demonstrate a constitutional violation or are impermissibly conclusory and vague. [*Id*. at 6–7; ECF No. 3 at 10]. As to Jane Doe 1's alleged sexual abuse, Doyle argues that the claim is deficient because it fails to plead her lack of consent. [ECF No. 296 at 6].

Plaintiffs respond that they more than adequately allege constitutional violations.[8] [ECF No. 297 at 1]. They argue that the alleged sexual abuse (including verbal sexual assault), extended room confinement, incidents of contraband, and use of force are all viable claims of cruel and unusual

[8] Because all responses are styled in the collective, the Court sets out arguments throughout this order as if asserted by all Plaintiffs. However, it addresses specific claims as the individual plaintiffs assert them.

punishment. [ECF No. 266 at 12–17, 19–20].[9] Citing no authority, Plaintiffs contend that "a prison guard's drug smuggling to child detainees is per se deliberate indifference to the health, safety, and wellbeing of those children." [ECF No. 297 at 5]. As to Doyle's alleged sexual abuse, Plaintiffs argue they have met their burden of showing these acts were nonconsensual. [*Id*. at 7].

*Jane Doe 1*

The Court agrees that Jane Doe 1 sufficiently states a § 1983 claim of cruel and unusual punishment against Doyle.

"A guard's sexual abuse of an inmate rises to cruel and unusual punishment because sexual abuse has no legitimate penological purpose, and is simply not part of the penalty that criminal offenders pay for their offenses against society." *Works*, 128 F.4th at 1163 (citation and internal quotation marks omitted). Because sexual assault claims are analyzed under the excessive-force framework, to state an Eighth Amendment claim, Jane Doe 1 is required to allege "(1) objectively harmful conduct to establish a constitutional violation and (2) [that Doyle] acted with a sufficiently culpable mental state." *Id*. at 1163–64.

For the first element, "a correction officer's nonconsensual sexual abuse of

[9] Plaintiffs' response adopts the legal argument from their response to Wilson, Powell, Lavine, T. Gray, and Harris's motion to dismiss [ECF No. 266]. Therefore, the Court cites to either motion when addressing Plaintiffs' response.

a prisoner is objectively harmful enough to establish a violation of the Eighth Amendment." *Works*, 128 F.4th at 1164. "When a prison guard violates an inmate's bodily integrity, the nature of the force shows objective harm to the inmate and establishes a violation of her constitutional rights." *Id.* A "significant injury" is not required to pursue an Eighth Amendment claim; instead, the inquiry is on the "nature of the force." *Id.* (quoting *Wilkins*, 559 U.S. at 37).

Here, the Court concludes that Doyle's alleged licking, choking, attempts at sexual touching, and his telling Jane Doe 1 to lift her shirt to expose her breasts would be a use of force that invaded Jane Doe 1's bodily integrity. *See Ullery*, 949 F.3d at 1291–92 (10th Cir. 2020) (holding that a guard pressing his genitals to an inmate's buttocks and grabbing her breast and crotch violates the Constitution). Therefore, if Doyle committed these acts without Jane Doe 1's consent, they were objectively harmful.

Doyle argues that Jane Doe 1's claim of sexual abuse is defective because it fails to plead that the alleged acts were nonconsensual. [ECF No. 296 at 17]. Viewing the facts in a light most favorable to Jane Doe 1, the Court disagrees and finds that her allegations plausibly demonstrate a lack of consent. She alleges Doyle repeatedly attempted to have her touch him sexually and that she exposed her breasts to Doyle upon his command. [ECF No. 176 at ¶ 146]. She further alleges that Doyle gave her unauthorized

privileges, such as the use of his cell phone and computer facilities, and unauthorized freedom to physical spaces within the JDC. [*Id.* at ¶ 149]. This raises an inference of coercion, which supports a lack of consent. *Works*, 128 F.4th at 1163; *Graham v. Sheriff of Logan Cty.*, 741 F.3d 1118, 1125 (10th Cir. 2013) ("coercive factors include favors, privileges, or any type of exchange for sex."). Notably, the complaint alleges that after Jane Doe 1 disclosed Doyle's acts, he was charged with sexual battery and indecent exposure. [*Id.* at ¶¶ 155–57]. The Court finds Jane Doe 1 has met her burden of alleging Doyle's sexual acts were objectively harmful enough to establish a violation of the Eighth Amendment.

Jane Doe 1 also sufficiently alleges the second element of her excessive force claim. She alleges Doyle acted with a sufficiently culpable state of mind by using force "maliciously and sadistically for the very purpose of causing harm." *Redmond*, 882 F.3d at 936. "Where no legitimate penological purpose can be inferred from a prison employee's alleged conduct, including but not limited to sexual abuse or rape, the conduct itself constitutes sufficient evidence that force was used 'maliciously and sadistically for the very purpose of causing harm.'" *Works*, 128 F.4th at 1165. No legitimate penological purpose can be inferred from Doyle's alleged sexual acts with Jane Doe 1. Therefore, Jane Doe 1 pleads sufficient facts to establish a

plausible § 1983 claim against Doyle.[10] Doyle's motion to dismiss as to Jane Doe 1's § 1983 claim is denied.

*Jane Doe 2*

Jane Doe 2 fails to state a § 1983 claim against Doyle.

In contrast to Jane Doe 1's allegations, Jane Doe 2 does not allege objectively harmful conduct that establishes a constitutional violation because she does not allege a use of force that invaded her bodily integrity. Although Jane Doe 2 states that Doyle repeatedly sexually assaulted her, she fails to support this conclusory allegation with any facts demonstrating sexual assault. Therefore, the Court is not bound to accept this allegation as true. *Iqbal*, 556 U.S. at 678.

Nor is Jane Doe 2's allegation that Doyle spoke to her while she used the women's restroom sufficient to show he violated her constitutional rights. Jane Doe 2 does not allege that Doyle viewed her when he made this statement or otherwise entered the restroom. Therefore, this conduct is not objectively harmful.

Doyle's statement also constitutes "undue familiarity," as opposed to

---

[10] A pretrial detainee bringing a sexual abuse claim is not required to meet the "subjective element" required of Eighth Amendment excessive-force claims. *Brown*, 974 F.3d at 1182–83. Therefore, because the Court finds Jane Doe 1 has alleged both objective and subjective elements of an Eighth Amendment claim, she has also stated a Fourteenth Amendment due process claim (in the event she was a pretrial detainee at the time of the alleged conduct).

"sexual misconduct." *See Keith v. Koerner (Keith II)*, 843 F.3d 833, 840 (10th Cir. 2016) ("'Undue familiarity' includes conduct that can range from casual conversation all the way to sexual misconduct, whereas 'sexual misconduct' is defined as sexual behavior that is directed by an employee toward an [inmate]." (cleaned up)). "[U]ndue familiarity—even if crude, boorish, inappropriate, and disgusting—" does not violate "a prisoner's constitutional rights." *Id*. at 843. Although Doyle's alleged acts with Jane Doe 2 are "highly inappropriate … not all misbehavior by public officials, even egregious misbehavior, violates the Constitution." *Graham*, 741 F.3d at 1125.

Because Doyle sent unprovoked requests for sex and a picture of his penis during a period of Jane Doe 2's release, those acts could not have violated the Eighth or Fourteenth Amendments.

Last, Jane Doe 2's allegations of harassment also do not sufficiently support her claim. She alleges that Doyle "repeatedly made sexually-explicit remarks and verbal advances" toward her between June and August 2023 but does not specify what Doyle allegedly said. [ECF No. 176 a ¶ 148]. Although detainees have the "right to be secure in [their] bodily integrity and free from attack by prison guards," acts of verbal sexual harassment and intimidation alone, even if severe, are not sufficient to state a claim under the Eighth Amendment. *Barney v. Pulsipher*, 143 F.3d 1299, 1310 n. 11 (10th Cir. 1998). However, "allegations of verbal harassment of female prisoners by officers

may be cognizable when such harassment is combined with sexual assaults." *Castillo v. Day*, 790 F.3d 1013, 1021 n.7 (10th Cir. 2015) (citing *Barney*, 143 F.3d at 1310 n. 11).

Where sexual harassment or sexual abuse has been alleged in the prison context, "the alleged limited, nonphysical conduct is not objectively, sufficiently serious to give rise to an Eighth Amendment violation." *Folsom v. Knutson*, No. CIV-13-632-D, 2015 WL 13742442, at *7 (W.D. Okla. Sept. 4, 2015) (collecting cases). The Tenth Circuit has found "[m]ere verbal threats or harassment do not rise to the level of a constitutional violation unless they create 'terror of instant and unexpected death.'" *Alvarez v. Gonzales*, 155 F. App'x 393, 396 (10th Cir. 2005) (finding no constitutionally protected right where plaintiff claimed guard antagonized him with sexually inappropriate comment) (quoting *Northington v. Jackson*, 973 F.2d 1518, 1524 (10th Cir. 1992)); *see also McBride v. Deer*, 240 F.3d 1287, at 1291 n.3 (10th Cir. 2001) ("[A]cts or omissions resulting in an inmate being subjected to nothing more than threats and verbal taunts do not violate the Eighth Amendment."). Therefore, courts must parse the boundary between conduct that rises to the level of a constitutional violation (threats or verbal comments paired with an actual attempt or clear capability to inflict serious harm) and conduct that, although despicable, does not rise to the level of a constitutional violation. Here, because Jane Doe 2 does not allege facts demonstrating Doyle sexually

assaulted or terrorized her with verbal threats, she has not sufficiently alleged a § 1983 claim against him. Jane Doe 2's § 1983 claim against Doyle is dismissed.

*Child Doe 19 and John Doe 1*

Child Doe 19 and John Doe 1 also fail to sufficiently state a claim against Doyle. The Court addresses Child Doe 19 and John Doe 1's claims together because they concern similar allegations:

*Child Doe 19*

In the Fall of 2023, Doyle gave Child Doe 19 two white pills and two gummies to "help" him sleep. [ECF No. 176 at ¶ 125]. Child Doe 19 assumed he received marijuana. [*Id.*]. After consuming the pills and gummies he received from Doyle, Child Doe 19 went on an extended room confinement with most of his unit. [ECF No. 176 at ¶ 125]. Shortly thereafter, he started vomiting and passed out for more than 24 hours. [*Id.*]. He was later advised that he was taken to the hospital, due to a drug overdose. [*Id.*]. Doyle is alleged to have widely disseminated drugs to multiple juvenile residents at the same time. [*Id.* at ¶¶ 125, 143].

*John Doe 1*

Doyle "further abused an unknown number of juvenile detainees, including John Doe 1, within the [JDC], resulting in the widespread

dissemination of marijuana-based products through the [JDC]." [ECF No. 176 at ¶ 318].

These allegations do not plausibly show a constitutional violation. To prevail on their conditions-of-confinement claims, Child Doe 19 and John Doe 1 must each prove: (1) the "conditions [were] sufficiently serious to implicate constitutional protection" and (2) that Doyle "acted with deliberate indifference to [their] health or safety." *DeSpain*, 264 F.3d at 971. To satisfy the first requirement, these plaintiffs must show they were "incarcerated under conditions posing a substantial risk of serious harm." *Id*. To show deliberate indifference, they must show (1) that Doyle "was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed; (2) that he actually drew that inference; and (3) that he was aware of and failed to take reasonable steps to alleviate that risk." *Perry*, 892 F.3d at 1122 (cleaned up).

Child Doe 19's allegation that he received marijuana from Doyle fails to show that he was incarcerated under conditions posing a substantial risk of serious harm, or that Doyle acted with deliberate indifference. Child Doe 19 alleges that he vomited and passed out shortly after he consumed the pills and gummies Doyle gave him and was later advised that he was taken to the hospital for a drug overdose. However, Child Doe 19 does not allege that Doyle was aware of any facts from which he could infer that a serious risk of

harm existed to Child Doe 19. Therefore, Child Doe 19's allegations involving drugs do not sufficiently show a deprivation of his constitutional rights.

Nor does Child Do 19's allegation of extended room confinement state a cognizable constitutional claim. Although he alleges that he "went on an extended room confinement," he does not include sufficient facts to show the duration of that confinement or whether it was imposed as punishment. He also fails to explain how his extended confinement resulted in a substantial risk to his health or safety to which Doyle was deliberately indifferent. For these reasons, he fails to state a viable Eighth or Fourteenth Amendment claim against Doyle based upon his alleged room confinement.

John Doe 1's allegation that Doyle's abuse of him "resulted in widespread dissemination of marijuana-based products through the [JDC]" also fails to show that Doyle violated his constitutional rights. Child Doe 19 and John Doe 1 must allege facts that demonstrate not only access to controlled substances and/or extended room confinement, but facts which show Doyle was aware of a pervasive safety risk yet chose to ignore it. Because they each fail to do so, their claims against Doyle are dismissed.

*John Doe 3*

John Doe 3 fails to state an excessive force claim against Doyle. John Doe 3 alleges that Doyle threatened to "beat [his] ass," after John Doe 3 had personally observed Doyle physically assault another resident. [ECF No. 176

at ¶ 94]. John Doe 3 further alleges that he was repeatedly abused and mistreated by "staff and other representatives, including some of the Defendants" while he was incarcerated at the JDC at various periods between 2021 and early 2024. [*Id*. at ¶¶ 26, 90].

The first prong of an Eighth Amendment excessive force claim requires "the alleged wrongdoing [to be] objectively harmful enough to establish a constitutional violation." *Redmond*, 882 F.3d at 936. Although "psychological harm, as well as physical injury, can implicate the Eighth Amendment," *Colbruno*, 928 F.3d at 1162, "threats and verbal taunts" are not enough. *McBride*, 240 F.3d at 1291 n.3; *Ortiz v. Torgenson*, No. 2:17-cv-328-TC, 2024 WL 1912424, at *9 (D. Utah April 30, 2024) ("threats alone do not rise to the level of a constitutional violation"); *Borrego v. Mathews*, No. 08–cv–00735–WYD–MJW, 2009 WL 812158, at *9 (D. Col. March 26, 2009) ("verbal threats and harassment … without more, do not state a claim of constitutional dimension") (collecting cases). Here, John Doe 3 does not sufficiently allege an Eighth Amendment claim against Doyle because he alleges only a verbal threat and does not allege Doyle participated in any repeated act against him.

Nor has he plausibly alleged a Fourteenth Amendment claim. "[A] pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." *Kingsley*, 576 U.S. at 397. John Doe 3

does not allege that Doyle used any measure of force against him. Consequently, John Doe 3's § 1983 claim against Doyle is dismissed.

Doyle's motion to dismiss is therefore granted, in part, and denied, in part, as set out above.

**McCoy**

*Child Doe 17*

Child Doe 17 plausibly states a § 1983 claim against McCoy. In count one, he alleges that McCoy supplied him with methamphetamine in July 2024, which necessitated a visit to the hospital. [ECF No. 176 at ¶ 326]. Child Doe 17 avers that McCoy gave him "two white pills and one red pill" and that he took them "all at once." [*Id*. at ¶ 277]. At the hospital, he tested positive for methamphetamine. [*Id*. at ¶¶ 277, 326]. His overdose is alleged to have occurred the day after a federal search warrant was served on the Juvenile Bureau. [*Id*. at ¶¶ 276–77].

McCoy moves to dismiss Child Doe 17's § 1983 claim against him under Rule 12(b)(6). [ECF No. 294]. He argues that the complaint alleges "an isolated incident of individual misconduct," and is absent of "well-pleaded facts to support the elements necessary to state a claim." [*Id*. at 7]. The Court disagrees.

The allegations of the complaint plausibly show that McCoy violated Child Doe 17's constitutional rights. As discussed above, claims related to

conditions of confinement must demonstrate sufficient seriousness of the condition complained of and the prison official's "deliberate indifference" to inmate health or safety. *Farmer*, 511 U.S. at 834.

A sufficiently serious deprivation exposes an inmate to "a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. Methamphetamine indisputably poses a danger to those who ingest it. Child Doe 17's reaction to ingesting the drugs he received from McCoy necessitated a visit to the hospital. [*Id*. at ¶ 326]. "[T]he inherent danger of drugs is magnified when introduced to a controlled environment like a prison." *Zakora*, 44 F.4th at 470 (quoting *United States v. Colon*, 246 F. App'x 153, 156 (3d Cir. 2007)). The allegations are therefore sufficiently serious to satisfy the objective prong of an Eighth Amendment claim.

To allege deliberate indifference, Child Doe 17 must show (1) that McCoy "was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed; (2) that he actually drew that inference; and (3) that he was aware of and failed to take reasonable steps to alleviate that risk." *Perry*, 892 F.3d at 1122 (cleaned up). Awareness can be demonstrated through "inference from circumstantial evidence, ... and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842 (citations omitted). Plaintiffs argue that McCoy gave Child Doe 17 drugs while knowing

that the JDC "was not safe for children," and "amid a multi-agency federal subpoena and investigation." [ECF No. 297 at 3]. They further argue that the act of prison guards smuggling drugs to inmates is a constitutional violation "on its face." [*Id*. at 4]. Despite Plaintiff's contention, the complaint does not allege McCoy was aware of any safety issue at the JDC. The Court also does not find the timing of the federal investigation particularly relevant, because the complaint fails to show the issued warrant concerned any alleged overdose or that McCoy was even aware of the investigation.

However, the complaint contains sufficient facts from which McCoy could infer that a serious risk of harm existed to Child Doe 17. When "a prison official has knowledge of a substantial risk of serious harm to inmates, he is not deliberately indifferent to that risk unless he is aware of and fails to take reasonable steps to alleviate that risk." *Tafoya*, 516 F.3d at 916. The complaint alleges: (1) McCoy "supplied Child Doe 17 with methamphetamine" [*id*. at ¶ 326]; (2) gave him "two white pills and one red pill, which Child Doe 17 took all at once" [*id*. at ¶ 277]; and that (3) "Child Doe 17 was taken to the hospital where [he] tested positive for methamphetamine." [*Id*.]. Although the complaint does not explicitly state that the substance of the pills McCoy allegedly provided to Child Doe 17 was methamphetamine, the circumstances described are enough, taken together, to allege they contained the drug. The risk of providing methamphetamine to Child Doe 17 was obvious. "[I]f a risk

is obvious, so that a reasonable man would realize it, we might well infer that [the prison official] did in fact realize it." *Tafoya* 516 F.3d 912 at 917 (citing *Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001)). Therefore, Child Doe 17's allegations sufficiently allege a deprivation of his constitutional rights. McCoy's motion to dismiss is denied as to Child Doe 17's claim.

*All Plaintiffs*

McCoy also moves to dismiss claims brought against him by all Plaintiffs. [ECF No. 294 at 4–5]. Plaintiffs allege that McCoy "assaulted and harassed one or more Plaintiffs and other juveniles, during the time they were in custody of the [JDC]." [ECF No. 176 at ¶ 61]. In count one, Plaintiffs include an allegation against McCoy and 12 other defendants that each "sexually abused one or more of the Plaintiff's within the [JDC], between 2023 and the present." [*Id*. at ¶ 315]. Plaintiffs cannot paper over absent facts with conclusory allegations. The complaint alleges no facts articulating McCoy's alleged sexual abuse, assault, or harassment of any plaintiff. Nor does it demonstrate a causal connection between McCoy and the specific claims of sexual abuse, assault, and harassment, which is required to establish § 1983 liability. Therefore, it does not contain any factual support for these conclusory allegations. *Iqbal*, 556 U.S. at 679. Plaintiffs' collective § 1983 claim of sexual abuse against McCoy is dismissed.

McCoy's motion to dismiss is granted, in part, and denied, in part, in accordance with the above.

**Wilson, Powell, Lavine, T. Gray, Harris, Treadway, Johnson, Loyd, and Slife**

Wilson, Powell, Lavine, T. Gray, Harris, Treadway, Johnson, Loyd, and Slife also move to dismiss Plaintiffs' § 1983 claims against them under Rule 12(b)(6). [ECF No. 220; ECF No. 269]. The collective arguments of these defendants include:[11]

(1) The allegations of the complaint are conclusory and fail to put them on notice of the alleged constitutional violations. [ECF No. 220 at 8–9; ECF No. 269 at 8–9];

(2) Plaintiffs' allegations relate to isolated incidents of employee misconduct that fail to demonstrate a substantial risk to their health or safety. [ECF No. 220 at 12; ECF No. 269 at 12];

(3) Plaintiffs' excessive force claims are insufficient to establish a constitutional violation, because they lack specific, non-conclusory

[11] Plaintiffs argue that these defendants raise arguments substantially similar to one another and to those raised by the Juvenile Bureau [ECF No. 219], Taylor [ECF No. 268], Edwards, Williams, Currington, and Tunley [ECF No. 221]. [ECF No. 266 at 6; ECF No. 272 at 1]. The Court agrees. For clarity and judicial efficiency, the Court acknowledges these shared arguments. The Court also notes that Plaintiffs adopt legal argument across their responses, including responses to motions to dismiss filed by Judge Gray [ECF No. 259], Taylor [ECF No. 272], Edwards, Williams, Curington, Tunley [ECF No. 265], Wilson, Powell, Lavine, T. Gray, Harris [ECF No. 266], Treadway, Johnson, Loyd, and Slife [ECF No. 272].

factual allegations demonstrating more than de minimus force that posed an objectively unreasonable threat to health or safety. [ECF No. 220 at 14; ECF No. 269 at 16]; and

(4) As to Plaintiffs' failure to intervene claims, Powell, Lavine, T. Gray, Treadway, and Loyd argue that the complaint lacks a causal connection between alleged constitutional violations and each defendant's knowledge of and opportunity to prevent them. [ECF No. 220 at 12, 16; ECF No. 269 at 12–13, 18–19].

In response, Plaintiffs argue that the complaint details the "systemic sexual, physical, medical, and emotional abuses" they suffered within the JDC. [ECF No. 266 at 6; ECF No. 272 at 10]. As to the failure-to-intervene claims, Plaintiffs argue that they need not provide a date certain as to when the JDC Employees were aware of Doyle's sexual abuse acts. [ECF No. 266 at 23]. They contend the complaint sufficiently alleges a failure to intervene because it shows that the JDC Employees personally witnessed Doyle's sexually abusive behaviors from June to August 2023. [*Id.*]. Plaintiffs argue that it is "undisputed that the JDC Employees have known of the multitude of abuses and deprivations within the [JDC]." [*Id.*].

Although the Court understands Plaintiffs bring their claims under a systemic-failure theory of liability, it still must independently evaluate their individual liability claims. "[C]ommon to all § 1983 … claims is the

requirement that liability be predicated on a violation traceable to a defendant-official's own individual actions." *Pahls*, 718 F.3d at 1225 (internal citations and quotation marks omitted). But the "personal-involvement requirement" does not require "direct participation," because "government officials may be held responsible for constitutional violations under a theory of supervisory liability." *Id.* (citing *Dodds*, 614 F.3d at 1199.

Here, some plaintiffs allege that certain defendants violated their constitutional rights directly, e.g., through sexual or physical abuse. Plaintiffs also assert a discrete claim of failing to intervene against Treadway, Powell, Lavine, Loyd, and T. Gray by alleging they each failed to stop other detention officers from violating their constitutional rights. [ECF No. 176 at ¶¶ 359–366]. And Plaintiffs base their claims against the JDC Supervisors and OJA Leadership on supervisory liability. But Plaintiffs do not identify any authority that allows the Court to consider their individual liability claims collectively. In "suits involving multiple defendants … it is incumbent upon a plaintiff to identify *specific* actions taken by *particular* defendants in order to make out a viable § 1983 … claim." *Pahls*, 718 F.3d at 1225–26 (internal citations and quotation marks omitted) (emphasis in original). Defendants in § 1983 cases "often include the government agency and a number of government actors sued in their individual capacities." *Robbins*, 519 F.3d at 1249–50. So, "it is particularly important … that the

complaint make clear exactly *who* is alleged to have done *what* to *whom*, to provide each individual with fair notice as to the basis of the claims against him or her, as distinguished from collective allegations against the state." *Id.* at 1250 (emphasis in original). Therefore, the Court addresses each individual liability claim against the JDC employees, in turn.

**Wilson**

*John Doe 1 and Child Doe 2*

John Doe 1 and Child Doe 2 fail to state § 1983 claims against Wilson. John Doe 1 alleges that Wilson fed him pineapple-soaked chicken with the knowledge that he was allergic to pineapple. [ECF No. 176 at ¶ 112]. After John Doe 1 consumed the chicken, Wilson allegedly said, "Let me know how your nurse trip goes." [*Id.*]. Child Doe 2 also alleges that Wilson intentionally fed him foods to which she knew he was allergic. [*Id.* at ¶ 113].

Wilson moves to dismiss John Doe 1's and Child Doe 2's § 1983 claims against her under Rule 12(b)(6). [ECF No. 220]. She argues that their allegations are not constitutional violations and therefore do not give rise to a viable § 1983 claim. [ECF No. 281 at 5]. John Doe 1 and Child Doe 2 respond that Wilson's "outright assault … by intentionally triggering a known food allergy is violative on its face and needs no further explanation." [ECF No. 266 at 20].

To prevail on their conditions-of-confinement claims, John Doe 1 and Child Doe 2 must each prove: (1) the "conditions [were] sufficiently serious to implicate constitutional protection" and (2) that Wilson "acted with deliberate indifference to [their] health or safety." *DeSpain*, 264 F.3d at 971. To satisfy the first requirement, they must show they were "incarcerated under conditions posing a substantial risk of serious harm." *Id*. The Eighth Amendment guarantees that "inmates receive the basic necessities of [nutritionally] adequate food." *Trujillo v. Williams*, 465 F.3d 1210, 1227 (10th Cir. 2006) (alteration in original) (citations omitted). But the "Constitution does not require prison officials to prepare a medical diet in the manner" inmates request. *Overton v. Cotton*, No. CIV–10–292–FHS–SPS, 2012 WL 1085509, at *13 (N.D. Okla. March 30, 2012) (granting summary judgment on a similar claim when the plaintiff failed to allege "that he suffered actual physical harm" from consuming food to which he was allergic).

John Doe 1 and Child Doe 2 each fail to meet the objective element of their claims because neither allege that Wilson placed them at a serious risk of harm by virtue of consuming the food she served. And neither allege an allergic reaction they sustained that would show their conditions of confinement were sufficiently serious. Therefore, they each fail to plausibly state a cognizable § 1983 claim. Accordingly, their asserted claims against Wilson are dismissed.

*All Plaintiffs*

In count one, Plaintiffs include Wilson with 12 other defendants in alleging "[e]ach of these Defendants sexually abused one or more of the Plaintiff's within the [JDC], between 2023 and the present." [ECF No. 176 at ¶ 315]. Like the same allegation against McCoy, the complaint contains no facts articulating Wilson's alleged sexual abuse of any plaintiff. Nor does it demonstrate a causal connection between Wilson and the specific claim of sexual abuse, which is required to establish § 1983 liability. Therefore, it does not contain any factual support for this conclusory allegation. *Iqbal*, 556 U.S. at 679. Plaintiffs' collective § 1983 claim of sexual abuse against Wilson is dismissed.

**Harris**

*John Doe 1*

John Doe 1 has sufficiently alleged a § 1983 claim against Harris. He alleges that Harris routinely placed him on room confinement because of verbal comments he made that "outlined [his] personal feelings toward" Harris. [ECF No. 176 at ¶ 102]. During many of these instances, Harris allegedly noted the disciplinary action as "resident request" to avoid filling out required disciplinary paperwork. [*Id.*]. John Doe 1 further maintains that Harris regularly placed him on room confinement "as a matter of routine discipline." [*Id.* at ¶ 328].

Harris argues that these allegations do not amount to a constitutional violation because John Doe 1 does not indicate for how long he was placed on room confinement or state any harm he suffered as a result. [ECF No. 281 at 6].

To state an Eighth Amendment conditions of confinement claim, John Doe 1 must plausibly allege that Harris knew of and disregarded a substantial risk that these room confinements posed to his health or safety. *DeSpain*, 264 F.3d at 973. To succeed on an Eighth Amendment claim, a prisoner must demonstrate: an objective component showing "that he is incarcerated under conditions posing a substantial risk of serious harm"—and a subjective component—"that the prison official was deliberately indifferent to his safety." *Verdecia v. Adams*, 327 F.3d 1171, 1175 (10th Cir. 2003) (internal quotation marks omitted). Conditions are sufficiently serious if they "deprive an inmate of the minimal civilized measure of life's necessities," such as adequate food, clothing, shelter, medical care, and safety. *Thompson*,2023 WL 2028961, at *3. However, "[t]he Eighth Amendment 'does not mandate comfortable prisons,' and conditions imposed may be 'restrictive and even harsh.'" *Barney*, 143 F.3d at 1311 (citation omitted).

The Court finds that John Doe 1 does not state an Eighth Amendment claim because he does not allege a deprivation of basic necessities. "[G]uidance from this Circuit and others suggests that confining inmates to

their cells for twenty-four hours per day or suspending visitation, even for extended durations, does not constitute sufficiently serious deprivations" to state an Eighth Amendment claim. *May v. Segovia*, No. 15–cv–00405–NYW, 2017 WL 57257, at *6 (D. Col. Jan. 2017) (collecting cases). Because John Doe 1 fails to satisfy the objective prong of the Eighth Amendment analyses, he has failed to state an Eighth Amendment claim of cruel and unusual punishment against Harris.

But John Doe 1 has sufficiently alleged a Fourteenth Amendment Due Process claim against Harris. He sets forth sufficient facts showing that he was placed on room confinement as a form of disciplinary action. "[P]unishment is *never* constitutionally permissible for presumptively innocent individuals awaiting trial." *Blackmon v. Sutton*, 734 F.3d 1237, 1241 (10th Cir. 2013) (citing *Bell*, 441 U.S. at 535 (emphasis in original)). But the government may subject pretrial detainees "to the restrictions and conditions of the detention facility so long as those conditions and restrictions do not amount to punishment, or otherwise violate the Constitution." *Bell* at 536–37. So, a court "must ask whether an expressed intent to punish on the part of detention facility officials exists. If so, liability may attach. If not, a plaintiff may still prove unconstitutional punishment by showing that the restriction [or condition] in question bears no reasonable relationship to any

legitimate governmental objective." *Blackmon*, 734 F.3dat 1241 (citation and internal quotation marks omitted).

Here, John Doe 1 alleges that Harris routinely placed him on room confinement to punish his verbal comments. [ECF No. 176 at ¶ 102]. He characterizes Harris's use of room confinement as a "disciplinary action" that would have required Harris to fill out "disciplinary paperwork" had he not noted the confinement was at John Doe 1's request. [*Id.*]. The Court finds this sufficient to demonstrate Harris's expressed intent to punish John Doe 1 by placing him on room confinement. This finding extinguishes the need for the Court to determine whether John Doe 1 has shown that the room confinement bore "no reasonable relationship to any legitimate governmental objective." *Blackmon*, 734 F.3d at 1241. To the extent John Doe 1 was a pretrial detainee during the alleged conduct, he has stated a plausible claim that Harris violated his Fourteenth Amendment due process rights.

*Child Doe 19*

Child Doe 19 sufficiently pleads an Eighth Amendment excessive force claim against Harris. He alleges that Harris threw him against a wall and repeatedly punched him, causing physical injury. [ECF No. 176 at ¶ 124]. Harris argues the allegation "is limited to a single incident" and does not show the "resulting injury or punitive impetus, untethered to proper

penological objectives" necessary to amount to a Constitutional violation. [ECF No. 281 at 6].

Although "[n]ot every push or shove … violates a prisoner's constitutional rights," *Marshall*, 415 F. App'x at 852–53, conduct violates the Eighth Amendment, "when it is 'incompatible with evolving standards of decency' or involves 'the unnecessary and wanton infliction of pain.'" *Ullery*, 949 F.3d at 1290 (quoting *Hudson*, 503 U.S. at 10). An Eighth Amendment excessive force claim has both an objective prong—which "asks if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation" and a subjective prong—where "the plaintiff must show that the officials acted with a sufficiently culpable state of mind." *Redmond*, 882 F.3d at 936 (quotation omitted). "An official has a culpable state of mind if he uses force 'maliciously and sadistically for the very purpose of causing harm,' rather than 'in a good faith effort to maintain or restore discipline.'" *Redmond*, 882 F.3d at 936 (quoting *Whitley*, 475 U.S. at 320–21). "To determine whether prison officials applied force maliciously and sadistically or, rather, in good faith, [courts] consider (1) the need for the force, and (2) whether the officers used a disproportionate amount of force." *Id.* at 937. "When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated." *Id.* (quotation omitted).

Child Doe 19's allegations sufficiently allege both the objective and subjective elements of an Eighth Amendment excessive force claim. Contrary to Harris's assertion, Child Doe 19 need not describe the extent of his injuries to sustain his claim. "[A]llegations of significant injury are also not required for the objective component of an [Eighth Amendment] excessive force claim." *Gilmore v. Neph*, No. 23-3134, 2024 WL 48989, at *2 (10th Cir. 2024) (citing *Hudson*, 503 U.S. at 5, 9). Moreover, "injury and force are not perfectly correlated and that the lack of the former does not doom an excessive force claim." *Id*. (citing *Wilkins*, 559 U.S. at 38 ("An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury.")); *accord United States v. LaVallee*, 439 F.3d 670, 688 (10th Cir. 2006) (holding "certain level or type of injury" is not required to establish objective component of excessive force claim).

Child Doe 19 has also sufficiently alleged an excessive force claim against Harris under the Fourteenth Amendment. "[A] pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." *Kingsly*, 576 U.S. at 396–97. Courts must determine reasonableness "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Id*. at 397. "A court must also account for the 'legitimate interests

that stem from [the government's] need to manage the facility in which the individual is detained,' appropriately deferring to 'policies and practices that in th[e] judgment' of jail officials 'are needed to preserve internal order and discipline and to maintain institutional security.'" *Id.* (quoting *Bell*, 441 U.S. at 540, 547). The following non-exhaustive factors may be considered: "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Id.* (citation omitted).

Child Doe 19's allegation that Harris threw him against a wall, repeatedly punched him, and caused him physical injury plausibly alleges an unreasonable use of force that serves no penological objective. Therefore, Child Doe 19 has sufficiently stated a Fourteenth Amendment excessive force claim against Harris. For these reasons, Harris's motion to dismiss is denied as to Child Doe 19's claims.

*Child Doe 12*

Child Doe 12 fails to plausibly state a § 1983 claim against Harris. He alleges that Harris repeatedly confiscated his family photos and letters from his personal cell. [ECF No. 176 at ¶ 164]. He further maintains that Harris

denied him access to a shower for more than a week, and on occasion, refused to allow him to shower with soap or shampoo. [*Id.* at ¶¶ 165–66].

Harris argues that these allegations do not show a violation of Child Doe 12's constitutional rights because denial of such amenities did not result in a substantial risk to Child Doe 12's health or safety to which Harris was deliberately indifferent. [ECF No. 220 at 11; ECF No. 281 at 6]. Child Doe 12 responds that Harris's deprivations, coupled with the improper use of room confinement, violated his Eighth and Fourteenth Amendment rights. [ECF No. 266 at 17]. The Court is unconvinced.

Claims related to conditions of confinement must include allegations that demonstrate sufficient seriousness of the conditions and the prison official's "deliberate indifference" to inmate health or safety. *Farmer*, 511 U.S. at 834. A sufficiently serious deprivation exposes an inmate to "a substantial risk of serious harm." *Id.* "The mere deprival of cosmetics or family photographs in one's cell does not present the extreme type of situation required to establish an Eighth Amendment infraction." *Sledge v. Carlson*, 405 F. Supp. 1315, 1317 (W.D. Okla. Oct. 30, 1975). Nor does the lack of daily shower access rise to the level of a constitutional violation. *See Hauschulz v. Bourbon Cty. Bd. of Comm'rs*, No. No. 04–3475–KHV, 2006 WL 1675907, at *10 (D. Kan. June 14, 2006) (finding access to a shower once every three days did not amount to a

constitutional violation). Therefore, Child Doe 12's claim against Harris is dismissed.

*Child Doe 15, Child Doe 16, and John Doe 2*

Child Doe 15, Child Doe 16, and John Doe 2 also fail to plausibly allege § 1983 claims against Harris. These plaintiffs allege that Harris made sexually explicit disclosures and that they executed a group grievance to report Harris's statements. [ECF No. 176 at 269–70]. Harris argues that these allegations are not sufficient to state constitutional claims because they were not coupled with physical interaction. [ECF No. 220 at 13; ECF No. 281 at 6]. Child Doe 15, Child Doe 16, and John Doe 2 argue that Harris's sexually explicit disclosures, made weeks after Hines's alleged rape, confirmed "that Harris could do whatever he wanted, whenever he wanted," and that Hines getting caught would not stop the "business-as-usual" practice of sexual misconduct at the JDC. [ECF No. 266 at 20].

For substantially the same reasons Jane Doe 2's claim of sexual harassment against Doyle is dismissed, so too are the claims of Child Doe 15, Child Doe 16, and John Doe 2 against Harris. Acts of verbal sexual harassment and intimidation alone, even if severe, are not sufficient to state an Eighth Amendment claim. *Barney*, 143 F.3d at 1310 n. 11. In the prison context, "alleged limited, nonphysical conduct is not objectively, sufficiently serious to give rise to" a constitutional violation. *Folsom*, No. CIV-13-632-D,

2015 WL 13742442, at *7 (collecting cases). Therefore, Child Doe 15's, Child Doe 16's, and John Doe 2's § 1983 claims against Harris are dismissed.

*All Plaintiffs*

Plaintiffs include Harris with 12 other defendants in count one's allegation that each "sexually abused one or more of the Plaintiff's within the [JDC], between 2023 and the present." [ECF No. 176 at ¶ 315]. For the same reasons this § 1983 claim of sexual abuse is dismissed against McCoy and Wilson, it is dismissed against Harris. The complaint contains no factual allegations demonstrating that Harris committed or caused the sexual abuse of any plaintiff. Plaintiffs' collective § 1983 claim of sexual abuse against Harris is dismissed.

**<u>Treadway</u>**

*Plaintiffs on behalf of an unidentified male juvenile detainee*

Plaintiffs, on behalf an unidentified male juvenile detainee, fail to state a § 1983 claim against Treadway. Plaintiffs allege that Treadway was involved in a "relationship" with a male juvenile detainee and "recruited" Jane Doe 1 and Jane Doe 2 to write and pass this detainee romantic notes. [ECF No. 176 at ¶¶ 151, 320]. Treadway argues that this allegation is insufficient to state a constitutional violation for two reasons: first, because Plaintiffs lack standing to establish a constitutional violation on behalf of another juvenile detainee; and second, because Jane Doe 1 and Jane Doe 2 do not claim Treadway made

any sexually inappropriate remarks or advances toward them. [ECF No. 269 at 15].

The Court agrees that Plaintiffs lack standing to assert a claim on behalf of an unidentified male juvenile detainee. *See Swoboda*, 992 F.2d at 290 (plaintiff lacked standing to bring claims on behalf of other prisoners); *Archuleta*, 897 F.2d at 497 (noting the "well-settled principle" that § 1983 claims "must be based upon the violation of plaintiff's personal rights, and not the rights of someone else").

To the extent this allegation could be construed as Jane Doe 1 and Jane Doe 2 bringing a claim against Treadway for sexual harassment, it is dismissed for substantially the same reasons Jane Doe 2's claim of sexual harassment against Doyle is dismissed, *supra*. *Barney*, 143 F.3d at 1310 n. 11.

*All Plaintiffs*

Plaintiffs further allege that Treadway, with six other defendants, "sexually assaulted, harassed, and/or raped" each of them during their detentions at the JDC. [ECF No. 176 at ¶ 30]. They maintain these defendants "exploited their positions of power to abuse, harass, rape, and sexually assault defenseless minor children." [*Id.*]. In count one, Plaintiffs include Treadway with 12 other defendants in alleging each "sexually abused one or more of the Plaintiff's within the [JDC], between 2023 and the

present." [ECF No. 176 at ¶ 315]. For substantially the same reasons this § 1983 claim of sexual abuse is dismissed against McCoy, Wilson, and Harris, it is dismissed against Treadway. The complaint contains no factual allegations demonstrating that Treadway committed or caused the sexual abuse of any plaintiff. Plaintiffs' collective § 1983 claim against Treadway is dismissed.

**<u>Johnson</u>**

*Child Doe 1, Child Doe 5, and Child Doe 13*

Child Doe 1, Child Doe 5, and Child Doe 13 have each failed to state § 1983 claims against Johnson. Child Doe 1 alleges that Johnson threatened him into silence about his April 6, 2024 rape, by approaching his counsel on April 19, 2024 and making several statements, including, "you need to tell your client to keep his mouth shut." [ECF No. 176 at ¶ 253]. Child Doe 5 and Child Doe 13 allege that Johnson disclosed in a June 2024 group meeting that every juvenile resident in their unit were "responsible" for Hines being charged with raping Child Doe 1. [*Id.* at ¶ 271]. Johnson allegedly stated that they all got what they bargained for by receiving money, snacks, etc. in return for tolerating Hines's sexual advances. [*Id.*]. Child Doe 13 alleges that Johnson called him a racially-derogative nickname. [*Id.*]. Child Doe 5 maintains that Johnson intentionally mispronounced his last name in a racially-derogatory manner, made him feel unsafe and uncomfortable by

specifically targeting him, and implied that he also engaged in sexual activity with Hines. [*Id.*]. Child Doe 5 further avers that Johnson confronted him again about the rape incident between June 18 and June 27, 2024. [*Id.* at ¶ 273].

Johnson moves to dismiss the claims against her on the basis that Plaintiffs did not name her in any claim for relief. [ECF No. 269 at 8, 16]. To the extent Child Doe 1, Child Doe 5, and Child Doe 13's allegations against her could be construed as a claim arising under § 1983 for cruel and unusual punishment, she argues that these allegations are insufficient to state a constitutional violation because they only involve verbal harassment. [*Id.*; ECF No. 282 at 6].

The Court notes that Johnson is not named in any count in the complaint. However, she provides no authority to show that the Court must dismiss in this circumstance if the facts alleged in the complaint otherwise plausibly state a claim for relief. A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. And the Court must assess "the legal sufficiency of the allegations contained within the four corners of the complaint." *Jojola*, 55 F.3d at 494. Accordingly, despite the omission of Johnson's name from the section of the complaint setting out the claims for relief, the Court will consider Child Doe 1, Child

Doe 5, and Child Doe 13's allegations and determine whether they sufficiently state § 1983 claims.

Construing the allegations against Johnson as Eighth Amendment claims for cruel and unusual punishment or Fourteenth Amendment due process claims, the Court finds that Child Doe 1, Child Doe 5, and Child Doe 13 have not sufficiently stated such claims for relief. For substantially the same reasons sexual harassment, alone, does not rise to the level of a constitutional violation, Child Doe 1, Child Doe 5, and Child Doe 13's claims of verbal threats and harassment are also insufficient. *Barney*, 143 F.3d at 1310 n. 11. "Mere verbal threats or harassment do not rise to the level of a constitutional violation unless they create 'terror of instant and unexpected death.'" *Alvarez*, 155 F. App'x at 396 (quoting *Northington*, 973 F.2d at 1524). "[E]ven extreme verbal abuse typically is insufficient to establish a constitutional deprivation." *Abeyta by & Through Martinez v. Chama Valley Indep. Sch. Dist. No. 19*, 77 F.3d 1253, 1256 (10th Cir. 1996) (citing *Collins v. Cundy*, 603 F.2d 825, 827 (10th Cir. 1979) (a sheriff's threat to hang a prisoner was verbal harassment or abuse not sufficient to state a § 1983 constitutional deprivation); *Walker v. Young*, 958 F.2d 381 (Table), 1992 WL 49785, at *2 (10th Cir. March 17, 1992) (affirming dismissal when plaintiff alleged officer threatened to "get even" with him and labeled him a "snitch"). And although a prison official making racist remarks is "deplorable and unprofessional," it

does not constitute a violation of Fourteenth Amendment rights. *Williams v. Levansailor*, 153 F.3d 730 (Table), 1998 WL 426865, at *1 (10th Cir. July 21, 1998). Because Child Doe 1, Child Doe 5, and Child Doe 13 allege no facts demonstrating that Johnson's statements created terror of instant and unexpected death, they have not sufficiently alleged § 1983 claims against her.

Moreover, to the extent these allegations show Johnson engaged in victim and witness intimidation, they are not enough to give rise to a § 1983 claim. Not all criminal misconduct by public officials violates the constitution. *Graham*, 741 F.3d at 1125; *see also Malek v. Haun*, 26 F.3d 1013, 1016 (10th Cir. 1994) ("[A] violation of state law alone does not give rise to a federal cause of action under § 1983."); *Marshall v. Columbia Lea Reg'l Hosp.*, 345 F.3d 1157, 1164 (10th Cir. 2003) (same). Child Doe 1's, Child Doe 5's, and Child Doe 13's claims against Johnson are dismissed.

**<u>Slife</u>**

*Child Doe 18*

Child Doe 18 alleges that Slife made sexually inappropriate comments to him, by telling Child Doe 18 he was a "male stripper" and that Slife would like to see him strip. [ECF No. 176 at ¶ 261]. As explained above, sexual harassment, alone, does not rise to the level of a constitutional violation.

*Barney*, 143 F.3d at 1310 n. 11. Therefore, Child Doe 18 fails to state a § 1983 claim against Slife.

*All Plaintiffs*

Slife is included in Plaintiffs' allegation against him and 12 other defendants that each "sexually abused one or more of the Plaintiff's within the [JDC], between 2023 and the present." [ECF No. 176 at ¶ 315]. For substantially the same reasons this § 1983 claim of sexual abuse is dismissed against McCoy, Wilson, Harris, and Treadway, it is dismissed against Slife. The complaint contains no factual allegations demonstrating that Slife committed or caused the sexual abuse of any plaintiff. Plaintiffs' collective § 1983 sexual abuse claim against Slife is dismissed.

***Failure to Intervene***

In count two, Plaintiffs assert a discrete claim alleging that Treadway, Powell, Lavine, Loyd, and T. Gray failed to intervene to stop other detention officers from violating their constitutional rights. [ECF No. 176 at ¶¶ 359–366]. Plaintiffs allege that these defendants "knowingly allowed the abuse, harassment, mistreatment, rape, and/or sexual assault of multiple Plaintiffs and other juveniles to occur, both at the hands of Juvenile Bureau detention officers and staff as well as other detainees." [*Id.* at ¶¶ 50–51, 53–57]. Specifically, Plaintiffs allege that between June 2023 and August 2023, Treadway, Powell, Lavine, Loyd, and T. Gray "all witnessed and personally

observed" Doyle's "sexually inappropriate behavior" towards Jane Doe 1 and not only failed to intervene but encouraged that behavior. [*Id.* at ¶¶ 153, 360, 361, 362]. Plaintiffs allege, despite these defendants' personal knowledge of one or more sexual abuses within the JDC, including Doyle's abuse of Jane Doe 1, each elected not to report the abuses and conspired to allow them to continue. [*Id.* at ¶¶ 310, 361].

Plaintiffs maintain these defendants "each stood by without intervening to prevent" the constitutional violations committed by Doyle and other defendants, despite having personal knowledge of the violations and an opportunity and duty to do so. [ECF No. 176 at ¶¶ 360, 363]. They state these defendants "had a reasonable opportunity to prevent this harm but failed to do so." [*Id.* at ¶ 364]. They further maintain that the conduct described "was objectively unreasonable and was undertaken intentionally, with malice, willful and/or reckless indifference" to Plaintiffs' constitutional rights. [*Id.* at ¶ 365].

Treadway, Powell, Lavine, Loyd, and T. Gray move to dismiss Plaintiffs' failure-to-intervene claim under Rule 12(b)(6). [ECF Nos. 220, 269]. These defendants contend that the complaint lacks a causal connection between alleged constitutional violations, their knowledge of those violations, and their opportunity to prevent them. [ECF No. 220 at 12, 16; ECF No. 269 at 12–13, 18–19].

The Court finds that Jane Doe 1 plausibly alleges a § 1983 failure to intervene claim against these defendants. However, the remaining plaintiffs do not set forth sufficient facts to demonstrate a plausible basis for this claim.

"[A]ll law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Bledsoe v. Carreno*, 53 F.4th 589, 616 (10th Cir. 2022) (internal quotation marks and citations omitted). To bring a failure-to-intervene claim, a plaintiff must allege "that 1) a government officer violated his constitutional rights, 2) a different government actor (the defendant) observed or had reasons to know about that constitutional violation, and 3) the defendant had a realistic opportunity to intervene, but failed to do so." *Id*. (citations omitted).

*Bledsoe* is instructive. After spending 16 years in prison for a murder he did not commit, Mr. Bledsoe brought a § 1983 action against 10 defendants, most of whom were law enforcement officers. *Bledsoe*, 53 F.4th at 594. He brought a failure-to-intervene claim, alleging the appellants violated his constitutional rights by conspiring to frame him. *Id*. at 594–95. When the district court denied a motion to dismiss, four sheriff's deputies appealed. *Id*. at 595. As relevant here, Mr. Bledsoe alleged:

- that one of the deputies "knowingly and purposefully falsified" statements against him and was at the meeting where the conspiracy was hatched;
- another deputy "purposefully withheld documentation of [another suspect's] inculpatory statements" and "declined" to search the home of that suspect; and
- a third and fourth deputy "intentionally" and "purposefully declined" to search the other suspect's home, room, clothing, or truck (where that suspect said he shot the victim) and shovel that the suspect said he used to bury the victim.

[*Id*. at 598–600].

The Tenth Circuit held that Mr. Bledsoe had adequately stated all the necessary elements of a § 1983 failure-to-intervene claim. *Id*. at 616. First, the court found Mr. Bledsoe had alleged constitutional violations in several ways, including fabricating false evidence. *Id*. Second, he had sufficiently alleged that each appellant knew of the ongoing constitutional deprivations. Third, the court found that each appellant had been given a reasonable opportunity to intervene to prevent harming Mr. Bledsoe, and failed to do so, based on the alleged conspiracy unfolding "over months and months." *Id*.

Likewise, here, Jane Doe 1 sufficiently alleges all the elements of a § 1983 failure-to-intervene claim. First, she alleges Doyle violated her constitutional

rights by sexually abusing her, as shown above. Second, she sufficiently alleges that Treadway, Powell, Lavine, Loyd and T. Gray knew of the ongoing sexual abuse by stating these defendants "witnessed … personally observed … and encouraged" Doyle's "sexually inappropriate behavior" with her. [ECF No. 176 at ¶¶ 153, 361]. Third, she demonstrates that each of these defendants had a reasonable opportunity to intervene and yet did not by alleging each "elected not to report" the abuse and "conspired" to allow it over a period of months. [*Id*. at ¶¶ 310, 361, 363, 364].

Treadway, Powell, Lavine, Loyd, and T. Gray's motions to dismiss are denied as to Jane Doe 1's § 1983 failure-to-intervene claim. As to the remaining plaintiffs' failure-to-intervene claims, their motions are granted.

**Supervisory Liability**

Plaintiffs bring § 1983 claims against Judge Gray, Parker, Taylor, Edwards, Williams, Currington, Tunley, Cartmell, and Holt under a theory of supervisory liability. They bring § 1983 claims against the Juvenile Bureau and the BOCC under a theory of Municipal / *Monell* liability. Before beginning the analysis of these claims, the Court will first discuss the legal framework.

For supervisory liability claims, § 1983 does not "authorize liability under a theory of respondeat superior." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013) (quotation omitted). Thus, it is not

enough that a supervisor acts in a supervisory role when a subordinate violates a plaintiff's constitutional rights. *Keith (II)*, 843 F.3d at 838. Instead, a plaintiff must show an "affirmative link" between the supervisor and the constitutional violation. *Dodds*, 614 F.3d at 1195. "This requires … more than a supervisor's mere knowledge of his subordinate's conduct." *Schneider*, 717 F.3d at 767 (citation and internal quotation marks omitted). The "affirmative link" requirement is embodied in the three elements of a supervisory liability claim: "(1) personal involvement; (2) causation[;] and (3) state of mind." *Id.*

As to personal involvement, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Schneider*, 717 F.3d at 768 (quoting *Iqbal*, 556 U.S. at 676). A plaintiff may also establish personal involvement by showing "the supervisor promulgated, created, implemented, or possessed responsibility for the continued operation of a policy, or the establishment or utilization of an unconstitutional policy or custom, provided the policy or custom resulted in a violation of the plaintiff's constitutional rights." *Burke v. Regalado*, 935 F.3d 960, 997 (10th Cir. 2019) (cleaned up). Personal involvement can also be demonstrated by showing the supervisor "was responsible for but failed to create and enforce policies to protect" the plaintiff from a constitutional harm. *Perry*, 892 F.3d at 1121–22 (citation and internal quotation marks omitted). In contrast to the individual liability claims discussed above, the

Court considers the "conditions of confinement as a whole" in determining whether the facts alleged present a reasonable inference that a defendant-supervisor was personally involved in failing to enforce policies in a way that allowed for a constitutional violation. *See Keith (II)*, 843 F.3d at 840, 846–47 (considering "the evidence as a whole" and concluding a reasonable jury could infer defendant warden was personally involved by failing to enforce policies in a way that allowed sexual misconduct to occur within the prison); *see also Tafoya*, 516 F.3d at 920 (recognizing several failures by the defendant sheriff but finding "perhaps most troubling" his failure to implement an adequate grievance procedure including "serious investigation and response").

For causation, a plaintiff must show "the defendant set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights." *Schneider*, 717 F.3d at 768 (citations and internal quotation marks omitted). "[A] supervising official's management actions may be sufficient to establish causation." *Keith (II)*, 843 F.3d at 847; *see Tafoya*, 516 F.3d at 922 ("[A]cts or deficiencies that result in a jail atmosphere in which discipline and supervision is entirely lacking, may be sufficiently related to a particular instance of assault that a jury is permitted to conclude that the conditions proximately caused the assault.").

The state of mind requirement turns on the type of claim a plaintiff brings. *Schneider*, 717 F.3d at 769 (citing *Iqbal*, 556 U.S. at 676; *Dodds*, 614 F.3d at 1204–05). For an alleged Eighth or Fourteenth Amendment violation, the plaintiff must prove deliberate indifference. *Keith (II)*, 843 F.3d at 848; *Burke*, 935 F.3d at 997. "The standard is subjective, requiring that the official actually be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Keith (II)*, 843 F.3d at 848 (cleaned up). "To satisfy this standard, the plaintiff must produce 'evidence showing that the defendant knowingly created a substantial risk of constitutional injury.'" *Id.* (quoting *Schneider*, 717 F.3d at 769). In some cases, inaction can be enough—"[a] local government policymaker is deliberately indifferent when he deliberately or consciously fails to act when presented with an obvious risk of constitutional harm which will almost inevitably result in constitutional injury of the type experienced by the plaintiff." *Schneider*, 717 F.3d at 769 (cleaned up). But a prison official "is not deliberately indifferent to that risk unless he is aware of and fails to take reasonable steps to alleviate that risk." *Keith (II)*, 843 F.3d at 848 (quoting *Tafoya*, 516 F.3d at 916). In identifying the risk, the focus is not "on the risk to a specific inmate by a specific employee[.]" *Id.* Instead, courts "analyze whether the combined circumstances created a risk for inmates in the plaintiff's situation." *Id.* (citing *Farmer*, 511 U.S. at 843 ("[I]t does not

matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk.”)).

**Municipal / *Monell* Liability**

“A municipality or other local government may be liable under” § 1983 “if the governmental body itself ‘subjects’ a person to a deprivation of rights or ‘causes’ a person ‘to be subjected’ to such deprivation.” *Connick v. Thompson*, 563 U.S. 51, 60 (2011). The “under color of state law” element of a § 1983 municipal liability claim requires that the constitutional deprivation occurred pursuant to official policy or custom. *Monell v. Dep’t of Soc. Servs.*, 436 U.S. 658, 694 (1978). To establish a viable claim under *Monell*, a plaintiff must first point to an underlying constitutional violation for which the governing body is responsible. *See Hinton v. City of Elwood, Kan.*, 997 F.2d 774, 782 (10th Cir. 1993) (without sufficient evidence for a jury to find an underlying constitutional violation, no basis exists for imposing municipal liability under § 1983); *see also Contreras on behalf of A.L. v. Dona Ana Cty. Bd. of Cty. Comm’rs*, 965 F.3d 1114, 1115 n.1 (10th Cir. 2020) (per curium) (“[A]lthough qualified immunity only shields individuals—municipal liability for claims of deliberate indifference must follow only from clearly established constitutional violations.”).

A plaintiff is also required to demonstrate that "the [governing body] *itself* cause[d] the constitutional violation at issue." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989) (emphasis in original). Local governing bodies can be held liable for the unconstitutional acts of its officers only if the officers implement or execute "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell*, 436 U.S. at 690. To ensure that a government body is being held liable for its own conduct, a plaintiff seeking to hold it liable for an officer's wrongdoing must show that (1) an official policy or custom (2) caused the plaintiff's injury, and (3) was "enacted or maintained with deliberate indifference to an almost inevitable constitutional injury." *Schneider*, 717 F.3d at 769.

An official policy or custom may arise in many forms, including "a formal regulation or policy statement, an informal custom that amounts to a widespread practice, decisions of municipal employees with final policymaking authority, ratification by final policymakers of the decisions of subordinates to whom authority was delegated, and the deliberately indifferent failure to adequately train or supervise employees." *Hinkle v. Beckham Cty. Bd. of Cty. Comm'rs*, 962 F.3d 1204, 1239–40 (quotation omitted). "The custom or practice giving rise to liability must be so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to

end the practice." *Burke*, 935 F.3d at 998 (citations and internal quotation marks omitted); *see also Waller v. City & Cty. of Denver*, 932 F.3d 1277, 1283 (10th Cir. 2019) (recognizing that a practice "so permanent and well settled as to constitute a custom or usage with the force of law" can give rise to municipal liability).

Causation may be established when a plaintiff shows "the municipality was the moving force behind the injury alleged." *Schneider*, 717 F.3d at 770 (internal quotation marks omitted). "Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Id.* (citation and internal quotation marks omitted).

To show that "a facially lawful municipal action has led an employee to violate a plaintiff's rights," the plaintiff must show that the action "was taken with deliberate indifference as to its known or obvious consequences." *Schneider*, 717 F.3d at 770 (citations and internal quotation marks omitted). "The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." *Waller*, 932 F.3d at 1284 (citation and internal quotation marks omitted). Although notice is

typically "established by proving the existence of a pattern of tortious conduct," it can also be established "in a narrow range of circumstances where a violation of federal rights is a highly predictable or a plainly obvious consequence of a municipality's action or inaction." *Id.* (cleaned up).

Generally, the question of whether a municipality is liable turns "on whether a specific municipal officer violated an individual's constitutional rights." *Crowson v. Washington Cty. Utah*, 983 F.3d 1166, 1191 (10th Cir. 2020). However, a limited exception exists in cases involving systemic failures: "where the alleged violation occurred as a result of multiple officials' actions or inactions." *Id.*

***Supervisory and municipal liability—Same elements in this case***

"Supervisory and municipal liability differ in that the former is imposed on an individual and the latter on an entity." *Burke*, 935 F.3d at 998. But like supervisory liability, "a municipality may be liable only if a municipal actor committed a constitutional violation." *Id.* (citation omitted). So, "[a] claim asserted against a supervisory official in both her individual and official capacities can serve as the basis for imposing both personal liability against the supervisor, and municipal liability (the official-capacity claim) if the supervisor is a municipal policymaker." *Id.* (quotation omitted).

Here, Plaintiffs do not allege that the BOCC personally participated in an underlying constitutional violation. And supervisory liability is predicated on

the JDC supervisors maintaining a policy or custom that resulted in the underlying violations. Therefore, the "same policy-or-custom element is required" for municipal liability as is required for the supervisory-liability claims. *Burke*, 935 F.3d at 999. Because both supervisory and municipal liability also require: "(1) a causal relationship between the policy or custom and the underlying violation and (2) deliberate indifference," the "elements for supervisory and municipal liability are the same in this case." *Id*.

The Court begins its analysis with the *Monell* claims against the Juvenile Bureau and the BOCC.

**Juvenile Bureau**

The Juvenile Bureau moves to dismiss Plaintiffs' claims against it on three bases. [ECF No. 219]. First, it argues that it is an arm of the state and therefore entitled to Eleventh Amendment immunity. [*Id*. at 7–10]. Next, it alternatively argues, to the extent it is considered a county entity, it is part of Tulsa County and therefore a duplicative party to BOCC and other county employees sued in their official capacities. [*Id*. at 10–11]. Last, it argues that Plaintiffs have failed to state a claim against it upon which relief can be granted. [*Id*. at 11–26].

Juvenile Bureau should be regarded as a county entity that is a duplicative party to BOCC. Oklahoma law provides for the creation of juvenile bureaus in counties having a population of more than eighty

thousand (80,000) residents. 10A O.S. § 2-4-101. Juvenile bureaus consist of a "director" and "other personnel," *see id.* § 2–4–102, whose duties include "investigat[ing] and report[ing] on all cases that are pending in the Juvenile Docket of the district court, and investigat[ing] and report[ing] on all cases of delinquent children and children in need of supervision, residing or being in the county," *see id.* § 2–4–104. The director is "subject to the direction and supervision of the judge of the Juvenile Division[.]" *Id.* at § 2–4–102. "The director may be removed by the judge of the Juvenile Division … at any time." *Id.* "[O]ther employees may be removed by the director." *Id.*

Under Oklahoma law, "[a] detention home … may be established as part[] of the juvenile bureau of the court." 10A O.S. § 2-4-108. And "[t]he judge of the Juvenile Division … may appoint necessary technicians and other employees for such homes in the same manner as … the appointment of other employees of the bureau." *Id.* "The salary of the director and other employees of the bureau and any detention home established pursuant to Section 2-4-108 … shall be fixed by the judge of the Juvenile Division, subject to the general administrative authority of the county commissioners of the contracting county." *Id.* at § 2-4-107(A).

"The board of county commissioners of every county shall provide for the temporary detention of a child who is or may be subject to secure detention and may construct a building or rent space for such purpose." 10A O.S. § 2-3-

103(C)(2). The enabling statutes further declare that the boards of county commissioners in the designated host counties shall …. "operate the juvenile detention facility through a statutorily constituted juvenile bureau subject to the supervision of the district court, or (b) operate the juvenile detention facility by employing a manager who may employ personnel and incur other expenses as may be necessary for its operation and maintenance…." 10A O.S. § 2-3-103(C)(3).

Each organized county in Oklahoma can sue and be sued. 19 O.S. § 1. "In all suits or proceedings by or against a county, the name in which a county shall sue or be sued shall be, 'Board of County Commissioners of the County of [Tulsa].'" 19 O.S. § 4. But "a county's board of county commissioners is not a separate legal entity from the county." *Snow v. Bd. of Cty. Comm'rs of Cty. of McClain*, No. CIV-14-911-HE, 2014 WL 7335319, at *2 (W.D. Okla. Dec. 19, 2014). Rather, "it exercises the powers of the county." *Id.* So, "[a] suit brought against a county's board of county commissioners is the way Oklahoma law contemplates suing the county." *Id.* (citing Okla. Stat. tit. 19, § 4). In the event of a lawsuit against a juvenile bureau, the relevant county must provide legal representation to the juvenile bureau, either through the district attorney's office or other means. 10A O.S. § 2-4-107(D) ("[T]he district attorney of the county in which the juvenile bureau is located shall represent the juvenile bureau and any employee who was acting in his or her official

capacity at the time of the act or omission complained of in any lawsuit.”). If a conflict of interest arises, “the county commissioners may request the assistance of the Attorney General or authorize the employment of private counsel for the juvenile bureau and its employees in their official capacity.” *Id*.

The statute creating the juvenile bureaus at one time contained language that juvenile bureaus “were to be considered departments of the county ‘for legal representation purposes only.’” *Reynolds v. Bd. of Cty. Comm’rs of the Cty. of Okla.*, No. No. CIV–14–0250–HE, 2014 WL 6455508, at *2 (W.D. Okla. Nov. 13, 2014). That language has since been deleted. Removal of this language suggests that “juvenile bureaus are to be regarded as county departments for all purposes.” *Id*. The statutory sections cited above support this conclusion.

The Court also finds persuasive Juvenile Bureau’s argument that district courts within the Tenth Circuit “have consistently held that detention facilities deemed subdivisions of a county are not separately suable entities from the county itself.” [ECF No. 285 at 4]. In addition to the cases Juvenile Bureau cites in their briefing, the Court has found independent authority supporting that assertion. *See Carroll v. Comanche Cty. Detention Ctr.*, No. CIV-18-0482-D, 2018 WL 4442282, at *2 (W.D. Okla. Aug. 1, 2018) (“A county jail in Oklahoma, as a subdivision of the county in which it is located, has no

separate legal identity under Oklahoma law[.]"); *White v. Utah*, 5 F. App'x 852, 853 (10th Cir. 2001) (affirming dismissal of county jail; although applicable state law provided that county may sue or be sued, no state law supported directing a cause of action directly against a county's subdivisions, including its jails); *see also Aston v. Cunningham*, No. 99-4156, 2000 WL 796086, at *4 n.3 (10th Cir. June 21, 2000) (affirming dismissal of county jail as defendant in prisoner's § 1983 action on basis that "a detention facility is not a person or legally created entity capable of being sued").

As a statutorily constituted Oklahoma juvenile bureau, the Court finds Juvenile Bureau to be a duplicative party to the BOCC. Therefore, the claims against it are dismissed.[12]

***Claims asserted against the BOCC and BOCC employees in their official capacities are redundant.***

Plaintiffs' § 1983 official-capacity claims against BOCC employees "represent only another way of pleading an action against an entity of which an officer is an agent." *Monell*, 436 U.S. at 690 n. 55. For this reason, the official-capacity claims against Parker, Taylor, Edwards, Williams, Currington, Tunley (JDC Supervisors), Doyle, Raymond, Treadway, Johnson, Wilson, Powell, Lavine, Loyd, T. Gray, Harris, McCoy, and Slife (JDC staff)

[12] Because the Court grants Juvenile Bureau's motion to dismiss on this basis, it will not address its remaining arguments.

are effectively claims against BOCC.[13] This is also why official-capacity claims against Taylor, Currington, and Tunley transferred to their successors, Parker and Williams, when they left office. *See Burke*, 935 F.3d at 998 (an official-capacity § 1983 claim against a retired sheriff transferred to a new sheriff).

Plaintiffs have sued the BOCC, Juvenile Bureau administrators in their official capacities, and JDC staff in their official capacities. These claims all amount to actions against the county and are permissible methods of pleading a *Monell* claim. *Powell v. Bd. of Cty. Comm'rs of Okla. Cty.*, No. CIV-18-294-D, 2019 WL 2238022, at *4 (W.D. Okla. May 23, 2019). Although permissible under § 1983, such claims are duplicative and unnecessary given that Plaintiffs have named the BOCC as a defendant. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("an official capacity suit is, in all respects other than name, to be treated as a suit against the entity"); 19 O.S. § 4 (a suit against a county must be brought by naming the board of county commissioners of that county); *Martinez v. Beggs*, 563 F.3d 1082, 1091 (10th Cir. 2009) (bringing "a claim against [a sheriff] in his official capacity … is the same as bringing a suit against the county"). Accordingly, Plaintiffs' claims

[13] Plaintiffs concede that official-capacity claims against Judge Gray, Cartmell, Holt, and Brown are barred by the Eleventh Amendment. [ECF No. 259 at 6, n.3; ECF No. 262 at 6, n.2].

against Parker, Taylor, Edwards, Williams, Currington, Tunley (JDC Supervisors), Doyle, Raymond, Treadway, Johnson, Wilson, Powell, Lavine, Loyd, T. Gray, Harris, McCoy, and Slife (JDC staff) in their official capacities are dismissed.

**BOCC**

The BOCC moves to dismiss Plaintiffs' claims against it under Fed. R. Civ. P. 12(b)(1) and 12(b)(6). [ECF No. 228]. Specifically, it argues that it is entitled to Eleventh Amendment immunity because it acts as an arm of the State regarding the JDC. [*Id.* at 12–15]. It further argues that Plaintiffs fail to state a § 1983 municipal liability claim because it was not the governing body of the JDC before July 19, 2024, and conduct that allegedly occurred since did not violate the constitution. [*Id.* at 15–25]. Last, the BOCC argues that Plaintiffs' state law breach of contract claim fails as a matter of law and that punitive damages are not recoverable. [*Id.* at 25–30].

In response, Plaintiffs argue that the BOCC is not entitled to Eleventh Amendment immunity because counties are not afforded that protection. [ECF No. 261 at 12–15].

As to their *Monell* claim, Plaintiffs argue that they have adequately alleged constitutional violations and their municipal liability theory "is based on the BOCC's deliberate indifference in the hiring, training, and supervision of employees, which lead [*sic*] to the consistent abuses and neglect occurring

within the confines of the Juvenile Detention Center, for years." [ECF No. 261 at 18]. They rely on *Crowson v. Washington Cty., Utah*, 983 F.3d 1166, 1191 (10th Cir. 2020) in asserting the BOCC cannot "escape liability by spiderwebbing responsibility across multiple entities." [*Id.* at 7].

Although the complaint does not assert punitive damages against the BOCC specifically, Plaintiffs explain that they are not seeking punitive damages against this defendant.[14] [ECF No. 261 at 8 n. 1]. Plaintiffs also concede that their cause of action for breach of a third-party beneficiary contract against the BOCC should be dismissed.[15] [ECF No. 261 at 8 n.1].

***Eleventh Amendment Immunity***

The Court finds that the BOCC is not entitled to Eleventh Amendment immunity. The BOCC argues that the Oklahoma legislature "explicitly recognizes that the operation of the [JDC] is a state function." [ECF No. 228 at 12]. The Oklahoma Juvenile Code states: "The operation of a juvenile detention facility by a county shall constitute a quasi-judicial function and is also hereby declared to be a function of the State of Oklahoma for purposes of

[14] To the extent Plaintiffs seek punitive damages against the individual defendants, punitive damages are a potential remedy, not a claim for relief, and ruling on the issue is premature at this early stage.

[15] Because Plaintiffs acknowledge that the Juvenile Bureau should also be dismissed from this claim [ECF No. 260 at 7 n.1], and Defendant OJA has previously been dismissed from this matter [ECF No. 267], count three of the third amended complaint is dismissed.

the Eleventh Amendment to the United States Constitution." 10A O.S. § 2-3-103(C)(7). The BOCC relies on this statutory language in arguing that it is entitled to Eleventh Amendment immunity. [ECF Nos. 228 at 12–15; 277 at 1–3]. However, the Court is unpersuaded. The BOCC presents no authority from the Supreme Court, or any court within the Tenth Circuit, demonstrating that a board of county commissioners acts as an arm of the state in any capacity.

In response, Plaintiffs direct the Court to *Reynolds v. Bd. of Cty. Comm'rs of the Cty. of Okla.*, No. CIV–14–0250–HE, 2014 WL 6455508 (W.D. Okla. Nov. 13, 2014). [ECF No. 261 at 12]. *Reynolds* involved an Oklahoma board of county commissioners citing 10A § 2-3-103(C)(7) and claiming Eleventh Amendment immunity in defense of an employment law claim brought by a juvenile bureau employee. *Id.* at *1–2. The district court found, "[a]s the State has set up the juvenile bureaus to operate as county offices, rather than as arms of the State, more than the language in § 2-3-103C(7) will be required to cloak [them] with Eleventh Amendment immunity." *Id.* at *2. Although *Reynolds* did not involve the operation of a juvenile detention center, the Court finds its reasoning persuasive.

Also, in *Burke v. Muskogee Cty. Council of Youth Services*, a more recent § 1983 case arising from the death of a juvenile at the Muskogee County Regional Juvenile Detention Center, the district court likewise held that the

board of county commissioners was not entitled to Eleventh Amendment immunity. No. CIV-18-108-RAW, 2018 WL 11271520, at *3 (E.D. Okla. Nov. 14, 2018). The *Burke* court found, "Eleventh Amendment immunity … is a creature of federal, not state, law, and the Supreme Court 'has repeatedly refused to extend sovereign immunity to counties.'" *Id.* (quoting *Northern Ins. Co. of N.Y. v. Chatham County, Ga.*, 547 U.S. 189, 193 (2006)).

"It is well established that counties are not entitled to Eleventh Amendment immunity." *Estate of Goodwin by and through Alvarado v. Connell*, 376 F. Supp.3d 1133, 1148 (D. Col. March 12, 2019) (citing *Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency*, 440 U.S. 391, 401 (1979) ("[T]he Court has consistently refused to construe the [Eleventh] Amendment to afford protection to political subdivisions such as counties and municipalities, even though such entities exercise a 'slice of state power.'"). Notwithstanding the language of the Juvenile Code, the Court finds that the BOCC is not entitled to Eleventh Amendment immunity.

***Municipal / Monell Liability***

The Court further finds that Plaintiffs plausibly allege a § 1983 municipal liability claim against the BOCC. As set forth above, "[a] *Monell* claim generally requires the plaintiff to allege facts showing: (1) an official policy or custom, (2) causation, and (3) deliberate indifference." *Myers v. Turn Key*

*Health Clinic, LLC*, No. 24-5113, 2026 WL 73939, at *5 (10th Cir. Jan. 9, 2026) (citation and internal quotation marks omitted).

The Tenth Circuit recognizes several types of *Monell* claims. One type is a failure to train/failure to supervise claim, which requires a plaintiff to show that failures of a municipality "are the driving force behind a constitutional violation by a specific municipal employee." *Myers*, 2026 WL 73939, at *5 (citations and internal quotation marks omitted); *Whitewater v. Goss*, 192 F. App'x 794, 797 (10th Cir. 2006) (failure to supervise claims "often may be indistinguishable from failure to train" claims).

Another type of *Monell* claim alleges that "a formally promulgated policy, well-settled custom or practice, or final decision by a policymaker ... 'itself is unconstitutional.'" *Crowson*, 983 F.3d at 1187 (citation omitted). "Because municipalities act through officers, ordinarily there will be a municipal violation only where an individual officer commits a constitutional violation." *Id*. at 1191. But "[w]here the sum of multiple officers' actions taken pursuant to municipal policy results in a constitutional violation, the municipality may be directly liable. That is, the municipality may not escape liability by acting through twenty hands rather than two." *Crowson*, 983 F.3d at 1191. This type of claim is sometimes referred to as a "systemic" theory of municipal liability. *Myers*, 2026 WL 73939, at *5; *see Thao v. Grady Cnty. Crim. Just. Auth.*, 159 F.4th 1214, 1233 n.13 (10th Cir. 2025) (explaining that "such a

claim represents a different theory of municipal liability"). "In [these] situations, the policies may be unconstitutional precisely because they fail to ensure that any single officer is positioned to prevent the constitutional violation." *Crowson*, 983 F.3d at 1191.

The Court construes Plaintiffs' *Monell* claim as alleging a "systemic" theory of municipal liability.

*Analysis*

As shown above, Plaintiffs rely upon an alleged pattern of similar constitutional violations by JDC employees, i.e., sexual and physical abuse, which Plaintiffs experienced for years. In the absence of an official policy, a plaintiff seeking to impose municipal liability under § 1983 may point to "an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law." *Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (internal quotation marks and brackets omitted). Here, Plaintiffs' *Monell* claim is premised on the BOCC's responsibility to operate the JDC and its repeated failure to supervise, discipline employee misconduct, and a failure to enact appropriate policies. [*See*, *e.g.*, ECF No. 176 at ¶¶ 303, 341]. Therefore, Plaintiffs point to an informal custom amounting to a widespread practice. Plaintiffs further allege these failures caused the constitutional violations with the BOCC

"perpetuating rape culture within the JDC." [*Id.* at ¶ 305]; *see Cordova v. Aragon*, 569 F.3d 1183, 1194 (10th Cir. 2009) ("A failure to investigate or reprimand might also cause a future violation by sending a message to officers that such behavior is tolerated."). As to the BOCC's state of mind, Plaintiffs allege that complaints of sexual abuse by detention officers were made but the BOCC took no corrective action. [ECF No. 176 at ¶¶ 293–95]. "Evidence of prior complaints can be sufficient to show that a municipal Defendant and the officials ignored the officers' misconduct." *Est. of Holmes by & through Couser v. Somers*, 387 F. Supp. 3d 1233, 1263 (D. Kan. 2019). Therefore, Plaintiffs have sufficiently stated a municipal liability claim against the BOCC.

Although the BOCC argues that it cannot be liable because it assumed management of the JDC from the Juvenile Bureau on July 19, 2024, the Court is unable to determine from the parties' briefing or from the complaint how the assumption of management was accomplished. And if the BOCC had the authority to take over the JDC in 2024, without any change in the applicable law or administrative code, it must have had the ability to do so before that time. Also, according to the policy manual the BOCC attaches to its motion, the judge of the Juvenile Bureau acted under the administrative authority of the BOCC before 2024. [ECF No. 228-1 at 11].

Because Plaintiffs have made a plausible claim for relief, the Court finds that the BOCC's motion to dismiss should be denied. At this stage of the case, the BOCC has raised a fact-intensive argument that is better suited for resolution on a motion for summary judgment. The BOCC's argument that its authority over the JDC was limited is a factual issue that cannot be resolved on a motion to dismiss. Accordingly, the BOCC's motion to dismiss is denied.

**JDC Supervisors and OJA Leadership**

Plaintiffs base their claims against the JDC Supervisors and OJA Leadership on supervisory liability.

**Judge Gray**

Judge Gray moves to dismiss Plaintiffs' § 1983 supervisory liability claim against him in his individual capacity, pursuant to Rule 12(b)(6). [ECF No. 218].[16] He argues that several of the plaintiffs' allegations fail to demonstrate a constitutional violation and that the collective allegations in the complaint fail to state a claim of supervisory liability. [ECF No. 218 at 5–7]. Judge Gray further contends that the complaint does not allege any identified policy was unconstitutional. [*Id*. at 7–8]. To the extent the complaint makes out a constitutional violation, Judge Gray argues that those allegations do not show his personal involvement, establish causation, or demonstrate that he

[16] Plaintiffs concede that an official-capacity claim against Judge Gray is barred by the Eleventh Amendment. [ECF No. 259 at 6, n.3].

was deliberately indifferent. [*Id*. at 8–9]. Last, he argues that he supervised only the director of the Juvenile Bureau, pursuant to his statutory authority. [*Id*. at 9]. Therefore, Judge Gray claims "there can be no 'affirmative link' between" himself and Plaintiffs' allegations without a showing of his personal involvement with Taylor and/or Edwards. [*Id*. at 9–10].

Plaintiffs respond that Judge Gray is liable because he "was statutorily responsible for the supervision and administration of the Juvenile Detention Center," knew about the constitutional violations occurring within the JDC, and did nothing about them. [ECF No. 259 at 9–12].

The Court finds that Plaintiffs state a plausible § 1983 supervisory liability claim against Judge Gray. That is, they allege an "affirmative link" between Judge Gray and a constitutional violation. *Dodds*, 614 F.3d at 1195. The "affirmative link" requirement is embodied in the three elements of a supervisory liability claim: "(1) personal involvement; (2) causation[;] and (3) state of mind." *Schneider*, 717 F.3d at 767.

Plaintiffs allege Judge Gray was personally involved by "perpetuating rape culture" within the JDC and failed to create and enforce policies to protect Plaintiffs from constitutional harm. [ECF No. 176 at ¶¶ 291–95, 304–05]. To be sure, each plaintiff had a constitutional right not to be raped by a detention officer in the JDC. *See Keith (II)*, 843 F.3d at 837. Personal involvement can be demonstrated by showing the supervisor "was responsible

for but failed to create and enforce policies to protect" the plaintiff from a constitutional harm. *Perry*, 892 F.3d at 1121–22. The Court considers the "conditions of confinement as a whole" in determining whether the facts alleged present a reasonable inference that a defendant-supervisor was personally involved in failing to enforce policies in a way that allowed for a constitutional violation. *See Keith (II)*, 843 F.3d at 840, 846–47 (considering "the evidence as a whole" and concluding a reasonable jury could infer defendant warden was personally involved by failing to enforce policies in a way that allowed sexual misconduct to occur within the prison); *see also Tafoya*, 516 F.3d at 920 (recognizing several failures by the defendant sheriff but finding "perhaps most troubling" his failure to implement an adequate grievance procedure including "serious investigation and response"). Here, Plaintiffs allege facts leading to a reasonable inference of Judge Gray's personal involvement.

Plaintiffs also sufficiently allege causation, which requires a plaintiff to show "the defendant set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights." *Schneider*, 717 F.3d at 768 (citations and internal quotation marks omitted). "[A] supervising official's management actions may be sufficient to establish causation." *Keith (II)*, 843 F.3d at 847. Plaintiffs allege that deficient customs and policies led to the constitutional

violations set out in the complaint, which include allegations of sexual assault and rape in 2023. [ECF No. 176 at ¶¶ 135, 293, 317]. "[A]cts or deficiencies that result in a jail atmosphere in which discipline and supervision is entirely lacking, may be sufficiently related to a particular instance of assault that a jury is permitted to conclude that the conditions proximately caused the assault." *Tafoya*, 516 F.3d at 922.

Finally, Plaintiffs plausibly allege that Judge Gray acted with deliberate indifference. To establish the requisite state of mind, "[t]he official's knowledge of the risk need not be knowledge of a substantial risk to a *particular* inmate, or knowledge of the particular manner in which injury might occur." *Tafoya*, 516 F.3d at 916 (emphasis in original). "The standard is subjective, requiring that the official actually be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Keith (II)*, 843 F.3d at 848. (cleaned up).

In some cases, inaction can be enough—"[a] local government policymaker is deliberately indifferent when he deliberately or consciously fails to act when presented with an obvious risk of constitutional harm which will almost inevitably result in constitutional injury of the type experienced by the plaintiff." *Schneider*, 717 F.3d at 769 (cleaned up). In identifying the risk, the focus is not "on the risk to a specific inmate by a specific employee[.]"

*Keith (II)*, 843 F.3d at 848. Rather, courts "analyze whether the combined circumstances created a risk for inmates in the plaintiff's situation." *Id.* (citing *Farmer*, 511 U.S. at 843 ("[I]t does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk.").

Here, Plaintiffs allege sufficient facts showing Judge Gray knew certain plaintiffs were sexually assaulted and raped in 2023 and 2024 and did not take immediate steps to remediate that conduct, despite his policy-making authority. Therefore, Plaintiffs allege Judge Gray was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]"; (2) that he actually drew that inference; and (3) that he was "aware of and fail[ed] to take reasonable steps to alleviate that risk." *Keith (II)*, 843 F.3d at 848 (quoting *Tafoya*, 516 F.3d at 916). Because Plaintiffs state a plausible § 1983 supervisory liability claim against Judge Gray, his motion to dismiss is denied.

**Edwards, Williams, Currington, Tunley**

Edwards, Williams, Currington, and Tunley also move to dismiss Plaintiffs' supervisory claims against them under Rule 12(b)(6). [ECF No. 221 at 5–17]. These defendants argue that many individual plaintiffs fail to assert a constitutional violation, and that plaintiffs who do assert such a

violation fail to allege facts sufficient to give rise to § 1983 supervisory liability. [*Id.* at 5]. Specifically, these defendants contend that Plaintiffs fail to allege a causal connection between them and specific claims of abuse, and further fail "to specify what knowledge, if any, Defendants had at the time of such violations." [*Id.* at 8–9, 16].

Plaintiffs respond that these defendants failed to implement and enforce policies that would have protected them at the JDC and that their inactions make them accountable for the deprivations Plaintiffs suffered. [ECF No. 265 at 7]. Plaintiffs maintain that the OJA informed these defendants for years about unlawful practices within the JDC that were out of compliance with JDC policies and procedures. [*Id.* at 28].

The Court finds that Plaintiffs state plausible § 1983 supervisory liability claims against Edwards, Williams, Currington, and Tunley for substantially the same reasons they sufficiently state a supervisory liability claim against Judge Gray. Plaintiffs allege that OJA inspectors identified recurring issues with the JDC, including room confinement and grievance protocols, and placed the JDC on probation for years. [ECF No. 176 at ¶¶ 73–74, 80, 82, 84, 275]. They further allege that the disciplinary system at the JDC was used as retaliation for residents who refused to comply with detention officers' sexual advances and to cut off any means of reporting sexual abuse. [*Id.* at ¶ 288].

Plaintiffs show personal involvement by alleging Edwards, Williams, Currington, and Tunley also promulgated a "perpetuating rape culture" within the JDC and were responsible for but failed to create and enforce policies to protect Plaintiffs from constitutional harm. [ECF No. 176 at ¶¶ 291–95, 304–05]; *Perry*, 892 F.3d at 1121–22; *Keith (II)*, 843 F.3d at 840, 846–47. For causation, Plaintiffs allege sufficient facts to show the "acts or deficiencies" of these defendants resulted in an atmosphere within the JDC that was entirely lacking in supervision and discipline, and that those conditions proximately caused the sexual abuse of some plaintiffs. *See Tafoya*, 516 F.3d at 922 ("acts or deficiencies that result in a jail atmosphere in which discipline and supervision is entirely lacking, may be sufficiently related to a particular instance of assault that a jury is permitted to conclude that the conditions proximately caused the assault."). Plaintiffs allege that Edwards, Williams, Currington, and Tunley were on notice of the dangerous conditions in the JDC and were aware that their own indifference toward JDC operations had contributed to those conditions. [ECF No. 176 at ¶¶ 291–95, 302, 304].

Finally, Plaintiffs allege that Edwards, Williams, Currington, and Tunley were deliberately indifferent to the substantial risk of constitutional injury the deficiencies at the JDC posed to Plaintiffs. They allege that these defendants neglected to remedy deficiencies at the JDC, despite having been

informed of them by inspectors and outside agencies. [ECF No. 176 at ¶¶ 291–95]. At bottom, Plaintiffs' allegations show that Edwards, Williams, Currington, and Tunley each allowed numerous deficiencies to go unaddressed for years, which contributed to the resulting constitutional harm. *See Burke*, 935 F.3d at 1000 (finding that a reasonable jury could conclude a sheriff was deliberately indifferent in allowing numerous deficiencies in medical care to go unaddressed for years). Thus, Plaintiffs allege Edwards, Williams, Currington, and Tunley were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]"; (2) that they actually drew that inference; and (3) that they were "aware of and fail[ed] to take reasonable steps to alleviate that risk." *Keith (II)*, 843 F.3d at 848 (quoting *Tafoya*, 516 F.3d at 916).

Edwards, Williams, Currington, and Tunley's motion to dismiss is denied.

**Taylor**

Taylor also moves to dismiss Plaintiffs' supervisory liability claim against him under Rule 12(b)(6). [ECF No. 268]. He argues that Plaintiffs cannot establish his supervisory liability because they fail to show his personal involvement in any alleged constitutional violation. [*Id.* at 8]. He further argues that Plaintiffs fail to show his knowledge of prior misconduct or an official policy endorsing such action and therefore have not sufficiently alleged his deliberate indifference. [*Id.* at 17]. He maintains that Plaintiffs

fall short of establishing causation for supervisory liability without "a specific, articulated link between … official policies or customs and the constitutional violations alleged[.]" [*Id.* at 18].

In response, Plaintiffs argue that the information alleged in Judge Gray's email, Taylor's response, and his subsequent firing are enough to plead a supervisory liability claim against Taylor. [ECF No. 272 at 4–6]. As to the alleged policy or custom, Plaintiffs argue that Taylor "promulgate[d] and promote[d] the lawlessness within the [JDC]." [*Id.* at 6].

The Court finds that Plaintiffs sufficiently state a § 1983 supervisory liability claim against Taylor. Judge Gray's email plausibly alleges Taylor's responsibility as a policy maker. Further, Plaintiffs sufficiently allege Taylor's personal involvement through his failure to implement an adequate grievance procedure that included "serious investigation and response." *Tafoya*, 516 F.3d at 920. Plaintiffs also allege "deficiencies that result[ed] in a jail atmosphere in which discipline and supervision [was] entirely lacking[.]" *Tafoya*, 516 F.3d at 922. Thus, the allegations sufficiently show that Taylor's actions as a supervisor proximately caused the alleged constitutional violations. *Keith (II)*, 843 F.3d at 847. Despite Taylor's assertion to the contrary, Plaintiffs do not rely on a systemic-failure theory to allege a constitutional violation for which Taylor is liable. Rather, the complaint alleges constitutional violations, and Plaintiffs adequately plead Taylor's

personal involvement and causation of those violations through his supervisory role.

Moreover, to establish Talyor's requisite state of mind, his "knowledge of the risk need not be knowledge of a substantial risk to a *particular* inmate, or knowledge of the particular manner in which injury might occur." *Tafoya*, 516 F.3d at 916 (emphasis in original). "The standard is subjective, requiring that [Taylor] actually be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Keith (II)*, 843 F.3d at 848. (cleaned up). In identifying the risk, the focus is not "on the risk to a specific inmate by a specific employee[.]" *Id*. Rather, courts "analyze whether the combined circumstances created a risk for inmates in the plaintiff's situation." *Id*. (citation omitted). Here, Judge Gray's email presented Taylor with an obvious risk of constitutional harm (sexual abuse of inmates), and Plaintiffs allege facts demonstrating Taylor "fail[ed] to take reasonable steps to alleviate that risk." *Id*.

Taylor's motion to dismiss is denied.

**Parker**

Parker also contends that Plaintiffs have failed to state a § 1983 supervisory-liability claim against him. [ECF No. 227]. He argues he was named in this lawsuit after all but one alleged incident and just 26 days after he was hired by the BOCC to serve as the first on-site manager of the JDC.

[*Id*. at 6, 11]. He further argues that the complaint is devoid of any allegation that he "promulgated, created, implemented or possessed responsibility for the continued operation of a policy or custom that caused" any alleged constitutional harm, or that he "acted with the requisite state of mind" to establish § 1983 supervisory liability. [*Id*. at 11].

Plaintiffs respond that Parker "knew exactly what he was stepping into when he accepted managerial responsibilities over the [JDC]." [ECF No. 264 at 7]. They further contend that they plausibly allege Parker's deliberate indifference by showing he continued the "status quo of the [JDC] for a period of time, resulting in the subsequent sexual assault of [Child Doe 20]." [*Id*.] (citing ECF No. 176 at ¶¶ 355–58).

Plaintiffs fail to set forth sufficient facts to state a § 1983 supervisory liability claim against Parker. Although he was in a supervisory role when an alleged constitutional violation occurred, § 1983 does not "authorize liability under a theory of respondeat superior." *Schneider*, 717 F.3d at 767. And Plaintiffs fail to assert sufficient facts to support a causal link between Parker's actions and the alleged constitutional violations within the JDC. Specifically, Plaintiffs fail to allege facts showing Parker "set in motion a series of events that [Parker] knew or reasonably should have known would cause others to deprive [Plaintiffs] of [their] constitutional rights." *Id*. at 768. Nor do they demonstrate Parker's management actions caused the jail

atmosphere that led to a constitutional violation. Thus, the allegations against Parker fail to allege that constitutional violations at the JDC were caused by his failure to enforce current policies or implement different ones. Because the allegations in the complaint do not establish a plausible basis for relief based on any conduct by Parker, his motion to dismiss is granted.

**Cartmell, Holt, and Brown**

Cartmell, Holt, and Brown also move to dismiss Plaintiffs' supervisory liability claims against them, pursuant to Rule 12(b)(6). [ECF Nos. 230, 231, 232]. Plaintiffs concede that the Eleventh Amendment bars official-capacity claims against these defendants. [ECF No. 262 at 6, n.2; ECF No. 263 at 6, n.1]. Therefore, the Court will address only Plaintiffs' individual-capacity supervisory liability claims against Cartmell, Holt, and Brown.

Cartmell argues that he "ensured that the OJA both monitored the [JDC] and acted, to the extent empowered to do so, on information it received about the day-to-day goings-on." [ECF No. 230 at 11]. He contends that Plaintiffs fail to allege how he had any operational or managerial control over the JDC such that he could have implemented or modified JDC policies. [*Id*. at 13, 25, 27]. Cartmell further maintains that Plaintiffs allege the OJA routinely monitored the JDC and took regular action in response to any noted concerns, including placing it on probationary status. [*Id*. at 13, 28]. Therefore, he argues that Plaintiffs fail to identify any specific policy he established or

maintained that led to any alleged constitutional violation. [*Id*. at 28]. As to his state of mind, Cartmell argues that Plaintiffs do not provide sufficient facts to put him on notice about how he was allegedly indifferent to misconduct at the JDC. [*Id*. at 30].

Holt's arguments for dismissal are substantially similar to Cartmell's. [ECF No. 231]. Plaintiffs filed a combined response to both Holt and Cartmell's motions to dismiss, making the same arguments as to each defendant. [ECF No. 262].

In response, Plaintiffs argue that Holt and Cartmell, as OJA Executive Directors, "possessed the sole authority to shut down the [JDC], ending the known child abuse that was occurring on a daily basis." [ECF No. 262 at 6]. They argue that Holt and Cartmell each exhibited deliberate indifference for their health and safety "through the continued refusal to honor OJA procedure, relative to the noncompliance that was occurring" at the JDC and this conduct proximately caused Plaintiffs' damages. [*Id*. at 11].

Brown also argues that Plaintiffs have not alleged sufficient facts to show his supervisory liability under § 1983. [ECF No. 232 at 22–29]. Specifically, he argues that Plaintiffs fail to name him in any count of the complaint, and that the general allegations against him fail to state a supervisory liability claim. [*Id*.]. He further argues that Plaintiffs fail to allege how he, "as the former General Counsel to the OJA, had any operational or managerial

control over the Juvenile Detention Center such that he could have implemented or modified the OJA's policies if he had wanted to do so." [*Id.* at 12]. He also contends that Plaintiffs' claims "do not identify with any particularity" any subordinate government official that he had a duty to hire, train, or discipline. [*Id.* at 25]. Brown further argues that the OJA "*provided* usable policies" for the JDC that other defendants failed to implement. [*Id.* at 27]. Finally, Brown argues that Plaintiffs fail to allege any facts showing he acted with deliberate indifference. [*Id.* at 27–29].

Plaintiffs acknowledge Brown was inadvertently left off the first count of the complaint, but argue that he suffered no prejudice as evidenced by his asserted arguments for dismissal. [ECF No. 263 at 11, n.3]. Plaintiffs maintain Brown possessed, by statute, the required policy-making authority and by failing "to implement abuse-preventing policies," caused Plaintiffs' damages. [*Id.* at 15]. As to his deliberate indifference, Plaintiffs argue that the JDC should have been closed, as opposed to being placed on repeated probations, "to stop the ongoing abuses OJA and Brown knew about." [*Id.* at 17].

The Court finds that Plaintiffs fail to state § 1983 supervisory liability claims against Cartmell, Holt, and Brown. Plaintiffs specifically allege that the BOCC and the Juvenile Bureau "are charged with implementing and developing the policies" of the OJA "with respect to the care and supervision

of juvenile inmates … housed at the [JDC.]" [ECF No. 176 at ¶ 336]. Therefore, the complaint does not show Cartmell, Holt, or Brown's personal involvement, notwithstanding a conclusory allegation that "every one of the Defendants is culpable" for "promoting said culture" within the JDC. [*Id.* at ¶ 297]. Although Ms. Howard's inclusion of Cartmell on her email implies that he had at least some authority over the JDC, Plaintiffs do not allege sufficient facts demonstrating Cartmell's control over any policy or custom that could have caused Plaintiffs' alleged constitutional violations. Nor do the allegations of the complaint "demonstrate that the [alleged] misconduct was caused by [Cartmell, Holt, or Brown's] failure to implement different polices or procedures." *Hyatt v. Bd. of Regents of Okla. Colleges*, 659 F. App'x 522, 525 (10th Cir. 2016).

Plaintiffs also fail to demonstrate that Cartmell, Holt, or Brown were deliberately indifferent. Liability is imposed only when a prison official disregards an excessive risk to inmate health or safety. *Farmer*, 511 U.S. at 837. Negligence is not enough. *Vasquez v. Davis*, 882 F.3d 1270, 1278 (10th Cir. 2018). Plaintiffs allege that the OJA placed the Juvenile Bureau back on probation after Cartmell became Executive Director and publicly warned that the JDC was at risk of closure if "new information comes to light." [*Id.* at ¶ 275]. Although the complaint sufficiently alleges Cartmell, Holt, and Brown were each "aware of facts from which the inference could be drawn that a

substantial risk of serious harm exist[ed]," it does not show that any of these defendants "fail[ed] to take reasonable steps to alleviate that risk." *Keith (II)*, 843 F.3d at 848 (quoting *Tafoya*, 516 F.3d at 916). Rather, Plaintiffs allege Cartmell, Holt, and Brown each took affirmative steps to address safety issues at the JDC, which included routine unannounced visits and placing the facility on probation. Therefore, Plaintiffs do not establish a plausible basis for relief based on Cartmell, Holt, or Brown's alleged conduct.

Cartmell, Holt, and Brown's motions to dismiss are granted.

**Qualified Immunity**

"Qualified immunity shields public officials from facing the burdens of litigation and is an immunity from suit, not simply a defense to a plaintiff's claims." *Buck v. Rhoades*, 598 F. Supp. 3d 1181, 1195 (N.D. Okla. April 6, 2022) (citing *Serna v. Colorado Dept. of Corrections*, 455 F.3d 1146, 1150 (10th Cir. 2006)). When a § 1983 defendant raises qualified immunity, "the burden shifts to the plaintiff." *Sawyers v. Norton*, 962 F.3d 1270, 1282 (10th Cir. 2020) (citation omitted). "To overcome qualified immunity, a plaintiff must show (1) facts that demonstrate the officials violated a federal constitutional or statutory right, which (2) was clearly established at the time of the defendant's conduct." *Id*. The Court "may address either prong of the inquiry first and need not address both if one is dispositive." *Heard v.*

*Dulayev*, 29 F.4th 1195, 1203 (10th Cir. 2022) (citing *Pearson v. Callahan*, 555 U.S. 223, 236, (2009)).

A right is "clearly established" when it "is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam) (quotations omitted). Generally, "[t]he plaintiff must show there is a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Doe v. Woodard*, 912 F.3d 1278, 1289 (internal quotation marks omitted). Relevant "precedent is considered on point if it involves '*materially similar conduct*' or applies 'with *obvious clarity*' to the conduct at issue." *Lowe v. Raemisch*, 864 F.3d 1205, 1208 (10th Cir. 2017) (quoting *Estate of Reat v. Rodriquez*, 824 F.3d 960, 964–65 (10th Cir. 2016)) (emphasis in original). However, "a case directly on point" is not necessary if "existing precedent [has] placed the statutory or constitutional question beyond debate." *White v. Pauly*, 580 U.S. 73, 79 (2017) (per curiam) (quotations omitted). Thus, a plaintiff may "occasionally rely on the general proposition that it would be 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted ... even though existing precedent does not address similar circumstances.'" *Colbruno*, 928 F.3d at 1165 (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 64 (2018)). But "a body of relevant case law is usually

necessary[.]" *Wesby*, 583 U.S. at 64 (quotation and internal quotation marks omitted).

*Analysis*

Because the complaint sufficiently alleges claims against Doyle, Harris, McCoy, Treadway, Powell, Lavine, Loyd, T. Gray, Judge Gray, Taylor, Edwards, Williams, Currington, and Tunley, and each raise qualified immunity, the burden falls on Plaintiffs. To meet that burden, Plaintiffs must show "the violation of a constitutional or statutory right and the clearly established nature of that right." *Lance v. Morris*, 985 F.3d 787, 793 (10th Cir. 2021) (citation omitted). Because qualified immunity turns on "a fact-bound inquiry," it is "typically resolved at the summary judgment stage rather than on a motion to dismiss." *Buck*, 598 F. Supp. 3d at 1196 (quoting *Thompson v. Ragland*, 23 F.4th 1252, 1256 (10th Cir. 2022)). At the Rule 12(b)(6) stage, the Court conducts the qualified immunity inquiry "bound by the facts alleged in the operative complaint." *Griffith*, 129 F.4th at 825 (citation omitted).

A. Doyle

As discussed above, Jane Doe 1 has satisfied the first step of the qualified-immunity analysis; that is, Jane Doe 1 sufficiently alleges that Doyle personally violated her constitutional right. In support of her argument that the right was clearly established, she cites *Keith v. Koerner (Keith II)*, 843

F.3d 833 (10th Cir. 2016). [ECF No. 266 at 12, 22]. Under *Keith II*, "[a]n inmate has a constitutional right to be secure in her bodily integrity and free from attack by prison guards." 843 F.3d at 837 (quoting *Hovater v. Robinson*, 1 F.3d 1063, 1068 (10th Cir. 1993)). Therefore, Jane Doe 1 has met her burden of showing that the right she sufficiently alleges Doyle violated has been clearly established under the law. Doyle is not entitled to qualified immunity.

B. Harris

The Court also determined above that John Doe 1 and Child Doe 19 sufficiently allege that Harris violated their constitutional rights.

*John Doe 1*

John Doe 1's allegations involve Harris using extended room confinement as a form of punishment. To the extent he was a pretrial detainee at the time of Harris's alleged conduct, John Doe 1 sufficiently alleges facts demonstrating that Harris violated his Fourteenth Amendment Due Process rights. However, John Doe 1 provides no caselaw from the Tenth Circuit, Supreme Court, or any other court, showing that the right was clearly established. Instead, John Doe 1 generally argues that any reasonable officer would have been put on notice that his conduct was unlawful. [*See, e.g.,* ECF No. 266 at 22 "widespread, systemic abuse—ranging from grooming, to providing contraband, to verbal assault, to withholding basic necessities such

as showers, to rape—make it clear to any reasonable officer that this conduct is unlawful yesterday, today, and always."].

Because the complaint does not clarify John Doe 1's detention status, the Court requires additional facts to definitively determine whether Harris is entitled to qualified immunity on this claim. However, for the purposes of his motion to dismiss, the Court finds that a reasonable detention officer would have known that it is clearly established by Supreme Court and Tenth Circuit precedent that pretrial detainees cannot be subjected to punishment. *Bell*, 441 U.S. 520, 535 (1979) (pretrial detainees "may not be punished prior to an adjudication of guilt in accordance with due process of law"); *Blackmon*, 734 F.3d at 1242 (defendants were on notice that they could not restrain an 11-year-old pretrial detainee to a chair "with the express purpose of punishing"). Harris is not entitled to qualified immunity on John Doe 1's Fourteenth Amendment Due Process claim.

*Child Doe 19*

Nor is Harris entitled to qualified immunity on Child Doe 19's excessive force claim. Child Doe 19's allegations that Harris threw him against a wall, repeatedly punched him, and caused him physical injury show excessive force claims under both the Eighth and Fourteenth Amendments. But Child Doe 19 also fails to point to specific authority demonstrating that the law was clearly established at the time of Harris's alleged conduct. The Court requires

additional facts to definitively determine whether Harris is entitled to qualified immunity on these claims. But, for purposes of Harris's motion to dismiss, the Court finds that a reasonable officer would have known that it is clearly established by Tenth Circuit precedent that an officer may not use force against a person "who is not resisting[.]" *Wise v. Caffey*, 72 F.4th 1199, 1209 (10th Cir. 2023) (quoting *Estate of Booker v. Gomez*, 745 F.3d 405, 429 (10th Cir. 2014)). Therefore, Harris is not entitled to qualified immunity on Child Doe 19's excessive force claim.

C. McCoy

The Court also determined above that Child Doe 17 sufficiently alleges that his constitutional rights were violated when McCoy gave him methamphetamine. Child Doe 17 similarly fails to point to authority showing clearly established law at the time of McCoy's alleged conduct. Although the Court requires additional facts to definitively determine McCoy's entitlement to qualified immunity, the Court finds, for purposes of his motion to dismiss, that a reasonable officer would have known that it is clearly established that a detention officer may not provide a juvenile detainee with illicit drugs. *See Wesby*, 538 U.S. at 63 ("'Clearly established' means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful.") (cleaned up).

Therefore, McCoy is not entitled to qualified immunity on Child Doe 17's § 1983 claim.

D. Treadway, Powell, Lavine, Loyd, and T. Gray

As discussed above, Jane Doe 1 has satisfied the first step of the qualified-immunity analysis for her failure-to-intervene claims against Treadway, Powell, Lavine, Loyd, and T. Gray. In support of her argument against dismissal, Jane Doe 1 cites *Bledsoe*, 53 F.4th at 616. [ECF No. 266 at 22–23]. In *Bledsoe*, the Tenth Circuit quoted its holding in *Vondrak v. City of Las Cruces*, 535 F.3d 1198, 1210 (10th Cir. 2008), that it is "clearly established that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." 53 F.4th at 616. Therefore, Jane Doe 1 has further met her burden by showing that her alleged failure-to-intervene claim has been clearly established under the law. Treadway, Powell, Lavine, Loyd, and T. Gray are not entitled to qualified immunity on this claim.

E. Judge Gray, Taylor, Edwards, Williams, Currington, and Tunley

Because Plaintiffs have sufficiently alleged supervisory liability claims against Judge Gray, Taylor, Edwards, Williams, Currington, and Tunley, they have satisfied the first step of the qualified-immunity analysis. The Court finds that Plaintiffs have also met their burden of demonstrating the

second step—that the law was clearly established—by citing *Tafoya v. Salazar*, 516 F.3d 912 (10th Cir. 2008). [ECF No. 266 at 26].

In *Tafoya*, a sheriff at a jail where sexual assaults had previously occurred "was on notice of the dangerous conditions in the jail and was aware that his own indifference toward jail operations had contributed to those conditions." 516 F.3d at 917. Consequently, the Tenth Circuit concluded that he "was under a duty not only to take reasonable measures to remedy the circumstances that directly led to the sexual assaults, but to cure his own lack of attention and unresponsiveness to inmate complaints and other indicators of serious problems with his detention staff." *Id*. Therefore, *Tafoya* is a case where the Tenth Circuit found that a defendant-supervisor acting under similar circumstances as Judge Gray, Taylor, Edwards, Williams, Currington, and Tunley violated a plaintiff's constitutional rights. *See id.*, 516 F.3d at 915 ("finding that the supervisory-defendant "was aware of prison conditions that were substantially likely to result in the sexual assault of a female inmate," and concluding "that a jury might infer that the assaults on [plaintiff] were caused by these dangerous conditions").

Here, the complaint alleges facts suggesting that Judge Gray, Taylor, Edwards, Williams, Currington, and Tunley each knew of the substantial risk of sexual assault and physical harm to juvenile detainees and failed to take reasonable measures to prevent its recurrence. *Tafoya* would have put

these supervisory defendants on notice that their conduct was unconstitutional. Therefore, Judge Gray (in his individual capacity), Taylor, Edwards, Williams, Currington, and Tunley are not entitled to qualified immunity.[17]

### *a. State Law Claims*

#### *1. Plaintiffs' negligence claims against Defendant Turn Key are dismissed pursuant to the Oklahoma Governmental Tort Claims Act.*

Turn Key oversees the day-to-day healthcare operations at the JDC, including the appointment of various healthcare professionals and nurses. [ECF No. 176 at ¶¶ 68, 72]. Plaintiffs allege that Turn Key did "nothing to change the policies, procedures, or culture of medical treatment at the [JDC],"and failed to provide "proper and prompt medical treatment for physical injuries," despite its receipt of "multiple, documented, instances of various employees refusing to give residents prescription medication, having inappropriate relationships with multiple residents, [and] distributing one resident's medication to multiple, other, residents[.]" [*Id*. at ¶ 296].

Plaintiffs bring two state law negligence claims against Turn Key. [ECF No. 176 at ¶¶ 373–384]. Turn Key seeks dismissal of these claims, arguing

---

[17] Johnson, Wilson, Slife, and Parker are all entitled to qualified immunity because the complaint fails to allege sufficient facts to show that any of these defendants violated any plaintiff's constitutional rights. Therefore, the Court grants them qualified immunity on the first prong of the analysis.

that Plaintiffs have failed to state plausible claims for relief, and that it is immune from liability under the Oklahoma Governmental Tort Claims Act ("GTCA"), 51 O.S. § 152.1. [ECF No. 207]. In response, Plaintiffs argue that they have sufficiently alleged a negligence claim under a theory of respondeat superior, and a direct negligent hiring, training, supervision, retention, and maintenance claim. [ECF No. 236 at 12–17]. They further argue that Turn Key is not immune from suit under the GTCA because *Lucas v. Turn Key Health Clinics, LLC*, 58 F.4th 1127, 1148 (10th Cir. 2023) is outcome determinative. [*Id*. at 18].

Although Plaintiffs reference four exhibits throughout their response, no exhibits are attached. However, Plaintiffs' response appears to have intended to attach Turn Key's contract with the BOCC, on behalf of the Juvenile Bureau, for medical services at the JDC. [ECF No. 236 at 7]. Plaintiffs and Turn Key agree that Turn Key "is in the businesses of contracting with county agencies for the provision of certain healthcare services at county detention facilities, including the Tulsa County Juvenile Detention Center." [ECF No. 207 at 4; ECF No. 236 at 6]. Therefore, the Court does not find the exhibits necessary for determining Turn Key's motion to dismiss.

The GTCA immunizes "[t]he state, its political subdivisions, and all of their employees acting within the scope of their employment" from liability for torts, such as negligence. 51 O.S. § 152.1(A). Relevant here, the GTCA

provides that the state and its political subdivisions are exempt from tort liability stemming from the "[p]rovision, equipping, operation or maintenance of any prison, jail or correctional facility ...." *Id.* at § 155(25). The term "employees" is defined to include "licensed medical professionals under contract with city, county, or state entities who provide medical care to inmates or detainees in the custody or control of law enforcement agencies." *Id.* at § 152(7)(b)(7).

The question of whether Turn Key qualifies as an employee of the state as contemplated by the Act has been heavily litigated. *See*, *e.g.*, *Lucas*, 58 F.4th at 1147; *Barrios v. Haskell Cty. Pub. Facilities Auth.*, 432 P.3d 233 (Okla. 2018). Recently, the Oklahoma Supreme Court answered this question in the affirmative: "Clearly, the scope of sovereign immunity maintained by 51 O.S. § 155(25) for claims resulting from 'equipping, operation or maintenance of any prison, jail or correctional facility' would include the traditional employer/employee relationship existing between a licensed medical professional when contractually supplying medical care to those in custody." *Sanders v. Turn Key Health Clinics*, 566 P.3d 591, 608 (Okla. 2025). Consequently, "[t]he 'licensed medical professional' services at the jail are being supplied by 'employees of this state' for the purposes of the GTCA." *Id.*

Plaintiffs' reliance on *Lucas* is misplaced. At the time *Lucas* issued, "no Oklahoma court" had developed the relevant text from *Barrios*. *Lucas*, 58

F.4th at 1147. Since, the Oklahoma Supreme Court issued *Sanders*, which held the GTCA:

> [M]akes licensed medical professionals to be "employees" of this state, regardless of the place in this state where duties as employees are performed, when the licensed medical professionals are under contract, including when under contract as an independent contractor, with city, county, or state entities and providing medical care to inmates or detainees in the custody or control of law enforcement agencies.

*Sanders*, 566 P.3d at 610.

Because Turn Key is an independent contractor employing licensed medical professionals for the JDC, it is an employee of the state and thus entitled to immunity under the GTCA. Accordingly, Plaintiffs' state law negligence claims against Turn Key (counts four and five) are dismissed. *See*, *e.g.*, *Miles v. Rogers County Board of Commissioners*, 783 F.Supp.3d 1314, 1323–24 (N.D. Okla. May 16, 2025); *Crawford v. Turn Key Health Clinics*, LLC, No. 24-cv-6-JDR-SH, 2025 WL 1885637, at *6–7 (N.D. Okla. July 8, 2025); *Robinson v. Turn Key Health Clinics, LLC*, No. 24-CV-0622-CVE-MTS, 2026 WL 788150, at *8 (N.D. Okla. March 20, 2026).[18]

***b. Claims against Raymond arise from the same transaction or occurrence; therefore, her motion to sever is denied.***

Raymond and Turn Key move to sever the claims against them from their

[18] Because Turn Key is entitled to immunity, there is no need to address the other arguments raised in its briefing.

co-defendants. [ECF No. 209]. They argue that Child Doe 2's claim against Raymond does not arise from the "same transaction or occurrence" as other claims of sexual misconduct in this case because she is the only medical staff employee accused of such misconduct. [*Id.* at 3]. Turn Key avers that it did not employ a nurse named Cierra Manning, a named co-defendant, and believes that "evidence will show … an outside agency investigation was performed and found Child Doe 2's claims were unsubstantiated, absolving Nurse Raymond." [*Id.*]. Turn Key and Raymond contend that they will be prejudiced if required to continue in this matter with the remaining plaintiffs, because it would "create an unnecessary financial burden" and "make it incredibly easy for a jury to conflate all Defendants and attach an inappropriate bias" against them. [*Id.* at 4].

Plaintiffs respond that severance is not warranted because "more than a third of the Plaintiffs have alleged some form of medical neglect against Turn Key and/or Raymond … making severance of Turn Key and Raymond nearly impossible, and certainly impractical." [ECF No. 237 at 3]. Plaintiffs contend that Child Doe 2's allegations against Raymond implicate not only her, but also the BOCC. [*Id.*]. Therefore, forcing Child Doe 2 to try a separate lawsuit against Raymond would, in turn, result in separate lawsuits and trials for Child Doe 2. [*Id.*].

Because Turn Key is entitled to immunity, as discussed *supra*, the Court will address the motion only as it relates to Raymond. Raymond was a nurse employed by the BOCC, pursuant to a contract with Turn Key. [ECF No. 176 at ¶ 49]. Plaintiffs allege that, from June 2023 to March 2024, Raymond raped and sexually assaulted Child Doe 2 multiple times. [ECF No. 176 at ¶ 135]. She allegedly prescribed "heat treatments" in a one-on-one setting to engage in sex acts with Child Doe 2 and provided Child Doe 2 "vape pens" or e-cigarettes in exchange for sex. [*Id*. at ¶¶ 136, 138, 317]. Child Doe 2's parent reported to Currington that Raymond had given her child "vape pens." [*Id*. at ¶ 141]. Plaintiffs allege that the BOCC, Juvenile Bureau, and the OJA became aware of the relationship between Raymond and Child Doe 2 and transferred Raymond to David L. Moss Criminal Justice Center as a corrective measure. [*Id*. at ¶ 317]. Child Doe 2 brings a § 1983 claim against Raymond under the Eighth and Fourteenth Amendments. [*Id*. at ¶ 317].

Plaintiffs may join defendants in a single action if they assert "any right to relief … jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences" and there is "any question of law or fact common to all defendants" that "will arise in the action." Fed. R. Civ. P. 20(a)(2). Misjoinder of parties in a single action is not a reason to dismiss a case, but "the court may at any time, on just terms, add or drop a party" or "sever any claim

against a party." Fed. R. Civ. P. 21. Severance of claims under Rule 21 is a distinct procedure from ordering separate trials under Fed. R. Civ. P. 42(b). "Severance of improperly joined claims creates two distinct actions or lawsuits and the cases proceed independently, while ordering separate trials of properly joined claims merely sets claims for separate trials in a single case or action before the court." *Lunsford v. City of Tulsa*, Okla., No. 22-CV-0347-CVE-MTS, 2023 WL 3919458, at *2 (N.D. Okla. June 9, 2023) (citing *Acevedo-Garcia v. Monroig*, 351 F.3d 547, 559 (1st Cir. 2003) and *Reinholdson v. Minnesota*, 346 F.3d 847, 850 (8th Cir. 2003)). When "the claims of different plaintiffs are 'discrete and separate,' and a claim is 'capable of resolution despite the outcome' of another claim, severance is appropriate. *Id*. (citing *Gaffney v. Riverboat Servs. of Indiana, Inc.*, 451 F.3d 424, 442 (7th Cir. 2006)).

Raymond argues that Child Doe 2's claim against her does not arise from the "same transaction or occurrence" as the other claims of sexual misconduct in this case. [ECF No. 209 at 3]. The Federal Rules of Civil Procedure do not define "transaction," but federal courts have applied a "logical relationship" test to determine whether claims arise out of the same transaction. *Lunsford*, 2023 WL 3919458, at *2 (citation omitted). A series of occurrences may amount to a "transaction" when "depending not so much upon the immediateness of their connection as upon their logical connection." *Id*.

(citation and internal quotation marks omitted). Courts are "inclined to find that claims arise out of the same transaction or occurrence when the likelihood of overlapping proof and duplication in testimony indicates that separate trials would result in delay, inconvenience, and added expense to the parties and to the court." *Id*. (quotation omitted).

Plaintiffs argue that their § 1983 claims allege an "endemic culture of systemic abuse and neglect that incorporates multiple agencies and organizations." [ECF No. 237 at 2]. Although not cited in their response, Plaintiffs cite *Green v. Padilla*, 484 F. Supp. 3d 1098 (D.N.M. Sept. 4, 2020) in other responses filed in this matter. [*See*, *e.g.*, ECF No. 259 at 4, 13]. In *Green*, three female inmates of the same prison alleged that guards were sexually abusing them and that supervisors were aware of the guards' conduct and did nothing to protect them. 484 F. Supp. 3d at 1150. The district court found that each plaintiff asserted essentially the same claim based on similar facts, and that those claims arose out of the same general policy of ignoring sexual assaults at the jail. *Id*. The court also found that there would be a substantial benefit to the parties and the court to try all the plaintiff's claims in a single case, given the overlap of factual and legal issues. *Id*. at 1151.

The Court finds *Green*'s reasoning persuasive because it bears significant similarity to Plaintiffs' attempt here to join their claims in a single action.

The Court declines to sever Raymond's claim for substantially the same reasons the district court declined to sever in *Green*. Raymond's motion to sever is denied.

***c. Turn Key and Raymond's motion to dismiss the second amended complaint is moot.***

Turn Key and Raymond also move to dismiss Plaintiffs' second amended complaint. [ECF No. 98]. However, "[a]n amended complaint supersedes the original complaint and renders the original complaint of no legal effect." *Franklin v. Kan. Dep't of Corr.*, 160 F. App'x 730, 734 (10th Cir. 2005) (citations omitted). When a complaint "has been superseded and nullified, there is no longer a live dispute about the propriety or merit of the claims asserted therein; therefore, any motion to dismiss such claims is moot." *Scott v. Buckner Co.*, 388 F. Supp. 3d 1320, 1324 (D. Col. May 16, 2019) (quotation and citations omitted). Because Plaintiffs have since filed a third amended complaint, Turn Key and Raymond's motion to dismiss the second amended complaint [ECF No. 98] is moot.

***d. Plaintiffs' request to amend is denied.***

Plaintiffs also seek leave in all their filed responses to amend the third amended complaint if the Court grants Defendants' motions to dismiss. [*See, e.g.*, ECF No. 262 at 20–21]. Plaintiffs do not provide a proposed amended pleading, separately move to amend, or provide any basis for their request

past noting that prior amendments were not afforded to cure dismissal. *See* Fed. R. Civ. P. 7(b) (requiring that a request for a court order be made by separate motion); LCvR7-1(h) (requiring that a motion to amend be accompanied by a proposed order that sets forth a summary of proposed changes). Rather, Plaintiffs request is in a conclusory fashion, stating, "[a]ssuming *arguendo*, the Court finds failure to state viable claims, it should permit Plaintiffs the opportunity to amend and cure any alleged deficiency." [*See*, *e.g.*, ECF No. 262 at 20–21].

Under Rule 15, courts "should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). But courts have no obligation to recognize "perfunctory, conditional requests" for leave to amend that are made in a response to a motion to dismiss. *Sullivan v. University of Kansas Hosp. Auth.*, 844 F. App'x 43, 52 (10th Cir. 2021). "[A] bare request to amend in response to a motion to dismiss is insufficient to place the court and opposing parties on notice of the plaintiff's request to amend and the particular grounds upon which such a request would be based." *Albers v. Bd. of Cty. Comm'rs of Jefferson Cty., Colo.*, 771 F.3d 697, 706 (10th Cir. 2014) (citation omitted). Therefore, amendment is discretionary. "However, in exercising its discretion, the court must be mindful of the spirit of the Federal Rules of Civil Procedure to encourage decisions on the merits rather than on mere technicalities." *Transportation Alliance Bank, Inc. v. Arrow Trucking Co.*, No.

10–CV–16–GKF–PJC, 2011 WL 221863, at *2 (N.D. Okla. Jan. 21, 2011) (internal citation omitted). Therefore, refusal of a request to amend is appropriate only "on a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility of amendment." *Id.*

Here, Plaintiffs have already amended the complaint three times, and some defendants argue that amendment would be futile. [*See*, *e.g.*, ECF No. 278 at 9–10; ECF No. 279 at 9–10]. Plaintiffs filed their initial complaint in May 2024. [ECF No. 2]. The Court finds that allowing an opportunity for a fourth amendment would unduly delay proceedings and prejudice Defendants. Therefore, the Court denies Plaintiffs' requests for leave to amend their pleading.

**V. Conclusion**

For the reasons stated above,

**IT IS THEREFORE ORDERED** that the following motions are GRANTED:

- Turn Key's motion to dismiss [ECF No. 207];
- Juvenile Bureau's motion to dismiss [ECF No. 219];
- Parker's motion to dismiss [ECF No. 227];
- Cartmell's motion to dismiss [ECF No. 230];
- Holt's motion to dismiss [ECF No. 231];

- Brown's motion to dismiss [ECF No. 232]; and

The following motions are DENIED:

- Raymond's motion to sever [ECF No. 209];
- Judge Gray's motion to dismiss [ECF No. 218];
- Currington, Edwards, Tunley, and Williams's motion to dismiss [ECF No. 221];
- BOCC's motion to dismiss [ECF No. 228]; and
- Taylor's motion to dismiss [ECF No. 268].

And the following motions are GRANTED, in part, and DENIED, in part, in accordance with this opinion and order:

- T. Gray, Harris, Lavine, Powell, and Wilson's motion to dismiss [ECF No. 220];
- Treadway, Johnson, Loyd, and Slife's motion to dismiss [ECF No. 269];
- Doyle's motion to dismiss [ECF No. 296]; and
- McCoy's motion to dismiss [ECF No. 294].

**IT IS FURTHER ORDERED** that Turn Key and Raymond's motion to dismiss [ECF No. 98] is MOOT.

DATED this 11th day of September, 2026.

Sara Hill

Sara E. Hill
UNITED STATES DISTRICT JUDGE